THE HONORABLE ROBERT S. LASNIK

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

JEANETTE PORTILLO, *et al.*,

                 Plaintiffs,

    v.

COSTAR GROUP INC, *et al.*,

                 Defendants.

Case No. 2:24-cv-00229-RSL

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS COMPLAINT**

NOTE ON MOTION CALENDAR:
August 28, 2024

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS COMPLAINT
CASE NO. 2:24-CV-00229-RSL
011190-11/2681344 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................1

II.    BACKGROUND ...................................................................................4

III.    LEGAL STANDARD............................................................................6

IV.    ARGUMENT .........................................................................................6

    A.    Plaintiffs plausibly allege an agreement. ...................................6

        1.    Plaintiffs can plead an "agreement" in one of two ways. ...........................7

        2.    Direct evidence establishes Defendants' agreement....................................8

        3.    Indirect evidence also establishes Defendants' agreement.......................11

            a.    Plaintiffs plead sufficient evidence of a hub-and-spoke conspiracy.............................................................11

            b.    Plaintiffs also plead circumstantial evidence of agreement in the form of parallel conduct and plus factors....................................................................13

                (1)    Defendants' information sharing constitutes parallel conduct.................................................13

                (2)    Plus factors are strongly indicative of an agreement.....................................................15

        4.    Defendants' reliance on *Kendall* is misplaced............................................18

    B.    Plaintiffs sufficiently allege anticompetitive effects from the information exchange......................................................................21

        1.    Defendants have market power......................................................22

        2.    The structure of the luxury hotel industry in the U.S. supports an inference of anticompetitive effects. ....................................24

        3.    The nature of the information exchanged supports an inference of anticompetitive effects......................................................26

        4.    Plaintiffs' economic evidence provides further support of plausible anticompetitive effects....................................................30

    C.    Plaintiffs suffered antitrust injury. ..........................................32

V.    CONCLUSION....................................................................................33



## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Am. Column & Lumber Co. v. United States,*
  257 U.S. 377 (1921)................................................................................15

*Am. Needle, Inc. v. Nat'l Football League,*
  560 U.S. 183 (2010)................................................................................16

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..................................................................................6

*In re Baby Food Antitrust Litig.,*
  166 F.3d 112 (3d Cir. 1999)......................................................................8

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.,*
  166 F. Supp. 3d 988 (N.D. Cal. 2015) ....................................................20

*Bd. of Trustees of Galveston Wharves v. Trelleborg, AB,*
  2010 WL 11508414 (C.D. Cal. Nov. 22, 2010).......................................19

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................6, 7, 13, 20

*Beltz Travel Serv., Inc. v. Int'l Air Trans. Ass'n,*
  620 F.2d 1360 (9th Cir. 1980) ................................................................20

*Brantley v. NBC Universal, Inc.,*
  675 F.3d 1192 (9th Cir. 2012) ................................................................31

*In re Broiler Chicken Antitrust Litig.,*
  290 F. Supp. 3d 772 (N.D. Ill. 2017) ......................................................17

*Brown v. Amazon.com, Inc.,*
  2023 WL 5793303 (W.D. Wash. Sep. 7, 2023)........................................23

*In re Citric Acid Litig.,*
  191 F.3d 1090 (9th Cir. 1999) ..................................................................7

*City of Phila. v. Bank of Am. Corp.,*
  498 F. Supp. 3d 516 (S.D.N.Y. 2020)......................................................31

*In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.,*
  906 F.2d 432 (9th Cir. 1990) ................................................................2, 7

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS COMPLAINT– ii
CASE NO. 2:24-CV-00229-RSL
011190-11/2681344 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

*Copeland v. Energizer Holdings, Inc.,*
2024 WL 511224 (N.D. Cal. Feb. 9, 2024) ..............................................7, 16, 18, 19

*Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.,*
99 F.3d 937 (9th Cir. 1996) ........................................................................................23

*Davitashvili v. Grubhub Inc.,*
2022 WL 958051 (S.D.N.Y. Mar. 30, 2022) ...............................................................32

*In re Dealer Mgmt. Sys. Antitrust Litig.,*
362 F. Supp. 3d 477 (N.D. Ill. 2019) ..........................................................................31

*In re Domestic Airline Travel Antitrust Litig.,*
221 F. Supp. 3d 46 (D.D.C. 2016) ..............................................................................14

*Dyroff v. Ultimate Software Grp., Inc.,*
934 F.3d 1093 (9th Cir. 2019) ......................................................................................6

*Epic Games, Inc. v. Apple, Inc.,*
67 F.4th 946 (9th Cir. 2023) ...........................................................................3, 8, 9, 22

*F.T.C. v. University Health, Inc.,*
938 F.2d 1206 (11th Cir. 1991) ...................................................................................24

*In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.,*
2021 WL 1109128 (S.D. Fla. Mar. 23, 2021) .............................................................14

*Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.,*
2023 WL 4677017 (9th Cir. July 21, 2023) ....................................................14, 15, 17

*In re Fresh & Process Potatoes Antitrust Litig.,*
834 F. Supp. 2d 1141 (D. Idaho 2011) ........................................................................19

*Gelboim v. Bank of Am. Corp.,*
823 F.3d 759 (2d Cir. 2016) ........................................................................................32

*Gibson v. Cendyn Grp., LLC,*
2024 WL 2060260 (D. Nev. May 8, 2024) ..................................................................10

*Gibson v. MGM Resorts Int'l,*
2023 WL 7025996 (D. Nev. Oct. 24, 2023) ................................................................20

*Hahn v. Oregon Physicians' Serv.,*
868 F.2d 1022 (9th Cir. 1988) .....................................................................................22

*Hoang v. Bank of Am., N.A.,*
910 F.3d 1096 (9th Cir. 2018) .....................................................................................33



*In re ICE LIBOR Antitrust Litig.*,
    2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020) ........................................................................18

*Interstate Circuit, Inc. v. U.S.*,
    306 U.S. 208 (1939) ..........................................................................................7, 11, 12, 13

*Jung v. Ass'n of Am. Med. Colls.*,
    300 F. Supp. 2d 119 (D.D.C. 2004) ......................................................................................29

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) .............................................................................................18

*Kendall v. Visa, U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) .....................................................................................3, 19, 20

*Kendall v. Visa U.S.A., Inc.*,
    No. C-04-4276-JSW, ECF No. 64, 2005 WL 6154847 (April 25, 2005).................................19

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
    910 F.3d 927 (7th Cir. 2018) ...............................................................................................17

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ...............................................................................................32

*Markson v. CRST Int'l, Inc.*,
    2019 WL 6354400 (C.D. Cal. Mar. 7, 2019) .....................................................................20, 21

*Meyer v. Kalanick*,
    174 F. Supp. 3d 817 (S.D.N.Y. 2016)..............................................................................11, 15

*Midwest Auto Auction, Inc. v. McNeal*,
    2012 WL 3478647 (E.D. Mich. Aug. 14, 2012) ....................................................................18

*Moehrl v. Nat'l Ass'n of Realtors*,
    492 F. Supp. 3d 768 (N.D. Ill. 2020) .....................................................................................9

*Monsanto Co. v. Spray–Rite Serv. Corp.*,
    465 U.S. 752 (1984)..............................................................................................................10

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) .............................................................................................18

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) .............................................................................................21

*NCAA v. Alston*,
    594 U.S. 69 (2021)................................................................................................................2



*Newcal Indus., Inv. v. Ikon Office Sol.,*
513 F.3d 1038 (9th Cir. 2008) ..................................................................23

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.,*
2020 WL 6134982 (N.D. Ill. Oct. 19, 2020)..........................2, 7, 13, 27

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.,*
967 F. Supp. 2d 1347 (N.D. Cal. 2013) ....................................................23

*Paladin Assocs., Inc. v. Mont. Power Co.,*
328 F.3d 1145 (9th Cir. 2003) ........................................................7, 8, 16

*In re Plasma-Derivative Protein Therapies Antitrust Litig.,*
764 F. Supp. 2d 991 (N.D. Ill. 2011) .......................................................32

*PLS.Com, LLC v. Nat'l Ass'n of Realtors,*
32 F.4th 824 (9th Cir. 2022) .....................................................12, 21, 22

*In Re Real Estate Comm'n Antitrust Litig.,*
4:23-cv-00945 (W.D. Mo.) ..........................................................................2

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II),*
2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023)...........................14, 15, 22

*Rebel Oil Co. v. Atl. Richfield Co.,*
51 F.3d 1421 (9th Cir. 1995) ....................................................................23

*Robertson v. Sea Pines Real Estate Cos.,*
679 F.3d 278 (4th Cir. 2012) ....................................................................14

*Sun Microsystems Inc. v. Hynix Semiconductor, Inc.,*
608 F. Supp. 2d 1166 (N.D. Cal. 2009) .......................................................7

*Todd v. Exxon Corp.,*
275 F.3d 191 (2d Cir. 2001)............................................................. *passim*

*In re Turkey Antitrust Litig.,*
642 F. Supp. 3d 711 (N.D. Ill. 2022) ..................................................17, 23

*U.S. v. Apple, Inc.,*
791 F.3d 290 (2d Cir. 2015).......................................................................12

*United States v. Agri Stats, Inc.,*
2024 WL 2728450 (D. Minn. May 28, 2024)...............................................2

*United States v. Charlotte-Mecklenburg Hosp. Auth.,*
248 F. Supp. 3d 720 (W.D.N.C. 2017) ......................................................31

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS COMPLAINT– v
CASE NO. 2:24-CV-00229-RSL
011190-11/2681344 V1



*United States v. Container Corp. of Am.*,
    393 U.S. 333 (1969)...................................................................................................... *passim*

*United States v. Jackson*,
    422 F.2d 975 (6th Cir. 1970) ...................................................................................14

*United States v. Masonite Corp.*,
    316 U.S. 265 (1942)...................................................................................................12

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978)...................................................................................... *passim*

*Wilcox v. First Interstate Bank of Oregon*,
    815 F.2d 522 (9th Cir. 1987) ...................................................................................27

### OTHER

FEDERAL TRADE COMMISSION & U.S. DEPARTMENT OF JUSTICE,
    *ANTITRUST GUIDELINES FOR COLLABORATIONS AMONG COMPETITORS* (APRIL 2000) ...............28


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

# I.   INTRODUCTION

Plaintiffs' Complaint demonstrates that six large luxury hotel operators agree to use a common intermediary, Smith Travel Research ("STR"), to continuously exchange their current, audited, competitively sensitive information with each other. This exchange occurs pursuant to a set of explicit contracts whereby each Defendant Hotel Operator[1] (together, "Operators") agrees to submit its proprietary business information to STR, with the understanding that doing so grants it reciprocal access to competitors' information.

The Supreme Court has long recognized the potential anticompetitive effects of orchestrated information exchanges.[2] And in 2023, in response to the increased risks posed by technological advancement, the Department of Justice withdrew its previous "safe harbor" guidelines for information exchanges.[3] ¶¶162-63. Notably, STR's information exchange does not meet even these now-retracted guidelines. Instead, it provides a textbook example of the type of information exchange that the Supreme Court and DOJ have identified as leading to anticompetitive effects, including the following features:

- Operators and their co-conspirators[4] collectively control at least 70% of the luxury hotel market;

- STR's data is provided on a near-contemporaneous basis, with daily, weekly, or monthly reports provided to participants, as well as *forward looking* occupancy data;

---

[1] Defendant Hotel Operators are Hilton, Hyatt, Six Continents Hotels, Loews Hotels, Marriott International, and Accor Management. ¶¶35-41. Operators together with Defendants STR, LLC and CoStar Group are the "Defendants."

[2] *United States v. U.S. Gypsum Co.,* 438 U.S. 422, 457 (1978) ("the most likely consequence of any such agreement to exchange price information would be the stabilization of industry prices"); *United States v. Container Corp. of Am.,* 393 U.S. 333, 337 (1969) ("The inferences are irresistible that the exchange of price information has had an anticompetitive effect in the industry, chilling the vigor of price competition.").

[3] The now-retracted safe harbor guidelines were that (1) the collection was managed by a third party; (2) all data was more than three months old; and (3) there were at least five providers for each statistic, with no individual provider representing more than 25% of the data on a weighted basis for that statistic. ¶163.

[4] Conspirator Hotel Operators are Choice Hotels, Great Eagle, Wyndham Hotels & Resorts, and Omni Hotels. ¶¶42-49. Operators together with the Conspirator Hotel Operators are collectively referred to as "Hotel Operators."

- benchmarks can be created with data from as few as three non-affiliated hotels; and
- denying public access, STR compiles and distributes detailed reports only to those who submit data.

The collective use of a common third-party intermediary to facilitate the information exchange does not reduce its anticompetitive effects or immunize Defendants from liability.[5] In fact, as the DOJ has stated, "in some instances, data intermediaries can enhance—rather than reduce—anticompetitive effects." ¶6. Indeed, even STR has qualms about its information sharing scheme: its co-founder has written that, when Westin (operated by Defendant Marriott) first contacted STR "about the prospect of identifying specific properties" in STR reports, STR was concerned that "the opportunity of abuse was so great that we initially refused to provide data at this level." ¶62.

While STR has produced benchmarking reports for over thirty-five years, this longevity does not legitimize its conduct. To the contrary, some of most insidious anticompetitive practices persist for decades before facing a successful challenge. Agri Stats, which has offered benchmarking reports for numerous meat processing industries in the U.S. since 1985, has faced courts' repeated denials of motions to dismiss claims brought under the Sherman Act, including a recent action brought by the U.S. Department of Justice.[6] The Supreme Court recently held, in a 9-0 decision, that certain of the NCAA's long-standing rules on amateurism were anticompetitive.[7] And the National Association of Realtors' rules related to real estate commissions, in place for decades, recently fell following a multi-billion dollar verdict.[8]

---

[5] *In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir. 1990) ("'[T]he *form* of the exchange—whether through a trade association, through private exchange as in *Container,* or through public announcements of price changes—should not be determinative of its legality.'") (citing R. Posner, *Antitrust Law: An Economic Perspective* 146 (1976)).

[6] *See, e.g.*, *United States v. Agri Stats, Inc.*, 2024 WL 2728450, at *1 (D. Minn. May 28, 2024); *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, 2020 WL 6134982, at *6 (N.D. Ill. Oct. 19, 2020).

[7] *NCAA v. Alston*, 594 U.S. 69 (2021).

[8] *In Re Real Estate Comm'n Antitrust Litig.*, 4:23-cv-00945 (W.D. Mo.).

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS COMPLAINT– 2
CASE NO. 2:24-CV-00229-RSL
011190-11/2681344 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

Defendants make three main arguments in their motion to dismiss. *First*, relying on *Kendall v. Visa, U.S.A., Inc.*[9], they argue Plaintiffs must satisfy a heightened, fraud-like pleading standard to survive a motion to dismiss, or what they call the "*Kendall* conspiracy pleading standard." Mot. at 10-13. But courts regularly reject this argument; *Kendall* does not establish a heightened pleading standard applicable only to antitrust conspiracy cases. Further, Plaintiffs have provided detailed factual allegations regarding the "who, did what, to whom (or with whom), where, and when" of the conspiracy.

*Second*, Defendants argue that Plaintiffs fail to allege direct or circumstantial evidence of an agreement between Operators and STR—arguing, among other things, that Plaintiffs do not allege direct communications between Operators. Mot. at 13-18. But "[a]n express agreement is direct evidence of concerted activity."[10] The terms and conditions of the give-to-get license agreement between each Operator and STR requires that each Operator provide its own proprietary data to gain access to competitors' data. This explicit contractual obligation is direct evidence of Defendants' agreement to exchange confidential information.[11] The "agreement" is hiding in plain sight.

Plaintiffs also plausibly allege that Defendants entered into a hub-and-spoke conspiracy, as well as circumstantial evidence of an agreement. Plaintiffs plead concerted action—Operators' parallel data-sharing—in conjunction with plus factors, including (1) Operators' actions against self-interest (their decision to share competitively sensitive information on price and occupancy, including forward looking data); (2) STR's monitoring efforts; (3) a market conducive to collusion; and (4) Defendants' motive and numerous opportunities to conspire. Evaluated holistically, these plus factors strongly support the plausibility of the alleged horizonal agreement.

---

[9] 518 F.3d 1042 (9th Cir. 2008).

[10] *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982 n.13 (9th Cir. 2023) (quoting *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1153 (9th Cir. 2003)).

[11] The "Hotel Benchmarking Product Terms and Conditions" are identified in the Complaint at ¶¶3, 99-101 and available at https://tinyurl.com/26twstsv. They are incorporated by reference into the Complaint and attached for reference as an Exhibit. *See* Declaration of Steve W. Berman Ex. A, filed concurrently.

**HAGENS BERMAN**

1 *Third*, Defendants contend that Plaintiffs fail to plead that Operators' exchange of
2 confidential information through STR has anticompetitive effects. Notably, however, Defendants
3 do not dispute that Plaintiffs adequately plead a relevant market—the Luxury Hotel Metropolitan
4 Market—of which Operators and their co-conspirators collectively control approximately 70%.
5 Defendants' argument also ignores Supreme Court precedent that the "most prominent[]" factors
6 in "divining the procompetitive or anticompetitive effects of" an information exchange agreement
7 are "the structure of the industry involved and the nature of the information exchanged."[12]

8 Both factors strongly support the plausible inference that Operators' exchange of
9 information through STR has anticompetitive effects. The luxury hotel market is dominated by a
10 few hotel chains in metropolitan areas across the nation, and features a fungible commodity
11 product with inelastic demand and price-based competition. The sensitive, current, highly
12 customized, and *confidential* nature of the information exchanged also makes the scheme here
13 likely to produce anticompetitive effects.

14 Plaintiffs' preliminary economic analysis further confirms this: it shows an average
15 overcharge of at least 4.3% at Operators' five-star hotels across 15 major cities in the United States.

16 The Court should deny Defendants' motion.

## II. BACKGROUND

18 Operators are six large luxury hotel corporations that operate the majority of luxury hotels
19 in major cities across the U.S. Operators and their co-conspirators control at least 70% of the
20 relevant Luxury Hotel Metropolitan Markets. ¶25, Compl. App'x C.

21 Defendant STR, which is owned by Defendant CoStar Group ("CoStar"), operates a
22 subscription service that provides performance benchmarking and comparative analytics for the
23 hotel industry. ¶60. To receive this subscription service, Operators each enter into a contractual
24 agreement with STR. ¶¶103-110. The terms and conditions of this agreement are posted on STR's
25 website, and explicitly state that STR's subscription service operates on a "give-to-get" basis:
26 "CoStar is under *no obligation* to provide to any Hotel Benchmarking Deliverables *if Licensee*

---

[12] *Gypsum*, 438 U.S. at 441 n.16.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

*does not provide the applicable Hotel Data* to CoStar based on such data guidelines and timeframes," and its service "is subject to and contingent on Licensee providing CoStar timely, true, accurate, correct and complete Hotel Data as required." ¶96-101; Berman Decl. Ex. A.

Through its subscription, STR collects detailed information from its subscribers about their operations—including information about their prices, supply, and future bookings—which is not available elsewhere. ¶¶69, 83-86. STR then audits the data to ensure its reliability, standardizes it to facilitate comparisons, and distributes those reports back to subscribers on a daily, weekly and monthly basis. ¶¶70-71. STR's flagship product—the means through which it disseminates this information—is its so-called "STAR report." ¶¶68-82.

STR reports are not simply collections of publicly available data. Instead, they contain competitively sensitive information concerning key business metrics, such as occupancy rate, average daily rate and revenue. ¶¶72-75. The comprehensive, detailed information provided by the reports gives hotels visibility into competitors' pricing and supply information and allows each hotel to compare its operation and revenue with a self-selected subset of competitors, called a "competitive set" (or "comp set"). ¶¶72-82, 87, 90-94. The data exchanged is (1) current and forward-looking price information, (2) shared only among participating hotels, (3) focused exclusively on prices and supply, (4) in a loosely deanonymized format, and (5) facilitated by a common third-party. ¶¶14-23; 131-36. Although STR anonymizes data in its reports, Operators know exactly which of their competitors are participating in the information exchange as well as the frequency with which they are submitting data. ¶¶4, 80, 95, 134. This is because Operators select which individual competitor hotels are included in the competitive sets for which STR generates benchmarking reports. ¶¶81-82, 102, 134, 152-53, 163.

STR only shares its reports with subscribers who submit data to STR, thus ensuring that only Operators and similarly situated hotels have access to this data. ¶3. By agreeing to regularly share their own proprietary data with STR, Operators know that this data is disseminated to participating competitors and in return, they will receive similar information. ¶¶96-102. To monitor competitors' participation in the agreements, STR even issues a "response report" in each

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS COMPLAINT– 5
CASE NO. 2:24-CV-00229-RSL
011190-11/2681344 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

publication, detailing properties in the subject hotel's comp set that have reported data to STR. ¶¶4, 133, Appendices A, B.

By STR's admission, the purpose of this exchange is for competitors to share "super-timely revenue and occupancy data" so that they can ensure each is getting its "fair share" of revenues. ¶¶1, 15, 21, 78, 89, 154. As a former revenue analyst at Hyatt explained, STR's "fair share" index—which measures whether a hotel is capturing more or less than its "fair share" relative to others in its comp set—"was a really important and critical tool for us" in showing how the hotel was "competing relative to the comp set." ¶21. Hoteliers regularly refer to STR reports and data to gauge performance compared to competitors, trends and performance gains or losses. *Id.*

### III.    LEGAL STANDARD

On a motion to dismiss, the Court accepts "all factual allegations in the complaint as true," "construe[s] the pleadings in the light most favorable" to Plaintiffs, and draws all reasonable inferences in Plaintiffs' favor.[13] Plaintiffs need allege only "enough facts to state a claim to relief that is plausible on its face."[14] "A claim has facial plausibility when the plaintiff pleads facts that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[15]

### IV.    ARGUMENT

**A.    Plaintiffs plausibly allege an agreement.**

Defendants argue that Plaintiffs fail to adequately allege either (1) direct or (2) indirect evidence of an agreement among Operators. Mot. at 13-18. But their brief is virtually silent on the binding STR license agreement at the heart of this case, the terms and conditions of which include a mandatory "give-data-to-get-data" restriction—and thus ensure that Operators contributed their

---

[13] *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019). Internal citations and quotations omitted, and emphasis added throughout, unless otherwise indicated.

[14] *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

[15] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).



confidential data with the "understanding that it would be reciprocated" by other conspirators.[16] Such information exchange agreements are routinely found actionable under the Sherman Act.[17]

### 1. Plaintiffs can plead an "agreement" in one of two ways.

Stating a Section 1 claim "requires … enough factual matter (taken as true) to suggest that an agreement was made."[18] All that is required is that the alleged parties share a "commitment to a common scheme" designed to achieve an unlawful objective.[19] A plaintiff "need not prove intent to control prices or destroy competition to demonstrate the element of an agreement among two or more entities."[20] The parties' motives also need not be identical.[21]

Plaintiffs can prove concerted action in two ways: through "direct evidence" or "circumstantial evidence."[22] Direct evidence establishes the existence of an agreement, "without requiring any inferences."[23] Plaintiffs can also plead "evidentiary facts" that "provide a plausible basis" to "infer the alleged agreements' existence."[24] Circumstantial evidence of invitation and acceptance by competitors to participate in an anticompetitive scheme is sufficient to establish agreement.[25] Alternatively, Plaintiffs' allegations of "factual enhancement" in the form of parallel conduct and plus factors may also be sufficient to "nudge[] their claims across the line from conceivable to plausible."[26]

---

[16] *Olean*, 2020 WL 6134982, at *6.

[17] *See Petroleum Prod. Antitrust Litig.*, 906 F.2d at 447 n.13 (information exchanges establish an antitrust violation when "the exchange is made pursuant to an express or tacit agreement that is itself a violation of § 1 under a rule of reason analysis"); *Container Corp.*, 393 U.S. at 334 (upholding the sufficiency of a complaint charging "an exchange of price information but no agreement to adhere to a price schedule[.]").

[18] *Twombly*, 550 U.S. at 556.

[19] *Sun Microsystems Inc. v. Hynix Semiconductor, Inc.*, 608 F. Supp. 2d 1166, 1192 (N.D. Cal. 2009) (citing *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 768 (1984)).

[20] *Paladin*, 328 F.3d at 1153–54.

[21] *Sun Microsystems Inc.*, 608 F. Supp. 2d at 1192.

[22] *In re Citric Acid Litig.*, 191 F.3d 1090, 1093 (9th Cir. 1999).

[23] *Id.*

[24] *Copeland v. Energizer Holdings, Inc.*, 2024 WL 511224, at *3 (N.D. Cal. Feb. 9, 2024).

[25] *Interstate Cir., Inc. v. U.S.*, 306 U.S. 208, 227 (1939).

[26] *Twombly*, 550 U.S. at 570.

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS COMPLAINT– 7
CASE NO. 2:24-CV-00229-RSL
011190-11/2681344 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

### 2.     Direct evidence establishes Defendants' agreement.

Defendants argue that Plaintiffs fail to plead direct evidence of an agreement. Mot. at 13. But "direct evidence" is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."[27] And "[a]n express agreement is direct evidence of concerted activity."[28] As the Ninth Circuit explained in *Paladin Assocs.*, "*every* commercial agreement is a 'restraint of trade,' meaning that every commercial agreement … is 'an agreement ... among two or more entities[.]'"[29] Thus, "[w]here a plaintiff puts forward only circumstantial evidence, courts must conduct a searching inquiry, lest they mistake parallel conduct (which is legal) for concerted activity (which is subject to Section 1 scrutiny)."[30] But "[w]here there is an express contract, that concern is simply not present," as "to bind, to restrain," is the very essence of every commercial agreement.[31] It is only that "not every commercial agreement is an illegal *unreasonable* restraint of trade[.]"[32]

Courts have repeatedly found that plaintiffs plausibly allege concerted action based on the existence of an express agreement or set of agreements. In *Gypsum*, the Supreme Court found direct evidence of concerted activity "from the face of the license agreements" executed between Gypsum and its licensees, which imposed restrictions over prices and methods of distribution.[33] In *Epic*, the plaintiff alleged that developers entered into Apple's Developer Program Licensing Agreement (DPLA), which requires developers to distribute their apps only through the App Store.[34] The Ninth Circuit held that the district court erred by holding the DPLA was not a "contract that fell within the scope of Section 1," emphasizing that Section 1 "reaches '[*e*]*very contract*,

---

[27] *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999).

[28] *Epic Games*, 67 F.4th at 982 n.13 (quoting *Paladin*, 328 F.3d at 1153).

[29] 328 F.3d at 1154 n.7 (quoting *N'west Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*, 472 U.S. 284, 289 (1985)).

[30] *Epic Games*, 67 F.4th at 982 n.13.

[31] *Id.*

[32] *Paladin*, 328 F.3d at 1154 n.7

[33] 340 U.S. at 83.

[34] 67 F.4th at 968.

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS COMPLAINT– 8
CASE NO. 2:24-CV-00229-RSL
011190-11/2681344 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    combination ..., or conspiracy' that unreasonably restrains trade."[35] Similarly, in *Moehrl v. Nat'l*

2    *Ass'n of Realtors*, the court found that defendant real estate brokerages "conspired" within the

3    meaning of Section 1 by "participating in, facilitating, and implementing" public rules

4    promulgated by the National Association of Realtors, emphasizing that the "the purported

5    anticompetitive restraints" at issue were "a product of written rules issued by the NAR that each

6    Corporate Defendant expressly imposes upon their franchisees and realtors."[36] This "suggest[ed]

7    that each Corporate Defendant ha[d] reviewed, understood, and ultimately agreed to the NAR's

8    rules" and thus "provide[d] direct evidence of an anticompetitive agreement[.]"[37]

9         Here, the conspiracy that is alleged is a reciprocal information exchange agreement

10   between Defendant hotel operators that is centrally administered by STR. Plaintiffs allege that

11   each Operator entered into a license agreement with STR, which imposes a mandatory contractual

12   obligation that all participating hotels must submit their own data in order to receive others' data.

13   ¶¶96-102. Specifically, as part of the license agreement (the "Hotel Benchmarking Product Terms

14   and Conditions"), STR provides that:

15            **Licensee shall provide the Hotel Data** types as indicated in
16            the License Agreement … CoStar is under no obligation to
              provide to any Hotel Benchmarking Deliverables if Licensee
17            does not provide the applicable Hotel Data to CoStar based
              on such data guidelines and timeframes.
18            …

19            **CoStar's provision of the Hotel Benchmarking**
              **Deliverables is subject to and contingent on Licensee**
20            providing CoStar timely, true, accurate, correct and complete
              Hotel Data as required.[38]

21   Similarly, Costar's annual report states that "[t]hese *confidential data reports* enable

22   customers to understand their market position based on trends and indices… STAR Reports are

23

24

25

26   ───────────────
     [35] *Id*. at 982 (quoting 15 U.S.C. § 1).

     [36] 492 F. Supp. 3d 768, 778 (N.D. Ill. 2020).

27   [37] *Id.* (citing *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 289–90 (4th Cir. 2012)).

28   [38] ¶99 (Berman Decl. Ex. A).



1    *only available to industry participants who provide us with data.*" ¶97.[39] Further, the license

2    agreement specifies that the cadence at which a participating hotel shares its data determines the

3    cadence at which that hotel receives data from STR, stating that: " … Hotel Benchmarking

4    Deliverables will generally be delivered to Licensee either daily, weekly and/or monthly,

5    depending on the frequency of data set provided by Licensee."[40]

6          Consistent with STR's stated policy and contract terms, Plaintiffs also provide direct

7    evidence of each Operator's participation in the information exchange agreement by showing that:

8    (1) multiple confidential witnesses confirmed that the hotels they worked at participated in and

9    used STR reports in their operations (¶¶104-07); (2) Operators' employees regularly use STR

10   reports, including evidence such as Operators' job postings listing the review and analysis of STR

11   reports as part of required hotel job duties (¶¶104-109); and (3) the LinkedIn profiles of Operators'

12   employees regularly tout using STR reports as part of their work experience (*e.g.*, ¶¶104, 106-08).

13   The evidence summarized above establishes the existence of an information exchange agreement

14   among Defendants without requiring any additional inferences.[41]

15         Defendants claim that there is no "direct evidence of an agreement among Hotel

16   Defendants to use STR" (Mot. at 13) thus ignores the binding, publicly available license agreement

17   they entered with STR, as well as the evidence from each Defendant Hotel Operator that they do

18   exchange information through STR. Defendants' reliance on *Gibson* to argue otherwise is also

19   unpersuasive.[42] There, Plaintiffs alleged that a group of hotels entered a hub-and-spoke conspiracy

20   by agreeing to use a common revenue management system. In granting defendants' motion to

21   dismiss, the court found plaintiffs failed to "plausibly allege the exchange of confidential

22   information from one of the spokes to the other."[43] Unlike here, there were no allegations that

23

24   [39] CoStar, December 31, 2022, Form 10-K:
       https://www.sec.gov/ix?doc=/Archives/edgar/data/1057352/000105735223000030/csgp-
25     20221231.htm.

26   [40] *See* Berman Decl. Ex. A §3.A.ii.

       [41] *Monsanto,* 465 U.S. at 768.

27   [42] *Gibson v. Cendyn Grp., LLC*, 2024 WL 2060260 (D. Nev. May 8, 2024).

28     [43] *Id*. at *5

**HAGENS BERMAN**

1    defendants entered an express, written contractual agreement that conditioned their receipt of

2    horizontal competitors' competitively sensitive information on the provision of their own

3    confidential information. Defendants also contend that Plaintiffs fail to plead that Defendants

4    Hotel Operators communicated with one another regarding their use of STR. Mot. at 13. But

5    Defendants do not explain why direct communication is also necessary when the terms and

6    conditions of the information exchange agreement is publicly available.

7         Ultimately, Plaintiffs offer evidence that Operators entered written agreements with STR

8    that committed each of them to the exchange of competitively sensitive information with each

9    other. ¶¶95-115. Plaintiffs also offer direct evidence regarding each Operator's participation in the

10   information exchange agreement. ¶¶4, 6, 21, 22, 67, 103-115, 117, 120-22. All of this is explicit,

11   direct evidence of the agreement that is being challenged here—an agreement to exchange

12   confidential pricing information between competitors that is unreasonable under the Rule of

13   Reason. And the Supreme Court has specifically held that the reciprocal exchange of price

14   information among competitors "is of course sufficient to establish the combination or conspiracy,

15   the initial ingredient of a violation of [section one] of the Sherman Act."[44]

16        **3.    Indirect evidence also establishes Defendants' agreement.**

17        Defendants also argue that Plaintiffs fail to plausibly allege circumstantial evidence of an

18   agreement among Operators, including parallel conduct and plus factors. Mot. at 13-18. Putting

19   aside STR's explicit, give-to-get contractual terms, Plaintiffs plead additional facts that support a

20   reasonable inference that each Operator, "knowing that concerted action was contemplated and

21   invited," chose to adhere "to the scheme and participated in it."[45]

22        **a.    Plaintiffs plead sufficient evidence of a hub-and-spoke conspiracy.**

23        Summarizing long-standing precedent, the Ninth Circuit recently reiterated that

24   "'[a]cceptance by competitors, without previous agreement, of an invitation to participate in a plan,

25   the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient

---

26   [44] *Container Corp.*, 393 U.S. at 335.

27   [45] *Interstate Cir.*, 306 U.S. at 226-27; *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 823–24
     (S.D.N.Y. 2016) (plaintiffs "plausibly alleged a conspiracy in which drivers sign up for Uber
28   precisely on the understanding that the other drivers were agreeing to the same pricing algorithm").

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS COMPLAINT– 11
CASE NO. 2:24-CV-00229-RSL
011190-11/2681344 V1


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

to establish an unlawful conspiracy under the Sherman Act.'"[46] As the Supreme Court held in *United States v. Masonite Corp.*, the "circumstances surrounding the making of [bilateral agreements]," including each Operator's awareness that "its contract was not an isolated transaction but part of a larger arrangement," left "no room for doubt that all had an awareness of the general scope and purpose of the undertaking," and was thus sufficient to establish an agreement.[47] Such a combination is often referred to as a hub-and-spoke conspiracy, where a series of horizontal competitors (the spokes) form vertical agreements with a common hub, and where "the spokes would not have gone along with the vertical agreements except on the understanding that the other spokes were agreeing to the same thing."[48]

STR's public materials constitute an invitation—they repeatedly advertise that its service exists to give a participating hotel access to its competitors' price and occupancy data. STR itself describes the service as "hotel benchmarking," which involves "comparing and analyzing your property or portfolio's performance against the competition." ¶¶76-80, 103. Evidence shows that each Operator accepts STR's invitation by subscribing to its services and providing information, thus "g[iving] [its] adherence to the scheme and participat[ing] in it."[49] ¶¶104-112. Operators also knew of each other's participation in STR. STR issues a "response report" listing competitive set properties' participation in each report and noting the specific months (out of the previous 24) for which they have produced no data, "only monthly data," or "monthly & daily data." ¶¶4, 75, 133; Compl. App'x B (tab 5). This publication allows STR's customers to monitor the information exchange and understand on a continuous basis that each other competitor that is participating in the reciprocal information exchange.

In *Olean*, the court found the plaintiffs sufficiently alleged a "hub-and-spoke conspiracy … to exchange competitively sensitive information" on nearly identical facts: defendant turkey wholesalers (1) agreed to "regularly exchange detailed, timely, competitively sensitive and non-

---

[46] *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 843 (9th Cir. 2022) (quoting *Interstate Cir.*, 306 U.S. at 227).

[47] 316 U.S. 265, 275 (1942).

[48] *See U.S. v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015).

[49] *Interstate Cir.*, 306 U.S. at 226-27.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

public information about their operations" via defendant Agri Stats, an information exchange service; (2) contributed data to Agri Stats with the "understanding that it would be reciprocated" by other defendants; (3) and "knew of each other's participation in the information exchange because Agri Stats listed its participants in the report."[50]

Plaintiffs plausibly allege that STR functions as the hub, and the Defendant operators the spokes, of an agreement to exchange information.

### b. Plaintiffs also plead circumstantial evidence of agreement in the form of parallel conduct and plus factors.

Plaintiffs also allege Defendants' concerted action in the form of parallel conduct and plus factors.

### (1) Defendants' information sharing constitutes parallel conduct.

Parallel conduct can be any "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."[51] Plaintiffs sufficiently plead parallel conduct: each Operator submits real-time, commercially sensitive pricing and supply data to STR, and in return receives standardized data from competitors based on this shared information. ¶¶69, 71-75, 86-87, 95-110. Plaintiffs' preliminary economic analysis corroborates Defendants' parallel data-sharing: compared to other luxury hotels, Operators are overwhelmingly more likely to increase their listed prices by more (or decrease them by less) for the same room and check-in date. ¶139. A separate analysis also shows price parallelism in four pairs of competing premium hotel chains across 15 major U.S. cities. ¶140. These allegations, taken as a whole, demonstrate parallel conduct.

Defendants make three arguments in response. *First*, they argue that Plaintiffs do not allege that Operators "subscribed to STR around the same time." Mot. at 14. But simultaneous action is not a necessary element of parallel conduct[52]; instead, an agreement "may be reached by successive

---

[50] 2020 WL 6134982, at *6.

[51] *Twombly*, 550 U.S. at 556 n.4.

[52] *See Interstate Cir.*, 306 U.S. at 227 (It is "elementary that an unlawful conspiracy may be and often is formed *without simultaneous* action or agreement on the part of the conspirators.").

1   actions evidencing their joining of [a] conspiracy."[53] Here, the complaint alleges with specificity
2   that each Operator shared data with STR during the class period.[54] ¶¶103-110. Further, each year,
3   Operators make parallel decisions to reaffirm their commitment to the conspiracy by renewing
4   their license with STR.[55]

5       *Second*, Defendants suggest that, to demonstrate parallel conduct, Plaintiffs must plead that
6   Operators all receive the same STR reports or that they use them in similar ways. Mot. at 14. But
7   courts routinely reject this argument.[56] Plaintiffs have sufficiently alleged that each Defendant
8   Operator engages in the parallel conduct of exchanging information through STR, and that their
9   exchange of this information allows them to charge higher prices. ¶¶71-75, 132-136.

10       *Third*, Defendants claim that Plaintiffs do not allege their rates moved in parallel because
11   they were "hundreds of dollars apart" on certain days. Mot. at 14-15. This is neither accurate nor
12   dispositive. As explained above, Plaintiffs' preliminary analysis shows highly correlated parallel
13   pricing movement among Operators, which is sufficient to plead parallel conduct. ¶¶139-40.[57]
14   Further, at the pleading stage, Plaintiffs need not "show what the prices for [the relevant] services
15   were before, during, or after what is alleged as the class period" to allege competitive harm.[58]

---

19     [53] *United States v. Jackson*, 422 F.2d 975, 978 (6th Cir. 1970).

20     [54] *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 2023 WL 9004806, at *15 (M.D. Tenn. Dec. 28, 2023) ("While Defendants may not have contracted with RealPage close-in-time to one another, their data contributions still constitute parallel behavior.").

21-22     [55] *Id.* at *19 (plaintiffs' allegations "demonstrate parallel, common, sequential conduct," as among other things, "every year each Lessor renews its license with RealPage, re-affirming its commitment to the data-sharing agreement").

23-24     [56] *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 69 (D.D.C. 2016) ("Plaintiffs do not need to demonstrate that Defendants [acted] in exactly the same way in order to adequately allege parallel conduct."); *RealPage*, 2023 WL 9004806, at *19 (same).

25-27     [57] *See, e.g.*, *In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*, 2021 WL 1109128, at *13 & n.23 (S.D. Fla. Mar. 23, 2021) (crediting charts showing "parallel pricing movements" as evidence of parallel conduct and rejecting defendants' argument that plaintiffs were "required to plead parallel conduct that is simultaneous or identical.") (collecting cases); *see also Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*, 2023 WL 4677017, at *1 (9th Cir. July 21, 2023) ("Parallel pricing need not be identical so long as it is similar and reasonably contemporaneous.").

28     [58] *Robertson*, 679 F.3d at 291.



1

**(2)    Plus factors are strongly indicative of an agreement.**

2

Plus factors are factual context permitting "an inference of conspiracy [to] be

3

reasonable."[59] The complaint details numerous plus factors that courts recognize as supporting an

4

inference of an agreement.[60] Evaluated holistically, these factors strongly support the plausibility

5

of the alleged horizonal agreement.

6

***Action against self-interest***. Plaintiffs plausibly allege that Operators acted against their

7

self-interest by agreeing to exchange their competitively sensitive information through STR.[61] ¶¶3-

8

4, 68-94, 96-102. Plaintiffs allege that Operators use STR as a conduit to exchange extensive

9

current and forward-looking pricing and supply information on a regular basis. ¶¶14-19. As

10

discussed in greater detail below, these types of information are those "more likely to raise

11

competitive concern."[62]

12

"Genuine competitors do not make daily, weekly, and monthly reports" of the details of

13

their business to their rivals, as Defendants did here.[63] The "contribution of sensitive pricing and

14

supply data…is in Defendants' economic self-interest *if and only if* Defendants know they are

15

receiving in return the benefit of their competitors' data[.]"[64] Here, it was not in any individual

16

Operator's economic self-interest to contribute its proprietary commercial information to STR

17

*unless* it knew it would benefit from its horizontal competitors doing the same. Indeed, the entire

18

structure of STR's reports, with their give-to-get requirement, is designed to ensure that

19

competitors will only get access to others' information if they reciprocally provide that same.

20

Defendants attempt to raise alternative explanations for their conduct, such as that they

21

made "unilateral decision[s] to submit data" or that "providing data to STR and receiving

22

benchmarking reports is in a hotel's independent economic interest." Mot. at 16-17. But the

23

24

[59] *Flextronics*, 2023 WL 4677017, at *1.

[60] *Id.* at *2–4.

25

[61] *Meyer*, 174 F. Supp. 3d at 823-24 (horizontal agreement was plausible where "drivers' agreements with Uber would be against their own interests were they acting independently").

26

[62] *Flextronics*, 2023 WL 4677017, at *3.

27

[63] *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921).

28

[64] *RealPage*, 2023 WL 9004806, at *15.

**HAGENS BERMAN**

1    inherent nature of this agreement is that it did not involve independent action by Defendants. The

2    very structure of STR's give-to-get requirement is multilateral—each Defendant submits data in

3    order to receive data.

4        This is not an antitrust case where Plaintiffs are asking the Court to infer an agreement

5    among competitors based on independent pricing and supply decisions made by each that may

6    have been in their unilateral self-interest economically, and that may have been made regardless

7    of what other competitors did. Here, the core action is each Defendant's participation in an

8    information exchange agreement, where the publicly-available terms and conditions state that each

9    competitor provides sensitive pricing and supply information *in exchange for* receiving that same

10   information from its competitors.[65]

11       Further, the fact that it may be in a hotel's independent economic interest to exchange

12   information with its competitors misses the point: the concerted-action element is separate from

13   the unreasonable-restraint element.[66] To prove the existence of an agreement, Plaintiffs "need not

14   prove intent to control prices or destroy competition."[67] The fact that the information exchange

15   might "foster[] competition," as Defendants claim, has no bearing on whether there is "an

16   agreement…among two or more entities."[68] As *American Needle* makes clear, even a

17   procompetitive agreement that does not violate Section 1 still satisfies the concerted-action

18   element.[69] Indeed, in any rule of reason claim based on an express agreement, it is in each

19   participant's independent economic interest to voluntarily enter into the agreement. However, that

20   does not immunize the conduct from scrutiny under the rule of reason analysis, nor does it

21   somehow erase the existence of the express agreement.

22

23   [65] *Copeland*, 2024 WL 511224, at *5 ("The question is whether the actions support an inference
     that [defendant] was acting in accordance with an agreement. If they do, then that suffices to state
24   a claim, because the agreement itself can be illegal even if the actions taken to implement it
     otherwise would not be.").

25   [66] *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186 (2010).

26   [67] *Paladin*, 328 F.3d at 1153 (intent is not an element of plaintiff's prima facie case; "it is
     sufficient" to allege that the defendants signed an agreement).

27   [68] *Id.*

28   [69] *See* 560 U.S. at 202–03.

***Defendants' efforts to monitor compliance.*** Evidence of enforcement mechanisms may "dissipate the inference of independent behavior."[70] For instance, in *Broilers*, the plaintiffs alleged that the defendants "knew that they were all in agreement because Agri Stats…served as a mechanism to monitor each other[]."[71] STR serves a similar role here. STR not only facilitates monitoring but conditions hotels' access to its services on the submission of "timely, true, accurate, correct and complete Hotel Data as required." ¶99, Compl. App'x B (Tab 5). STR even characterizes the information it provides as telling participants whether they are getting more or less than their "fair share" of price as compared to the other participating competitors. ¶78. Such disciplinary measures help Defendants monitor compliance, detect "cheating," and ensure the accuracy and quality of the data received for the purpose of precise benchmarking.

***Market structure.*** In *Flextronics*, the Ninth Circuit recognized that certain characteristics render a market conducive to collusion, including high barriers to entry, inelastic demand, and product interchangeability.[72] So too here. Plaintiffs allege that (1) Operators and their co-conspirators collectively controlled at least 70% of the relevant market during the relevant period (¶128); (2) luxury hotel owners and operators face significant barriers to entry in the market (¶¶126-27); (3) demand for luxury hotel rooms is inelastic (¶130); and (4) luxury hotel guest rooms within classes of properties are fungible for benchmarking purposes (¶129). These facts about the structure of the market make "the inference of conspiracy" "more plausible."[73]

***Motive and opportunities to conspire.*** "Although opportunities to cooperate in trade associations are not ipso facto evidence of a conspiracy, when one considers them in the broader context, evidence of these opportunities plausibly helps to fill-out the picture."[74] Here, the trade association in question is the Hotel Data Conference ("HDC"), which is organized and hosted by STR itself. Plaintiffs describe how the HDC serves as a platform for STR to educate its audience

---

[70] *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 937 (7th Cir. 2018).

[71] *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 798 (N.D. Ill. 2017).

[72] *Flextronics*, 2023 WL 4677017, at *4.

[73] *Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir. 2001) ("[T]he possibility of anticompetitive collusive practices is most realistic in concentrated industries.").

[74] *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 727 (N.D. Ill. 2022).

about how to use data to drive up hotel room prices, including through use of revenue managements strategies based on the data STR provides. ¶¶18-19, 119-21. Defendants' and their co-conspirators' employees frequently attend the conferences and serve as speakers, sharing their views on hotel pricing. ¶¶104-115, 122. These allegations contrast with Defendants' cited cases, in which plaintiffs made only "conclusory allegations of 'numerous opportunities'"[75] to conspire or alleged "mere participation in trade-organization meetings."[76]

In sum, considered together, Plaintiffs' allegations of parallel conduct and plus factors strongly support the inference of an agreement. Indeed, if Plaintiffs' allegations of parallel conduct and plus factors did not support the inference of an agreement, then that may say more about potential limitations in that mode of analysis than whether an agreement exists here. After all, the written terms and conditions of the information exchange are attached as Exhibit A to the Berman Decl. filed concurrently with this brief.

### 4.    Defendants' reliance on *Kendall* is misplaced.

Defendants also argue that Plaintiffs' Complaint should be dismissed because it fails to satisfy what they call—in reference to the Ninth Circuit's decision in *Kendall*—the "*Kendall* conspiracy pleading standard." Mot. at 10-12.

As a threshold matter, Defendants deploy a familiar tactic: they invoke *Kendall* to suggest that Rule 9(b)'s heightened pleading standard[77] should apply to antitrust claims and that plaintiffs must specifically plead "who, did what, to whom (or with whom), where, and when" to survive dismissal. But *Kendall* does not establish such a heightened standard, and courts regularly reject this reading of the case.[78] Indeed, the court in *Twombly* expressly stated that it did "not require

---

[75] *Midwest Auto Auction, Inc. v. McNeal*, 2012 WL 3478647, at *10 (E.D. Mich. Aug. 14, 2012).

[76] *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015); *In re ICE LIBOR Antitrust Litig.*, 2020 WL 1467354, at *6 (S.D.N.Y. Mar. 26, 2020) (plaintiffs "simply alleg[ed] an opportunity to conspire" without alleging that "discussions actually took place").

[77] *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (plaintiff alleging fraud must plead "'the who, what, when, where, and how' of the misconduct charged").

[78] *Copeland*, 2024 WL 511224, at *4 ("*Kendall* does not establish a heightened pleading standard applicable only to antitrust conspiracy cases. Nor could it: The Supreme Court has



1  heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible

2  on its face."[79] And "[t]he Ninth Circuit's rejection of a complaint [in *Kendall*] that pleaded *no*

3  evidentiary facts and answered *none* of these questions does not mean that antitrust plaintiffs must

4  answer *all* of these questions to state a claim"; instead, "[w]hile such allegations would of course

5  be relevant, at the pleading stage the plaintiffs need not allege every possible detail about an

6  agreement in order to raise a reasonable inference that one exists."[80]

7      Further, *Kendall* is distinguishable. There, merchants sued credit card companies and

8  intermediary banks, alleging they conspired to set payment card transaction fees.[81] The district

9  court dismissed plaintiffs' complaint and granted them leave to conduct discovery and file an

10 amended complaint.[82] Even after discovery, plaintiffs filed a bare-bones 19 page complaint that

11 lacked any substantive factual allegations.[83] As the Ninth Circuit stated, the complaint did "not

12 allege *any* facts to support their theory that the [defendants] conspired or agreed with each other...to

13 restrain trade."[84]

14     Here, unlike *Kendall*, Plaintiffs do not rely on "naked" assertions of conspiracy; rather,

15 they allege direct evidence showing that each and every Operator agreed to participate in STR's

16 information exchange. And even without discovery, Plaintiffs have provided detailed factual

17 allegations regarding the actors, content, location, and timing of the agreements between

18 Defendants.

19

20

21 repeatedly recognized that the same Rule 8 standard applies to antitrust and non-antitrust cases
   alike."); *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1163 (D. Idaho
22 2011) ("[m]any courts have rejected" defendants' "reli[ance] on footnote 10 and the who-what-
   where-when language in *Kendall* to argue that complaints filed against them are deficient")
23 (collecting cases); *Bd. of Trustees of Galveston Wharves v. Trelleborg, AB*, 2010 WL 11508414,
   at *4 & n. 7 (C.D. Cal. Nov. 22, 2010).

24     [79] 550 U.S. at 570.

       [80] *Copeland*, 2024 WL 511224, at *4 (emphasis in original).

25     [81] 518 F.3d at 1044-45.

26     [82] *Id.* at 1046.

27     [83] *See Kendall v. Visa U.S.A., Inc.*, No. C-04-4276-JSW, ECF No. 64, 2005 WL 6154847 (April
   25, 2005) (copy of amended complaint).

28     [84] *Kendall*, 518 F.3d at 1048.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

***Who agreed with whom?*** In *Kendall*, plaintiffs failed to allege *any* facts showing that the banks were either controlled by or in a conspiracy with the credit card companies.[85] Here, by contrast, Plaintiffs clearly identify each Operator as the corporate actor who entered this agreement with STR, along with the names of several of their high-level executives who spoke about the company's use of data provided by STR at the STR-hosted Hotel Data Conference.[86] ¶¶96-102, 103-110. Defendants' argument that they own multiple hotel brands or companies is a red herring. Plaintiffs allege specific facts showing that hotel operators have control or management authority over their brands and franchisees. ¶¶104-15, 145-49.

***Did what?*** Defendants contend that Plaintiffs fail to allege "what" they did to form an agreement and the specific type or frequency of the reports they received. Mot. 11. But the license agreements Operators entered spell out the operational terms of the alleged information exchange scheme: each Operator submits its proprietary business information through a common intermediary, STR, with the understanding that its competitors does the same.[87] ¶¶96-102. STR serves as a go-between for all participants in the scheme to collect competitively sensitive data from hotels on hotel occupancy, rooms sold, and room revenue; standardizes this data; then distributes it back to hotels in reports that allow them to "benchmark" (compare) their occupancy rate, room prices, and revenue per room against competitors. ¶¶69-94.

***When?*** Defendants suggest that Plaintiffs must plead exactly when they reached any agreement and exactly when Operators began using STR. Mot. at 12. But Plaintiffs plead a detailed chronology regarding the history of the STR reports, including that it was one of the Defendant

---

[85] *Id.* at 1048-1050.

[86] The other cases Defendants cite are similarly distinguishable. *See Gibson v. MGM Resorts Int'l*, 2023 WL 7025996, at *4 (D. Nev. Oct. 24, 2023) (no comparable allegations that defendants entered give-to-get information exchange agreement); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 995 (N.D. Cal. 2015) (same); *compare Markson v. CRST Int'l, Inc.*, 2019 WL 6354400, at *4 (C.D. Cal. Mar. 7, 2019) ("Defendants' argument that Plaintiffs must specifically allege which persons, on behalf of Defendants, consummated the conspiracy and exactly when they did so goes beyond the pleading requirement—otherwise, those subjected to a conspiracy would almost never be able to survive a motion to dismiss[.]").

[87] *Beltz Travel Serv., Inc. v. Int'l Air Trans. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) ("Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability.").

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1   operators, Westin, that first proposed that STR "identify[] specific properties that each of their

2   hotels could be compared against." ¶62; *see* ¶¶60-69. Plaintiffs also plausibly allege that each

3   Operator has been participating in the information exchange since at least February 2020. ¶¶103-

4   110. These allegations provide enough specificity to put Defendants on notice to form the basis

5   for a response.[88]

6        ***Where*?** Defendants contend that "the Complaint is also silent as to *where* the alleged

7   conspiracy was formed." Mot. at 12. This is a red herring: Plaintiffs do not allege that Defendants

8   met in secret in a smoke-filled room, but rather that they formed a conspiracy by contractually

9   agreeing to STR's "give-to-get" policy and using STR as a conduit for the exchange of

10   confidential, competitively sensitive information.

11        Ultimately, as the *Copeland* court noted, the infirmity of the *Kendall* complaint was that it

12   included "no alleged facts."[89] Viewing the complaint in its entirety, Plaintiffs plead more than

13   "enough factual matter (taken as true) to suggest that an agreement was made."[90]

14 **B.**   **Plaintiffs sufficiently allege anticompetitive effects from the information exchange.**

15        Defendants next argue that Plaintiffs fail to plausibly allege anticompetitive effects. Mot.

16   at 18-28. But this ignores the detailed allegations in Plaintiffs' complaint, including both direct

17   and indirect evidence that Operators' exchange of confidential information through STR harms

18   competition—and leads to higher prices.

19        At the pleading stage, Plaintiffs need only "identify a harm that is attributable to an

20   anticompetitive aspect of the practice under scrutiny."[91] Plaintiffs can make this showing for

---

[88] *See Markson*, 2019 WL 6354400, at *4 (allegation that conspiracy was ongoing "for at least the past six years" sufficient to state claim).

[89] 2024 WL 511224, at *4.

[90] *Id.* (quoting *Twombly*, 550 U.S. at 556).

[91] *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019). Courts analyze rule of reason claims with a three-step burden-shifting framework. *PLS.Com*, 32 F.4th at 834. Steps two and three are not properly resolved at the motion to dismiss stage, because "whether the alleged procompetitive benefits of [a challenged restraint] outweigh its alleged anticompetitive effects is a factual question that the district court cannot resolve on the pleadings." *Id.* at 839.

purposes of the rule of reason analysis "either directly or indirectly."[92] Direct evidence includes "proof of actual detrimental effects [on competition], such as reduced output, increased prices, or decreased quality in the relevant market."[93] Indirect evidence involves proof of a defendant's market power plus "some evidence that the challenged restraint harms competition."[94] This inquiry needs not "be extensive or highly technical. It is sufficient that the Plaintiff prove the defendant's conduct, as matter of economic theory, harms competition."[95]

Plaintiffs allege ample direct and indirect evidence of anticompetitive harm from the challenged restraints. *First*, Operators and their co-conspirators have the requisite market power: they collectively control at least 70% of the relevant markets.[96] ¶192. *Second*, Plaintiffs provide substantial factual allegations that the challenged restraint harms competition—including that both the structure of the market and the nature of the information exchange have key anticompetitive characteristics identified by the Supreme Court. *Third*, Plaintiffs further support the plausibility of these anticompetitive effects with econometric analysis that shows direct anticompetitive effects: increased prices during the conspiracy period.

### 1.   Defendants have market power.

Plaintiffs' well-pled factual allegations support the plausible inference that Operators and their conspirators possess market power in the Luxury Hotel Metropolitan Markets and use that power to harm competition by elevating prices. "Market power is the ability for a defendant to profitably raise prices" and "is generally inferred from the defendant's possession of a high market share and the existence of significant barriers to entry."[97] To withstand a motion to dismiss, a plausible allegation of sufficient market share generally constitutes an adequate basis for inferring

---

[92] *PLS*, 32 F.4th at 834.

[93] *Id*.

[94] *Epic Games*, 67 F.4th at 983.

[95] *Id.* at 983–84; *RealPage*, 2023 WL 9004806, at *24.

[96] Defendants' possession of market power "casts an anticompetitive shadow over a party's practices in a rule-of-reason case." *Hahn v. Oregon Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988).

[97] *Epic Games*, 67 F.4th at 983.

market power.[98] The Ninth Circuit has recognized a 44% market share as "sufficient as a matter of law to support a finding of market power, if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing."[99]

Defendants do not dispute that Plaintiffs adequately plead the Luxury Hotel Metropolitan Markets are the relevant antitrust markets. ¶¶165-188. Within the relevant markets, Plaintiffs allege that the conspirators' market share ranged from 50% to 87%. Compl. App'x C. Collectively, they controlled an average market share of 70% across all 15 metropolitan areas. ¶192. Plaintiffs also allege that substantial barriers impede entry into this market. ¶¶126-27.

Defendants appear to further concede Plaintiffs' allegations that Defendants have market power, challenging only that Plaintiffs aggregate shares of the named Operators, their brands and co-conspirators. Mot. 25. But an aggregation of conspirators' market shares is appropriate where, as here, Plaintiffs allege that Defendants and co-conspirators entered into a horizontal agreement to exchange competitively sensitive through a common intermediary.[100] It is well-established that aggregation of market shares is "justified if the rivals are alleged to have conspired."[101]

In sum, Plaintiffs sufficiently allege that Defendants possess market power in the relevant antitrust market, particularly given the Ninth Circuit guidance that "[a]n antitrust complaint … survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect."[102]

---

[98] *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 950-51 (9th Cir. 1996) (defendant's 65% market share provided a basis for inferring the requisite market power).

[99] *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995); *see also Brown v. Amazon.com, Inc.*, 2023 WL 5793303, at *10 (W.D. Wash. Sep. 7, 2023) (plaintiffs sufficiently alleged anticompetitive effect indirectly where defendant had 50% market share); *Copeland*, 2024 WL 511224, at *8 (plaintiffs alleged anticompetitive effect indirectly where defendant had market share from 40 to 50%).

[100] *In re Turkey*, 642 F. Supp. 3d at 716 (in calculating market share, court found that "defendants and Co-Conspirators together control approximately eighty percent of the wholesale turkey market in the United States").

[101] *See Rebel Oil*, 51 F.3d at 1437-38 ("[t]he aggregation of market shares of several rivals is justified if the rivals are alleged to have conspired to monopolize"); *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1362 (N.D. Cal. 2013) (aggregation of market share for showing defendant's concerted conduct under Section 1 is appropriate).

[102] *Newcal Indus., Inv. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

## 2. The structure of the luxury hotel industry in the U.S. supports an inference of anticompetitive effects.

One of the two "most prominent[]" factors in the rule of reason analysis of an information exchange agreement is "the structure of the industry involved."[103] In *Container Corp.*, the Supreme Court held that information exchanges are likely to have anticompetitive effects in markets that have (1) relatively few sellers, (2) fungible products, and (3) inelastic demand.[104] Plaintiffs adequately allege that that the luxury hotel market possesses each of these characteristics, thus supporting the plausible inference that STR's information exchange agreement produces anticompetitive effects. ¶¶125-130.

*Market concentration*. "Significant market concentration makes it easier for firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level."[105] Plaintiffs allege that the luxury hotel market across the relevant geographic markets in the U.S. is dominated by *ten* Hotel Operators, who together controlled an average 70% share of the relevant market during the class period. ¶¶25, 192; Compl. App'x C. This is more concentrated than the market at issue in *Container Corp.*, where the Supreme Court deemed a market in which eighteen sellers controlled 90% of the market to be sufficiently concentrated to give rise to an inference that the exchange of information would have anticompetitive effects.[106]

*Fungibility.* Defendants argue that luxury hotel rooms are not substantially identical due to various factors such as hotels' locations, amenities, or services and there is non-price competition among competitors. Mot. 26-27. This argument is inapposite because it misses the context in which the fungibility question arises. The purpose of the fungibility inquiry is not whether there are product variations, but to determine whether the alleged products are

---

[103] *Gypsum*, 438 U.S. at 441 n.16.

[104] *Container Corp.*, 393 U.S. at 342; *Todd*, 275 F.3d at 208 ("[s]usceptible markets tend to be highly concentrated—that is, oligopolistic—and to have fungible products subject to inelastic demand").

[105] *F.T.C. v. University Health, Inc.*, 938 F.2d 1206, 1218 n.24 (11th Cir. 1991).

[106] 393 U.S. at 342.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  "comparable, or fungible enough" so that the defendants could have used the exchanged

2  information to compare their positions for coordination purposes.[107]

3       Here, the very structure of the STR reports emphasizes the fungible nature of luxury hotel

4  rooms—STR ensured that its "benchmarking" reports allowed Defendants to compare their prices,

5  occupancy, and revenue across hotel properties. *See, e.g.*, ¶¶1, 20, 21, 60-64, 76-78. Plaintiffs

6  allege the sophisticated procedures and techniques STR used to ensure comparability. At a high

7  level, STR classifies hotels into seven chain scale groups, with luxury hotels grouped as one

8  distinct product segment. For data collection, STR released detailed "reporting guidelines" to

9  ensure consistency across different properties. ¶70. Further, STR creates standardized metrics,

10  such as occupancy rate, average daily rate (ADR) and revenue per available room (RevPAR) as

11  well as "index" charts in its benchmarking reports so that hotel operators can easily compare their

12  operation against competitors and across properties. ¶¶71-78. Further, Operators' use of the report

13  itself illustrates that the hotel rooms they provide are fungible enough for comparison and

14  matching purpose; if they were not fungible, there would be no reason for Operators to think it

15  was profit-maximizing or even useful to compare their data in this manner.[108]

16       ***Inelastic demand.*** Plaintiffs also allege that demand for renting luxury hotel rooms is

17  relatively inelastic. ¶130. The Supreme Court has emphasized that inelastic demand occurs in

18  markets where "buyers place orders only for immediate, short-run needs."[109] This is precisely the

19  situation here. The inherently short-term use of hotel rooms means that consumers make purchases

20  based on short-term needs. Common sense dictates that travelers, whether for business or leisure,

21  require accommodations on specific dates and cannot easily postpone their stays without

22  significant inconvenience.

23       Defendants argue that, because hotel guests book rooms in advance, this negates the

24  inelastic nature of demand here. This argument is fundamentally flawed. The relevant inquiry is

---

25     [107] *See Todd*, 275 F.3d at 209-211 ("since the purpose of the fungibility inquiry is to test

26  whether defendants would be able to compare…for coordination purposes, the sophisticated techniques employed by defendants to account for the differences [] are extremely telling").

27     [108] *Id.*

28     [109] *Container Corp.*, 393 U.S. at 337.



not the timing of the booking but "whether it is economically feasible for buyers to abstain from purchasing the product for some period of time."[110] When booking hotels, consumer travelers must secure accommodations regardless of price changes, particularly in concentrated markets with limited alternatives.

In sum, similar to the industry conditions alleged in *Container Corp* and *Todd*, Plaintiffs sufficiently allege that the luxury hotel market features a sufficiently fungible product with inelastic demand that is dominated by relatively few sellers.

### 3. The nature of the information exchanged supports an inference of anticompetitive effects.

Alongside the "structure of the industry involved," the other major factor for courts to consider in a data exchange case is the "nature of the information exchanged."[111] The data exchanged in this case shares characteristics that, according to other courts, enable participants to suppress competition, as it (1) consists exclusively of price and supply information; (2) involves the current and forward-looking exchange of information; (3) is customizable by Operators into small subsets of competitors they want to monitor; and (4) is available only to hotels who share data with STR.

*Sensitivity*. STR distributes competitively sensitive information to hotel competitors, focusing exclusively on price and supply data. The Supreme Court has recognized the danger of collusion posed by the exchange of pricing information,[112] and found that the agreed-upon exchange of pricing information "must remain subject to close scrutiny under the Sherman Act."[113] Here, on a daily, weekly, or monthly basis, participating hotels provide STR with three types of historical and live property-level data: rooms available, rooms sold, and revenue. STR also collects forward-looking occupancy data, including rooms available and rooms booked. ¶¶83-89.

---

[110] *Todd*, 275 F.3d at 211.

[111] *Gypsum*, 438 U.S. at 441 n.16.

[112] *Id*. at 457; *Container Corp.,* 393 U.S. at 337.

[113] *Gypsum*, 438 U.S. at 459.

In exchange for sharing this information, Operators receive detailed benchmarking reports that compare their prices and occupancy data against competitors on an ongoing basis. ¶¶71-75. The three most crucial performance metrics included in STR reports are occupancy rate, average daily rate (ADR), and revenue per available room (RevPAR). Defendants claim that STR only provides "non-price" data. Mot. at 22. However, by definition, ADR directly reflects the average room rate sold over a given time period. ¶73. STR itself acknowledges that ADR "is an essential measurement in the benchmarking process because of its *direct relationship with* demand, guest types and *their price points*[.]" ¶77. Knowing the average rate at which competitors' rooms are sold enables hotels to see how much more they could charge compared to competitors, and allows them to adjust their pricing strategies accordingly.[114] And critically, ADR provides pricing information that is not publicly available because it allows competitors to ascertain realized revenue—the number of hotel rooms that each participant is actually successfully selling, and their overall average price, rather than just the publicly available listed price.

Defendants reliance on *Wilcox v. First Interstate Bank of Oregon*[115] to argue otherwise is unpersuasive. That case involved a per se claim of price fixing based on purely parallel conduct (one bank setting its reference interest rate based on the public reference interest rates of certain other competitors). And the alleged price rate information was readily available *public* information, in contrast to the *confidential* nature of the data provided in the STR reports.[116] Unlike in W*ilcox*, Plaintiffs here are not bringing a claim based on each Defendant Hotel Operator's publicly listed room prices for guests. Instead, their claim is based on Operators' private provision of confidential information about realized price to their competitors in a process of reciprocal exchange.

RevPAR, which integrates both ADR and occupancy, further reveals competitors' pricing information. STR's RevPAR Positioning Matrix (RPM) Report enables a hotel to see how its

---

[114] *Olean*, 2020 WL 6134982, at *2 (Agri Stats's reports "enable subscribers to compare the prices they charge against the national average net price").

[115] 815 F.2d 522 (9th Cir. 1987).

[116] *Id.* at 526 (distinguishing between Defendants' "public" dissemination of certain list price information versus the "confidential" exchange of price information in *Container Corp.*).

1   RevPAR performed relative to *each* of the competitors identified in the comp set. ¶¶93-94. By

2   comparing hotels' RevPAR with their competitors, participating hotels can gauge their

3   competitiveness in filling rooms and their effectiveness in pricing.

4           STR's mandatory give-data-to-get-data policy further illustrates the competitively

5   sensitive nature of the information exchanged among Defendants. Indeed, this requirement reflects

6   that competitors are not willing to unilaterally provide such information unless they know that they

7   will receive confidential pricing information from competitors in return. The detailed data points

8   collected and provided in STR reports are core, competitively sensitive pricing information,

9   enabling hotels to strategically adjust their rates based on competitive insights into the confidential

10  information of their competitors.

11          *Timeliness*. Plaintiffs provide detailed factual allegations that Defendants exchanged past

12  and current prices and supply information, as well as forward looking booking information,

13  through STR. ¶¶68-94. For example, a participating hotel needs to supply information "for current

14  month, year-to-date, running 3 month and running 12 month periods." Compl. App'x B (Tab 3).

15  STR's "Forward STAR" reports allow hotels to monitor their competitors' forward inventory and

16  occupancy information for the next weekend, 7 days, 14 days, 28 days and 90 days. ¶87.[117]

17          "Exchanges of current price information, of course, have the greatest potential for

18  generating anticompetitive effects."[118] The FTC and DOJ also recognize that "[o]ther things being

19  equal, the sharing of information on current operating and future business plans is more likely to

20  raise concerns than the sharing of historical information."[119] Indeed, as noted above, STR's

21  information exchange does not meet even the DOJ's now-retracted guidelines for information

22  exchanges. ¶¶162-63.

---

[117] *See* ¶86 (citing STR, *Forward STAR Data Reporting Guidelines*, https://str.com/forward-star-datareporting-guidelines).

[118] *Gypsum*, 438 U.S. at 443 n.16.

[119] Federal Trade Commission & U.S. Department of Justice, *Antitrust Guidelines for Collaborations Among Competitors* 15–16 (April 2000).

1        **_Customization_**. STR creates tailored data cuts in its reports, enabling hotels to compare

2   their occupancy, average daily rate, and revenue data against a subset of the most relevant

3   competitors they have identified in the market. ¶¶20, 79-82.

4        Defendants claim that these customized reports are not anticompetitive because they show

5   aggregated and averaged data. Mot. at 22. However, it is undisputed that each participating hotel

6   receives data from a self-identified comp set, which only needs to include as few as *three*

7   competitors that are not affiliated with the subject hotel. ¶134. Courts have repeatedly held that

8   data reports with such a limited number of competitors raise plausible anticompetitive concerns.

9   In *Todd*, the Second Circuit emphasized that the manner in which the data was distributed, in

10  "subsets consisting of as few as three competitors," allowed the competitors to monitor each other

11  "easily and quickly."[120]

12       Here, because the information exchange contains "aggregated information" from small

13  subsets of competitors, and because the subject hotel handpicks which competitors to include in

14  the comp set, there is no ambiguity about which competitors are being compared in each report.

15  Further, according to a confidential witness, hotels can deanonymize STR data and link it to

16  particular competitors by strategically selecting the hotels in the comp set. ¶22. Defendants

17  emphasize the "many precautions" STR takes "to ensure that data from an individual hotel cannot

18  be identified in any STR report[.]" Mot. at 6. This is at odds with Plaintiffs' well-pled allegations.

19  And Defendants' protestations only underscore the highly sensitive nature of the competitive

20  information exchanged and Operators' motive to conspire by agreeing to STR's "give-to-get"

21  policy in order to access their competitors' information (that they would not otherwise be able to

22  get).

23       **_Asymmetry_**. STR reports are not publicly available. "Public dissemination is a primary way

24  for data exchange to realize its procompetitive potential."[121] But no such dissemination occurred

---

[120] 275 F.3d at 212–13; *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 166–67 (D.D.C. 2004) (citing *Todd*, 275 F.3d at 212) (defendant's reports plausibly facilitated price-fixing conspiracy because "salary information [in the report] is broken down into subsets," and "those subsets consist of as few as *five* employers").

[121] *Todd,* 275 F.3d at 213.



1  here. Because STR functions on a "give-data-to-get-data" basis, the exchanged information was
2  not disclosed to the public nor to consumers. ¶96.

3  Defendants counter that hotel prices are publicly available because a guest can look up
4  *prospective* room rates and availability information online for a specific room. But the relevant
5  inquiry here is how Operators determine room rates *before* posting them to consumers. A hotel's
6  ADR (realized average price rates), RevPAR (revenue), and occupancy (supply) information—
7  which are what STR reports provide to assist Operators in price setting—are not publicly visible
8  datapoints that guests see online. Indeed, if the information provided by STR were truly publicly
9  available, as Defendants claim, there would be no reason for hotels to spend extra effort submitting
10 their own data to STR and paying for access to its reports. Even Defendants admit that publicly
11 available "future listing prices are not evidence of the actual prices that any Hotel Defendant
12 charged." Mot. at 19. By contrast, the STR reports are such evidence.

13 Ultimately, Plaintiffs could not use STR data to bargain or find cheaper options and are
14 thus entirely denied the potential benefits of information exchange.[122] As recognized by the
15 Supreme Court, such one-sided information exchanges will tend to stabilize prices at artificially
16 high levels.[123]

17 In sum, the characteristics of the data exchange in this case reveal the plausible
18 anticompetitive effects caused by Defendants' information exchanges.

19     **4.   Plaintiffs' economic evidence provides further support of plausible anticompetitive effects.**

20 Plaintiffs have provided extensive allegations that STR's information exchange leads to
21 anticompetitive effects. ¶¶124-136. This is sufficient at the motion to dismiss stage, where courts

---

[122] *Id.* ("[I]n the traditional oligopoly (seller-side) context, access to information may better equip buyers to compare products, rendering the market more efficient while diminishing the anticompetitive effects of the exchange").

[123] *Container Corp.*, 393 U.S. at 336 ("The result of this reciprocal exchange of prices was to stabilize prices[.]").

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS COMPLAINT– 30
CASE NO. 2:24-CV-00229-RSL
011190-11/2681344 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

have held that the plaintiffs have met their burden to plead anticompetitive effects without any accompanying analysis of economic data to support the allegations.[124]

But here, Plaintiffs have also put forward economic analysis showing price increases in the relevant market. *First*, Plaintiffs performed a preliminary regression analysis comprising more than 360,000 price points for over 6,000 hotels across 15 major cities in the United States. ¶137. The regression finds an average overcharge of at least 4.3% for Hotel Operators' five-star hotels, after accounting for hotel characteristics, location, and quality. ¶138. *Next*, Plaintiffs further plead that statistics show the exchange of information facilitated by STR enables Operators to increase their listed prices by more (or decrease them by less), for the same room and check-in date (¶ 139) and that Operators' prices exhibit parallel movement—which suggests a common pricing strategy and/or a shared input in determining room prices (¶ 140). *Finally*, consistent with Plaintiffs' allegations, leading economic research and government regulators recognize that competitors' data sharing, in the manner alleged here, is more likely to raise competitive concern. ¶¶156-64.

Defendants make various factual challenges to Plaintiffs' analysis, all premised on a mischaracterization of Plaintiffs' burden. Plaintiffs will eventually have to prove that these direct effects resulted from the alleged agreement. But at the pleading stage, Plaintiffs are only required to "sketch the outline of the injury to competition with allegations of supporting factual detail" that are enough to "raise a reasonable expectation that discovery will reveal evidence of an injury to competition."[125] Consistent with this, courts do not require comprehensive market analyses or "engage in a *Daubert*-like analysis of Plaintiffs' statistical pleadings" and "must[] accept as true Plaintiffs' factual assertions regarding pricing and other data."[126]

Without the benefit of discovery (and having to rely on publicly available data and information), Plaintiffs have formulated economic analysis—which need only be plausible—to

---

[124] *United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720, 729 (W.D.N.C. 2017) (allegations of anticompetitive effects, including higher prices, sufficient at motion to dismiss stage); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 477, 538 (N.D. Ill. 2019) (allegations of anticompetitive foreclosure sufficient based on allegations of defendants' market share and supracompetitive pricing).

[125] *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012).

[126] *City of Phila. v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 527-28 (S.D.N.Y. 2020).

show that STR information exchange caused price increases in the relevant market. Requiring more would create an untenable standard prior to the start of discovery; courts recognize that plaintiffs should not be penalized for failing to plead data in defendants' sole possession where, as here, Defendants' historical room rate and occupancy data is not generally publicly available.[127]

In summary, the combination of Defendants' market power in a concentrated market, the nature of the information exchanged, and the economic evidence, accepted as true, is sufficient to plausibly allege substantial anticompetitive effects.

## C. Plaintiffs suffered antitrust injury.

Finally, Defendants argue that Plaintiffs do not plausibly allege that they paid higher hotel room prices as a result of Operators' use of STR—and thus do not plead antitrust injury—because STR reports "*might* be one of many inputs into disparate revenue management systems that some hotels use to assist with pricing." Mot. at 28-29.

But that argument merely disputes Plaintiffs' claims of causation, which "does not foreclose antitrust injury,"[128] and ignore Plaintiffs' well-pled allegations that they were harmed by Defendants' information exchange scheme—which allowed Defendants to set prices higher than they would have been absent this unlawful conduct. And Defendants' factual arguments regarding causation "cannot be decided on a Rule 12(b)(6) motion."[129] Because Plaintiffs allege that they "pa[id] prices that no longer reflect ordinary market conditions, they suffered injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[130]

---

[127] *See, e.g.*, *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002 n.10 (N.D. Ill. 2011); *Davitashvili v. Grubhub Inc.*, 2022 WL 958051, at *10 (S.D.N.Y. Mar. 30, 2022).

[128] *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 773 (2d Cir. 2016).

[129] *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989 (9th Cir. 2000).

[130] *Gelboim*, 823 F.3d at 772; *Knevelbaard Dairies*, 232 F.3d 979 at 987-88.

**HAGENS BERMAN**

1

## V.     CONCLUSION

2        Plaintiffs respectfully request the Court deny Defendants' motion; however, if the motion

3   is granted in any part, Plaintiffs request leave to amend.[131]

4   DATED: July 22, 2024                          Respectfully submitted,

5
                                                  HAGENS BERMAN SOBOL SHAPIRO LLP
6
                                                  */s/ Steve W. Berman*
7                                                 Steve W. Berman (WSBA No. 12536)
                                                  */s/ Theodore Wojcik*
8                                                 Theodore Wojcik (WSBA No. 55553)
                                                  */s/ Xiaoyi Fan*
9                                                 Xiaoyi Fan (WSBA No. 56703)
10                                                1301 Second Avenue, Suite 2000
                                                  Seattle, WA 98101
11                                                Telephone: (206) 623-7292
                                                  Facsimile:  (206) 623-0594
12                                                Email: steve@hbsslaw.com
                                                  Email: tedw@hbsslaw.com
13                                                Email: kellyf@hbsslaw.com

14
                                                  Rio S. Pierce (*pro hac vice*)
15                                                HAGENS BERMAN SOBOL SHAPIRO LLP
                                                  715 Hearst Avenue, Suite 300
16                                                Berkeley, CA 94710
                                                  Telephone: (510) 725-3000
17                                                Facsimile:  (510) 725-3001
                                                  Email: riop@hbsslaw.com
18
19                                                *Attorneys for Plaintiffs*

20        I certify that this memorandum contains 11,373 words, in compliance with Court Order,

21   ECF No. 89, and the Local Civil Rules.

22                                                */s/ Steve W. Berman*
                                                  Steve W. Berman (WSBA No. 12536)
23

24

25

26

27
   _____
28   [131] *See Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1102 (9th Cir. 2018).

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS COMPLAINT– 33
CASE NO. 2:24-CV-00229-RSL
011190-11/2681344 V1



1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on July 22 2024, I caused the foregoing document to be served upon

3    counsel of record via ECF.

4    DATED: July 22, 2024                    /s/ *Steve W. Berman*

5                                           Steve W. Berman

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS COMPLAINT– 34
CASE NO. 2:24-CV-00229-RSL
011190-11/2681344 V1

