The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JEANETTE PORTILLO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> COSTAR GROUP, INC., et al., <br><br> Defendants. | Case No. 2:24-cv-00229-RSL <br><br><br> DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY RE DKT. 91 |

Pursuant to LCR 7(n), Defendants provide this Notice of Supplemental Authority in support of Defendants' Joint Motion to Dismiss Complaint (Dkt. 91). Attached as Exhibit A to this Notice is a Memorandum Opinion and Order granting defendants' motion to dismiss plaintiffs' second amended complaint issued on March 31, 2025 by Judge Gottschall in the U.S. District Court for the Northern District of Illinois in *Segal v. Amadeus IT Group, S.A.*, Case No. 24-CV-1783 (N.D. Ill. Mar. 31, 2025) (Dkt. 143).

DEFENDANTS' NOTICE OF SUPPLEMENTAL
AUTHORITY RE DKT. 91
Case No. 2:24-cv-00229-RSL

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
1271 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

| | | |
|---|---|---|
| 1 | Dated: April 1, 2025 | Respectfully submitted, |
| 2 | | |
| 3 | s/ Heidi Bradley<br>Heidi Bradley (WSBA No. 35759) | s/ Vanessa Soriano Power<br>Vanessa Soriano Power (WSBA No. 30777) |
| | BRADLEY BERNSTEIN SANDS | STOEL RIVES LLP |
| 4 | 2800 First Avenue, Suite 326<br>Seattle, WA 98121 | 600 University Street, Suite 3600<br>Seattle, WA 98101 |
| 5 | | |
| 6 | Jarrett Arp (*pro hac vice*)<br>Mari Grace (*pro hac vice*) | s/ Lawrence E. Buterman<br>Lawrence E. Buterman (*pro hac vice*) |
| 7 | DAVIS POLK & WARDWELL LLP<br>1050 17th Street, NW | LATHAM & WATKINS LLP<br>1271 Avenue of the Americas |
| 8 | Washington, DC 20036 | New York, NY 10020 |
| 9 | Neal Potischman (*pro hac vice*)<br>DAVIS POLK & WARDWELL LLP | Sarah M. Ray (*pro hac vice*)<br>LATHAM & WATKINS LLP |
| 10 | 900 Middlefield Road, Suite 200<br>Redwood City, CA 94063 | 505 Montgomery Street, Suite 2000<br>San Francisco, CA 94111 |
| 11 | Tina Hwa Joe (*pro hac vice*) | Elyse M. Greenwald (*pro hac vice*) |
| 12 | DAVIS POLK & WARDWELL LLP<br>450 Lexington Avenue | LATHAM & WATKINS LLP<br>10250 Constellation Blvd. Suite 1100 |
| 13 | New York, NY 10017 | Los Angeles, CA 90067 |
| 14 | *Counsel for Defendant Hilton Domestic Operating Company* | David L. Johnson (*pro hac vice* forthcoming)<br>LATHAM & WATKINS LLP |
| 15 | s/ Michael Rosenberger | 555 Eleventh Street NW, Suite 1000<br>Washington, DC 20001 |
| 16 | Michael Rosenberger (WSBA No. 17730)<br>GORDON TILDEN THOMAS & CORDELL LLP | *Counsel for Defendants CoStar Group, Inc. and STR, LLC* |
| 17 | 600 University Street, Suite 2915<br>Seattle, WA 98101 | |
| 18 | s/ Douglas E. Litvack | s/ Robert Maguire<br>Robert Maguire (WSBA No. 29909) |
| 19 | Douglas E. Litvack (*pro hac vice*)<br>Lindsay C. Harrison (*pro hac vice*) | DAVIS WRIGHT TREMAINE LLP<br>920 5th Avenue, Suite 3300 |
| 20 | JENNER & BLOCK LLP<br>1099 New York Avenue, NW, Suite 900 | Seattle, WA 98104-1610 |
| 21 | Washington, DC 20001-4412 | Katherine B. Forrest (*pro hac vice*)<br>Matthew A. Robinson (*pro hac vice*) |
| 22 | *Counsel for Defendant Hyatt Corporation* | PAUL, WEISS, RIFKIND, WHARTON & GARRISON<br>1285 Avenue of the Americas |
| 23 | s/ Paul R. Taylor | New York, NY 10019 |
| 24 | Paul R. Taylor (WSBA No. 14851)<br>BYRNES KELLER CROMWELL LLP | Paul D. Brachman (*pro hac vice*)<br>PAUL, WEISS, RIFKIND, WHARTON & GARRISON |
| 25 | 1000 Second Avenue, 38th Floor<br>Seattle, Washington 98104 | 2001 K Street, NW<br>Washington, DC 20006-1047 |
| 26 | | *Counsel for Defendant Loews Hotels Holding Corporation* |
| 27 | Jeffrey S. Cashdan (*pro hac vice*)<br>Emily S. Newton (*pro hac vice*) | |
| 28 | Lohr A. Beck (*pro hac vice*)<br>Caroline Buyak (*pro hac vice*) | s/ Kristen C. Limarzi<br>Kristen C. Limarzi (*pro hac vice*) |

DEFENDANTS' NOTICE OF SUPPLEMENTAL
AUthORITY RE DKT. 91  
Case No. 2:24-cv-00229-RSL

2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
1271 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

| | | |
|---|---|---|
| 1 | KING & SPALDING LLP<br>1180 Peachtree Street, NE, Suite 1600 | Melanie L. Katsur (*pro hac vice*)<br>Sarah Akhtar (*pro hac vice*) |
| 2 | Atlanta, GA 30309-3521 | GIBSON, DUNN & CRUTCHER LLP<br>1700 M Street, N.W. |
| 3 | *Counsel for Defendant Six Continents Hotels, Inc.* | Washington, D.C. 20036 |
| 4 | | Jeffrey B. Coopersmith (WSBA No. 30954)<br>Steven Fogg (WSBA No. 23528) |
| 5 | | CORR CRONIN<br>1015 Second Avenue, Floor 10 |
| 6 | | Seattle, WA 98104 |
| 7 | | *Counsel for Defendant Marriott International, Inc.* |
| 8 | | |
| 9 | | *s/ Robin Wechkin*<br>Robin Wechkin (WSBA No. 24746)<br>SIDLEY AUSTIN LLP |
| 10 | | 8426 316th Place SE<br>Issaquah, WA 98027 |
| 11 | | |
| 12 | | Carrie Mahan (*pro hac vice*)<br>Benjamin M. Mundel (*pro hac vice*) |
| 13 | | S. Nicole Booth (*pro hac vice*)<br>SIDLEY AUSTIN LLP |
| 14 | | 1501 K Street, N.W.<br>Washington, D.C. 20005 |
| 15 | | Amy P. Lally (*pro hac vice*) |
| 16 | | SIDLEY AUSTIN LLP<br>1999 Avenue of the Stars, 17th Floor |
| 17 | | Los Angeles, CA 90067 |
| 18 | | *Counsel for Defendant Accor Management US Inc.* |

DEFENDANTS' NOTICE OF SUPPLEMENTAL
AUTHORITY RE DKT. 91                                3
Case No. 2:24-cv-00229-RSL

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
1271 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Ryan Segal, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 24-CV-1783 |
| v. | ) |
| | ) Honorable Joan B. Gottschall |
| Amadeus IT Group, S.A., et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ryan Segal brings this antitrust suit as a proposed class action under §§ 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and § 4 of the Clayton Act, 15 U.S.C. §§ 15, 26, against the operators of several luxury hotel brands, such as Ritz-Carlton, Fairmont, and Four Seasons hotels. *See* Second Am. Compl. ("SAC") ¶¶ 25–33, ECF No. 136. In addition to the eight "hotel defendants," Segal names as defendants two companies he refers to collectively as "Amadeus:" (1) Amadeus IT Group, S.A. ("Amadeus S.A."), "a Spanish Sociedad Anonima headquartered in Madrid, Spain;" and (2) Amadeus Hospitality, Inc. ("Amadeus Hospitality"), a Delaware corporation headquartered in New Hampshire. *Id*. ¶¶ 34–35. Segal's claims primarily concern a software platform known as Demand360, which he characterizes as the center of a "hub-and-spoke conspiracy to restrain trade." *Id*. ¶ 11; *see also id*. ¶ 12. "By virtue of exchanging proprietary, non-public, present and forward-looking demand data" via Demand360, Segal contends that "the Hotel Defendants have been able to charge increased rates for Luxury Hotel Rooms despite historically low overall demand, divorced from the market forces that drive supply and demand in a competitive environment." *Id*. ¶ 13.

The hotel defendants and Amadeus Hospitality argue that the SAC fails to state a plausible claim under § 1 of the Sherman Act. For the reasons discussed herein, the court dismisses the SAC for failure to state a claim.

## I. FACTUAL AND PROCEDURAL BACKGROUND

For purposes of deciding the pending motion, the court must accept the SAC's well-pleaded factual allegations as true and view them in the light most favorable to Segal. *See Yash Venture Holdings, LLC v. Moca Fin., Inc.*, 116 F.4th 651, 653 (7th Cir. 2024). Accordingly, the court recites the facts alleged in the SAC in the light most favorable to Segal, without vouching for the alleged facts.

### A. The Luxury Hotel Market

Collectively, hotel defendants "comprise at least 60% of the overall U.S. market for Luxury Hotel Rooms sold." SAC ¶ 136 (allegation made on information and belief). Hotel defendants' share of the market for luxury hotel rooms varies among major metropolitan areas and geographic regions. *See id.* By way of illustrating the variation, hotel defendants account for 46% of luxury hotel rooms in New York City, 87% of such rooms in Los Angeles, and 76% of luxury hotel rooms in Chicago. *See id.* The SAC identifies 47 cities or geographic areas as "relevant geographic markets," alleging that "Defendants' scheme harmed competition in at least [these] . . . separate and distinct relevant geographic markets." *Id.* ¶ 88; *see also id.* ¶¶ 89–134 (defining each "relevant geographic market" listed in alphabetical order by state). Segal seeks to represent a class consisting, with certain exceptions, of "All persons in the United States who rented a Luxury Hotel Room from one or more Defendants between March 1, 2020, and the Present in any of the Relevant Geographic Markets." *Id.* ¶ 193.

High startup costs and low marginal costs characterize the luxury hotel market. *See id.* ¶¶ 36–37. "There are very high fixed costs associated with building, staffing, and maintaining a Luxury Hotel." *Id.* ¶ 37. On the other hand, the marginal cost of renting an additional room is relatively low. *Id.*; *see also id.* ¶¶ 137–44. Accordingly, prior to adopting Demand360, the software platform primarily at issue here, luxury hotel operators had incentives to maximize occupancy rates, referred to sometimes in the SAC as putting "heads in beds." *Id.* ¶¶ 36–37. "That dynamic provides a strong incentive for Luxury Hotel operators, including Hotel Defendants here, to lower their rents to fill vacant rooms." *Id.* ¶ 37. Segal specifically alleges

2

that the luxury hotel market functioned prior to Demand360 such that "absent collusion, Hotel Defendants could not unilaterally raise room rates above market rates." *Id.* ¶ 38.

**B. The Demand360 Platform**

TravelClick, Inc. ("TravelClick"), launched Demand360 in 2015 and "re-launched" the service in 2017. *Id.* ¶¶ 39, 43. Amadeus acquired TravelClick and Demand360 in 2018 in a $1.52 billion transaction. *Id.* ¶ 50. At issue are the features of Demand360 after its relaunch. *See also id.* ¶ 159 (describing "enhancements" to Demand360 in 2020).[1] As relaunched, Demand360 focuses "on providing hotels with real-time future demand data via advance booking data supplied by participating hotels." *Id.* ¶ 44. Demand360 operates on a "give-to-get" basis. *Id.* ¶ 46. To participate, each luxury hotel chain "must share twelve months of their own forward-looking occupancy data to the Demand360 platform either via each individual hotel's property management system, or through a centralized data warehouse." *Id.* (citation omitted). In return, the luxury hotel chain receives the opportunity to "select a set of four or more competitor hotels that are located in the same or similar geographic market." *Id.* ¶ 48. Each Demand360 user has access to "twelve months of aggregated, forward-looking demand data from those competitor properties," and, due to the give-to-get requirement, participating competitors have access to the same information. *Id.* ¶¶ 48–49.

After acquiring Demand360, Amadeus promoted its benefits to hoteliers as follows: "The best performing hotels have mastered the use of forward-looking demand data to make more informed decisions that maximize their revenues and help them earn their fair share of bookings . . . . [E]ducated guesswork has been replaced by real, hard data from actual future bookings in their market." *Id.* ¶ 51 (quoting Amadeus' corporate website). Hotel defendants began using Demand360 at different times. *See id.* ¶¶ 39, 53, 156–58. Defendants Marriott, Hilton, IHG, and Starwood were charter users in 2015, and Four Seasons adopted Demand360 in

---

1. Some hotel defendants access Demand360 via a related product called RevenueStrategy360. SAC ¶ 53. "RevenueStrategy360 is a combination of Demand360 and Amadeus's Rate360 product, which is an extensive database of real-time, forward-looking rate data." *Id.*

3

2016. *Id.* ¶¶ 39–40. Segal alleges that the "remaining Hotel Defendants each adopted Demand360 such that, during the Relevant Period, each of the Hotel Defendants used Demand360 data to obtain their competitors' non-public future occupancy data and use[d] this information to set supracompetitive rates." *Id.* ¶ 52; *see also id.* ¶¶ 56–62.

**C. Economic Effects**

Segal cites economic data he contends demonstrate the alleged effects of hotel defendants' use of Demand360 on the luxury hotel room market. *See id.* ¶¶ 63–69, 164–71. For the first time in 2020, the beginning of the class period, the data show that the average daily rate ("ADR") (that is, the average price of a luxury hotel room) began increasing independently of hotel occupancy rates. As occupancy rates fell during the COVID-19 pandemic, the average price of a luxury hotel room nevertheless continued to increase. *See id.* ¶¶ 63–64, 67. Luxury hotel revenue also increased during the class period, despite decreased occupancy rates. *Id.* ¶ 66. The SAC includes the following chart illustrating the alleged economic effects of Demand360 on eight sample geographic markets:

| MARKET | YEAR | Average ADR | Change in ADR | Average Occupancy | Change in Occupancy |
|---|---|---|---|---|---|
| Los Angeles | 2019 | $ 393.18 | | 78.32% | |
| Los Angeles | 2023 | $ 440.91 | **12.14%** | 69.27% | **−11.55%** |
| Minneapolis | 2019 | $ 194.00 | | 65.32% | |
| Minneapolis | 2023 | $ 224.68 | **15.81%** | 55.46% | **−15.09%** |
| Nashville | 2019 | $ 279.65 | | 77.45% | |
| Nashville | 2023 | $ 347.71 | **24.34%** | 69.16% | **−10.71%** |
| Seattle | 2019 | $ 260.80 | | 80.77% | |
| Seattle | 2023 | $ 302.11 | **15.84%** | 65.12% | **−19.38%** |
| Chicago | 2019 | $ 258.28 | | 71.30% | |
| Chicago | 2023 | $ 295.83 | **14.53%** | 63.79% | **−10.54%** |
| Hawaii | 2019 | $ 563.77 | | 76.44% | |
| Hawaii | 2023 | $ 839.08 | **48.83%** | 59.53% | **−22.13%** |
| Miami | 2019 | $ 331.34 | | 71.07% | |
| Miami | 2023 | $ 434.01 | **30.99%** | 64.37% | **−9.42%** |
| NYC | 2019 | $ 419.63 | | 80.60% | |
| NYC | 2023 | $ 526.02 | **25.35%** | 74.38% | **−7.72%** |

4

| | | | | | | |
|---|---|---|---|---|---|---|
| USA | 2019 | $ | 293.18 | | 72.88% | |
| USA | 2023 | $ | 377.79 | **28.86%** | 66.92% | −8.17% |

**D. Claim for Relief**

Segal pleads a single count, a claim under §§ 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. He alleges that defendants engaged in a "contract, combination, or conspiracy [involving] the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications." *Id*. ¶ 205. The anti-competitive effects allegedly included restraining or eliminating price competition for luxury hotel rooms and fixing, stabilizing, or raising luxury hotel room prices to artificially inflated levels. *See id*. ¶ 206. Segal pleads that he and members of the proposed class paid prices for luxury hotel rooms that were higher than they would have been absent defendants' alleged contract, combination, or conspiracy. *Id*. ¶ 209.

**E. Procedural History**

Segal filed his original complaint on March 1, 2024. ECF No. 1. He amended his complaint on March 25, 2024, to drop former defendant Minor Hotel Group, Ltd. *See* First Am. Compl., ECF No. 32; Min. Order at 1 (Mar. 18, 2024), ECF No. 23.

By June 2024, all defendants except Amadeus S.A. had appeared. The appearing parties proposed, and the court adopted, a schedule for briefing motions to dismiss the first amended complaint. Min. Order at 1 (June 21, 2024), ECF No. 107. All defendants except Amadeus S.A. filed the first of two pending motions to dismiss for failure to state a claim upon which relief can be granted on June 24, 2024. ECF No. 109. For simplicity's sake, this opinion refers to the moving parties—the eight hotel defendants plus Amadeus Holdings—as "hotel defendants," except where it is necessary to disaggregate these defendants.[2]

---

2. On October 10, 2024, this court denied without prejudice Segal's motion for leave to file supplemental authority, that is, a 23-page statement of interest filed October 1, 2024, by the Antitrust Division of the Justice Department in In re Pork Antitrust Litigation, No. 18-cv-12776-JRT-JFD (D. Minn.). ECF No. 121 at 1. Segal did not renew his motion for leave to file supplemental authority.

\*\*\*\*\*\*\*\*\*\*\*\*\*Amadeus S.A. appeared on October 10, 2024, and moved for an extension of its deadline to answer the first amended complaint. ECF No. 122. The motion was granted, ECF No. 123, and in compliance with its extended deadline, Amadeus S.A. filed its pending motion to dismiss for lack of personal jurisdiction and for failure to state a claim on December 2, 2024. ECF No. 128. Amadeus S.A.'s motion is also fully briefed, but it will not be addressed in this opinion. *See* Resp. Amadeus S.A.'s Mot. Dismiss, ECF No. 138; Amadeus S.A.'s Reply, ECF No. 141.

While briefing on Amadeus S.A.'s motion to dismiss was underway, Segal moved without opposition for leave to file a SAC dropping his claims against former defendant Omni Hotels Management Corp. ("Omni Hotels"). ECF No. 132 (Dec. 6, 2024). By agreement of the remaining parties, the order granting leave to file the SAC provided that "the pending motions to dismiss the first amended complaint apply to the SAC without further briefing." Min. Order at 1 (Dec. 9, 2024), ECF No. 134. The paragraph numbering did not change between the first and second amended complaints because Segal left blank the paragraph that formerly named Omni Hotels as a defendant. *Compare* First. Am. Compl. ¶ 32, ECF No. 32, *with* SAC ¶ 32, ECF No. 136. This opinion cites the SAC.

## II. Hotel Defendants' Motion to Dismiss

Since the Sherman Act's passage in 1890, "Protecting consumers from monopoly prices has been the central concern of antitrust" law. *Apple Inc. v. Pepper*, 587 U.S. 273, 288 (2019) (internal quotation omitted). "In the Sherman Act, Congress tasked courts with enforcing a policy of competition on the belief that market forces 'yield the best allocation' of the Nation's resources." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 73 (2021) (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.27 (1984)). Section one of the Sherman Act "prohibits 'every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce.'" *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021) (alteration omitted) (quoting *Agnew v.*

6

*Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012), in turn quoting 15 U.S.C. § 1). "To state a claim for relief under § 1, a plaintiff must show the following: '(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury.'" *Always Towing*, 2 F.4th at 703 (quoting *Agnew*, 683 F.3d at 335).

Hotel defendants challenge the SAC's sufficiency to state a claim under each of the three prongs of Segal's § 1 claim. The court reaches only the first prong, finding, for the reasons discussed below, that the SAC does not plausibly allege a conspiracy in restraint of trade. The court begins, however, with the Rule 12(b)(6) standard under which it scrutinizes the SAC.

### A. Rule 12(b)(6) Standard and Facts Considered

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to raise by motion a defense that the complaint "fails to state a claim upon which relief can be granted." *Marcure v. Lynn*, 992 F.3d 625, 630–31 (7th Cir. 2021). A Rule 12(b)(6) motion tests the sufficiency of the complaint rather than the merits of the case. *See Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1338 (7th Cir. 2024); *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019).

The Federal Rules of Civil Procedure adopt a "liberal, undemanding pleading standard." *Brockett v. Effingham Cnty.*, 116 F.4th 680, 684 (7th Cir. 2024). "When analyzing the sufficiency of a complaint" under Rule 12(b)(6), the court "must construe it in the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in the plaintiff's favor.'" *Yash Venture Holdings, LLC v. Moca Fin., Inc.*, 116 F.4th 651, 656 (7th Cir. 2024) (quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014)). "To survive a motion to dismiss, a complaint must be plausible on its face, meaning that the plaintiff must have pled 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Brockett*, 116 F.4th at 684 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The complaint "need not contain detailed factual allegations to meet that standard, but

7

must go beyond mere labels and conclusions, and must 'be enough to raise a right to relief above the speculative level.'" *Id.* at 685 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In their memorandum in support of their motion to dismiss, hotel defendants make several factual assertions not made in the SAC. Mem. Supp. Hotel Defs.' Mot. Dismiss 5–7, ECF No. 110. They also point to evidence, such as a consumer study, referred to nowhere in the SAC. *E.g.*, *id.* at 8. Because a Rule 12(b)(6) motion tests a pleading's sufficiency, such a motion "can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (citations omitted). Rule 12(d) provides, "If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

No party asks the court to convert hotel defendants' Rule 12(b)(6) motion to one for summary judgment, and the court declines to do so on its own initiative. "[D]ocuments that are (1) referenced in the plaintiff's complaint, (2) concededly authentic, and (3) central to the plaintiff's claim" may be considered on a Rule 12(b)(6) motion without conversion to a summary judgment motion. *Fin. Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654, 663 (7th Cir. 2022). The SAC does not reference the consumer study cited in defendants' briefing, and the court finds that it is not central to Segal's claims. Mem. Supp. Hotel Defs.' Mot. Dismiss 5–6, 8. Having so ruled, the court excludes from consideration all evidence cited in hotel defendants' briefing that is extrinsic to the SAC. The court also disregards all factual assertions made in hotel defendants' briefing that contradict, expand upon, or are inconsistent with the facts alleged in the SAC. *See Geinosky*, 675 F.3d at 745 n.1.

8

B. Analysis

In his SAC, Segal alleges:

> [D]efendants and Conspirators engaged in a hub-and-spoke conspiracy to restrain trade. By using Demand360 (the hub) with knowledge and assurance that others were asked to participate and cooperation (i.e., sharing current and forward-looking occupancy data) was essential to successful operation of the plan, the Hotel Defendants (the spokes) formed a horizontal agreement in restraint of trade (the rim). Defendants' conduct is not meaningfully different from that held to be a violation of § 1 of the Sherman Act in *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939).

SAC ¶ 11. Hotel defendants devote approximately a third of their memorandum in support of their motion to dismiss to arguing that the SAC fails to allege a plausible hub-and-spoke conspiracy. *See* Mem. Supp. Hotel Defs.' Mot. Dismiss 10–20. "A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015) (citation omitted). To plead a hub-and-spoke conspiracy, Segal must "allege both that there was a central coordinating party (the 'hub'), and that each participant (along the 'rim') recognized that it was part of the greater arrangement, and it coordinated or otherwise carried out its duties as part of the broader group. In other words, a 'hub-and-spokes conspiracy' requires a 'rim' connecting the various horizontal agreements." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020) (citing *In re Musical Instruments,* 798 F.3d at 1192).

In his response brief, Segal disclaims reliance on a hub-and-spoke conspiracy theory, and he does not argue that the SAC plausibly alleges such a conspiracy. *See* Resp. Hotel Defs.' Mot. Dismiss 1, ECF No. 115.³ The court agrees that the SAC fails to allege a plausible hub-and-spoke conspiracy. Absent are any allegations that the hotel defendants, the "spokes," made agreements with one another sufficient to form a "rim." The SAC says only that the respective

---

3. Indeed, Segal goes so far as to assert that, despite paragraph 11 of the SAC quoted above in the text, the hub-and-spoke theory is "found nowhere in the complaint." Resp. Hotel Defs.' Mot. Dismiss 1.

9

hotel defendants began using Demand360 at various times knowing that they would receive access to forward-looking data of their competitors without establishing any basis to conclude that hotel defendants recognized that they were a "part of the greater arrangement" and "coordinated or otherwise carried out [their] duties as part of the broader group." *Marion Healthcare*, 952 F.3d at 842; *see, e.g.*, SAC ¶¶ 46–49. Accordingly, and because Segal has abandoned any hub-and-spoke conspiracy theory alleged in the SAC, it must be dismissed insofar as it premises liability on a hub-and-spoke conspiracy. *See Marion Healthcare*, 952 F.3d at 842; *In re Fico Antitrust Litig. Related Cases*, 2023 WL 6388247, at *8 (N.D. Ill. Sept. 28, 2023).

Abjuring the hub-and-spoke theory, Segal argues that he has alleged a plausible § 1 claim based on the sharing of non-public information, relying on *United States v. Container Corp. of America.*, 393 U.S. 333, 336–38 (1969) (hereinafter "*Container Corp.*"), and *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001), claiming that the alleged information-sharing is itself illegal. Like the parties here, courts treat the theory Segal advances in his response memorandum as separate and distinct from a hub-and-spoke conspiracy under § 1 of the Sherman Act. *See In re Brand Name Prescript. Drugs Antitrust Litig.*, 288 F.3d 1028, 1033–35 (7th Cir. 2002); *Todd*, 275 F.3d at 198–99 (Sotomayor, J.); *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 903 n.37 (N.D. Ill. 2023); *compare* Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1402C, LexisNexis (database updated Nov. 2024) [hereinafter "Areeda & Hovenkamp"] (hub and spoke conspiracy), *with id.* ¶ 1406F (information sharing).[4] Significantly, however, *Container Corp.* and *Todd* involve anticompetitive conduct based

---

4. According to a leading treatise cited by the parties, disagreement exists over what must be pleaded and proven to sustain a § 1 claim under *Container Corp.* and *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978), predicated on sharing of price information, including disagreement over whether and to what extent a per se rule or a rule of reason analysis should be employed. *See Areeda & Hovenkamp* ¶ 1406 n.2 (collecting and discussing cases). No party has briefed these complex questions, and the court takes no position on them today.

precisely on the information exchanged. In *Container Corp.*, defendants furnished their competitors with their current pricing information, with the effect that, while supply capacity consistently exceeded demand, prices remained basically stable. *See* 393 U.S. at 336–37. In *Todd*, defendants allegedly shared compensation information with the effect that salaries for the plaintiff class were kept depressed, eliminating any incentive for the defendants to bid up salaries to compete to hire class members. *See* 275 F.3d at 196–97, 199. Segal does not allege that by sharing occupancy information, defendants conspired to stabilize or otherwise anticompetitively effect occupancy rates. His claim appears to be rather that the defendants used occupancy data to affect pricing, a somewhat attenuated connection compared to the cases on which he relies.

This is not to say that information sharing cannot be an appropriate basis for a Sherman Act section 1 conspiracy case, but as Segal acknowledges, the "nature of the information exchanged" is a major factor in any information-sharing case. And it is here that the court, unfamiliar with the basics of the hotel industry other than what the parties have told it, falters in trying to determine, as it must, whether Segal has alleged a plausible case for the anticompetitive effect of the alleged information-sharing. Segal seems to be asserting two contradictory theories of why he claims that the information-sharing he alleges led to anticompetitive effects. First, he alleges that if the user of the Amadeus platform learns from the occupancy data it receives that its competitors are close to or fully-booked during the time frame in question, it can raise its rates without fear that the competition will undercut them, since the competition has little or nothing available to sell. *See* SAC ¶¶ 15–16, 57–62. But on the other hand, Segal contends that his charts show that as a result of the exchange of occupancy information, prices rose as demand fell, demonstrating that the market is not responding to normal competitive forces. SAC ¶ 67. The problem is that one theory depends on the competition being fully-booked and having no supply, and the other theory depends on prices increasing as occupancy declines. To complicate matters further, Segal asserts that his SAC "contains no mention of a price-fixing conspiracy at

11

all" and is limited to "a claim of unlawful information exchange."[5] Resp. Hotel Defs.' Mot. Dismiss, 10. Without a claim that the information-sharing led to anticompetitive pricing, it is hard to be sure what Segal means to allege and what pleading standards should apply. Perhaps Segal's theories can be reconciled, but at this point, the court cannot find that Segal has given fair notice of what he intends to plead or that he has pleaded a plausible case for defendants' alleged anticompetitive behavior. If his case rests exclusively on the theory that information was illegally shared, he needs to make a plausible case, and not a contradictory one, for the anticompetitive effect of that information-sharing. And he needs to give the defense fair notice of what he is claiming.

Segal will be given an opportunity to file a third amended complaint, if he wishes to do so, and plead under *Container Corp.* or any other theory he would like to advance. If he relies on *Container Corp.*, then all parties will have an opportunity to brief fully plaintiff's theory of recovery.

### III. CONCLUSION

For the reasons stated, hotel defendants' motion to dismiss the second amended complaint for failure to state a claim is granted. If he wishes, plaintiff may file a third amended complaint within twenty-eight days, on or before April 28, 2025.

Date: March 31, 2025                                /s/ Joan B. Gottschall
                                                    United States District Judge

---

    5. Despite Segal's claim that the SAC "contains no mention of a price-fixing conspiracy," the following paragraphs certainly seem to be alleging precisely that. *See* ¶¶ 2, 9, 13, 14, 16–18, 52, 55, 58, 60–64, 67, 146, 149, 150, 160, 162–71, 182, 186, 189, 192, 198(b), 207–09, 211.

12