The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

JEANETTE PORTILLO, ALICIA
COAKLEY, FREDDY BARAJAS,
HERIBERTO VALIENTE, DAVID
CONCEPCION, DANIEL KASSL, AND
DANIEL SMITH, individually, and on behalf
of all others similarly situated,

        Plaintiffs,

        v.

CoSTAR GROUP, INC., a Delaware
corporation; STR, LLC., a Delaware
corporation, HILTON DOMESTIC
OPERATING COMPANY INC., a Delaware
corporation, HYATT CORPORATION, a
Delaware corporation, SIX CONTINENTS
HOTELS, INC., a Delaware corporation,
LOEWS HOTELS HOLDING
CORPORATION, a Delaware corporation,
MARRIOTT INTERNATIONAL, INC., a
Delaware corporation, and ACCOR
MANAGEMENT US INC., a Delaware
corporation,

        Defendants.

Case No. 2:24-cv-00229-RSL

**FIRST AMENDED CLASS ACTION
COMPLAINT**

**JURY DEMAND**

**[REDACTED VERSION]**

---

FIRST AMENDED CLASS ACTION COMPLAINT
011190-11/3301271 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

# TABLE OF CONTENTS

**Page**

I.    NATURE OF ACTION ............................................................................. 1

II.   PARTIES ............................................................................................... 6

    A.    Plaintiffs ...................................................................................... 6

    B.    Defendants ................................................................................... 7

    C.    Co-Conspirators .......................................................................... 8

III.  JURISDICTION AND VENUE ............................................................. 10

IV.   FACTUAL ALLEGATIONS ................................................................. 11

    A.    STR Operates a Centralized System for Exchanging Competitively
        Sensitive Pricing Information ..................................................... 11

        1.    Participating Defendant Hotels are required to submit actual
               pricing information by STR. .......................................... 13

               a.    Rooms available is a form of information about
                     actual hotel room prices ..................................... 14

               b.    Rooms sold is valuable, confidential information
                     about hotel room prices ...................................... 15

               c.    Room revenue is valuable, confidential information
                     about hotel room prices ...................................... 15

    B.    STR Provides Participating Hotels with Information About Actual
        Hotel Room Prices ..................................................................... 16

        1.    Average Daily Rate (ADR) ............................................ 16

        2.    Revenue per Available Room (RevPAR). ...................... 19

        3.    Occupancy ...................................................................... 23

    C.    Defendant Hotels Entered into Contracts Requiring Data
        Submission as a Condition of Receiving STAR Reports ..................... 24

        1.    The STAR reports are designed around providing
               Participants with Competitively Sensitive Information about
               the actual prices of their closest competitors ............... 34

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

2.    The STAR  Report feature several key hallmarks of the type of information exchange that are recognized as likely to produce anticompetitive effects. ................................................. 36

D.    STR's information exchange occurs in a closed system on a give-to-get basis .................................................................................................... 36

1.    The information exchanged through STR is current and prospective. ...................................................................................... 38

2.    The information exchanged involves competitively sensitive data. ............................................................................................... 40

3.    Participating Hotels rely on STR reports as part of their business operations. .............................................................................. 47

E.    Defendant and Conspirator Hotel Operators Subscribe to the STR Reporting Services .................................................................................... 55

F.    The information exchanges orchestrated by STR produce anticompetitive effects. ................................................................................ 57

1.    The structure of the relevant Luxury Hotel market is one where information exchange is likely to lead to anticompetitive effects. ............................................................. 58

2.    The nature of the information exchanged renders it likely to produce anticompetitive effects. ................................................. 60

1.    Economic analysis confirms that the STR information-sharing scheme produces anticompetitive effects in the form of higher prices for participating hotels during the conspiracy period. ............................................................... 61

3.    Competitively sensitive information sharing among competitors is likely to result in anticompetitive effects. .......................... 64

G.    Defendant and Conspirator Hotel Operators Possess Market Power in the Relevant Luxury Hotel Metropolitan Markets ................................................. 69

1.    Luxury Hotels constitutes the relevant product market. .............................. 69

2.    Metropolitan Areas constitute the relevant geographic markets. ............................................................................................ 71

3.    The Luxury Hotel Metropolitan Markets constitute the relevant antitrust markets. ..................................................... 80



4.    Defendant and Conspirator Hotel Operators collectively possess market power in the Luxury Hotel Metropolitan Markets ..................................................................82

V.    CLASS ACTION ALLEGATIONS ..................................................................84

VI.    ANTITRUST INJURY ..................................................................86

VII.    CAUSES OF ACTION ..................................................................87

FIRST CLAIM FOR RELIEF: VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR  CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION 15 U.S.C. § 1 ..................................................................87

REQUEST FOR RELIEF ..................................................................89

JURY TRIAL DEMANDED ..................................................................90

FIRST AMENDED CLASS ACTION COMPLAINT - iii
011190-11/3301271 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

Plaintiffs bring this action on behalf of themselves individually and on behalf of a class consisting of all persons who rented rooms in the Luxury Hotel Metropolitan Markets from a defendant or co-conspirator from February 21, 2020, through the present. Plaintiffs bring this action for treble damages and injunctive relief under Section 1 of the Sherman Act. Plaintiffs demand a trial by jury.

## I.     NATURE OF ACTION

1.     In response to the Court's order, Plaintiffs have amended the Complaint to provide additional detail regarding the information exchange at issue. These additions underscore both the breadth of the exchange and the concrete ways in which it facilitated anticompetitive coordination among competing hotels. Specifically, the Complaint now

- Identifies the competitively sensitive data STR requires from hotel operators by written agreement, including information directly tied to room pricing;

- Details how STR disseminates, per written agreement, reports to participants with specific measures of competitors' performance—such as Average Daily Rate, Revenue per Available Room, and occupancy;

- Explains how these metrics allow hotels to monitor rivals' pricing and supply;

- Describes STR's near-continuous collection of performance data from Defendant Hotels;

- Draws directly on STR's contracts produced in discovery, which confirm that regular submission of pricing information was an explicit condition of Defendant Hotels' participation;

- Having alleged an agreement (Step 1 of a Rule of Reason claim), Plaintiffs show the anticompetitive effects of that agreement (Step 2) through a preliminary regression analysis demonstrating that hotels in the luxury hotel markets that participate in STR charge significantly higher prices than hotels that do not participate in STR.

- Sets out, based on information obtained in discovery, specific Defendant hotels in the relevant markets simultaneously engaged in the exchange.

FIRST AMENDED CLASS ACTION COMPLAINT - 1
011190-11/3301271 V1



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

2.    This case challenges an unlawful agreement among Defendant and Conspirator hotel operators, facilitated by STR, LLC. ("STR"), to exchange pricing information.[1] STR runs a benchmarking program in which rival hotels submit core transactional data and, in return, receive detailed reports containing information about the prices and occupancy levels of their closest competitors. Defendant and Conspirator Hotel Operators collectively possess market power in the Luxury Hotel Metropolitan Markets, and their combined market share gives them the power to sustain supra-competitive prices when they eliminate uncertainty through coordinated exchanges of competitively sensitive pricing information.[2]

3.    The mechanics of the agreement are straightforward. On its website, STR puts it simply, explaining that from participating hotels "[w]e collect **rooms available**, **rooms sold**, and **net room revenue** on a **monthly, weekly and daily basis.**"[3]

4.    From these inputs, STR calculates and returns three metrics to participating hotels: (a) **Average Daily Rate** ("ADR"), (b) **Revenue per Available Room** ("RevPAR"), and (c) **Occupancy**. These metrics are presented relative to a hotel's "competitive set"—a group of rival hotels chosen by each participant for benchmarking. STR reports show each hotel where it stands compared to its competitors on ADR, RevPAR, and occupancy. Each of these outputs conveys information about the actual prices for individual hotel rooms that competitors are

---

[1] Defendant Hotel Operators are Hilton Domestic Operating Company Inc., Hyatt Corporation, Six Continents Hotels, Inc., Loews Hotels Holding Corporation, Marriott International, Inc., and Accor Management US Inc. Conspirator Hotel Operators are Choice Hotels International, Inc., Great Eagle Holdings Limited, Wyndham Hotels & Resorts, Inc., and Omni Hotels Management Corporation. Defendant Hotel Operators together with the Conspirator Hotel Operators are collectively referred to as "Hotel Operators."

[2] For purposes of this Complaint, "pricing information" refers to data reflecting realized room transactions collected by STR, including: (a) the number of rooms sold, (b) the net revenue collected from room rentals, and (c) the number of rooms available. It also refers to the standardized pricing metrics that STR derives from these inputs and provides to participants in the information exchange — Average Daily Rate (ADR), Revenue per Available Room (RevPAR), and occupancy. These metrics capture the prices and occupancy levels that competitors achieved in the market, in contrast to publicly available posted or advertised rates, which disclose only asking prices and do not reveal whether customers paid them.

[3] Available at https://str.com/data-insights/resources/faq (emphasis added) (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

charging or sustaining in the market, whether expressed as the average price per room sold

(ADR), the effective price per room across the full inventory (RevPAR), or the amount of supply

that competitors were able to sell at current prices (occupancy).

5.    **Average Daily Rate (ADR).** Average Daily Rate is calculated as room revenue

divided by rooms sold. ADR is information about the actual price paid by guests for rooms that

were occupied. STR itself defines ADR as "the average daily rate paid for rooms sold." By

providing ADR information, STR gives Defendant hotels a clear view of the average prices their

closest competitors are actually charging guests.

6.    **Revenue per Available Room (RevPAR).** Revenue per Available Room is

calculated as room revenue divided by rooms available. RevPAR is information about the actual

price realized per available room across the hotel's entire inventory, whether or not each room

was filled. In other words, it reflects the effective actual price competitors achieved across all

rooms they had to sell. STR itself describes RevPAR as the "gold standard metric around the

industry."[4]

7.    **Occupancy.** Occupancy is calculated as rooms sold divided by rooms available.

By providing occupancy information, STR enables Defendant hotels to observe how much of

their competitors' room supply is being sold. As STR itself has explained, "Occupancy rate is one

of the global hotel industry's foundational performance metrics."[5]

8.    STR reports thus reveal to each participating Defendant hotel the average price per

sold room their nearest competitors charged (ADR), the effective average price their competitors

realized across all available rooms (RevPAR), and whether those prices were being accepted by

the market (occupancy).

9.    Defendant Hotel Operators know exactly which other Defendants are participating

in the information exchange as well as the frequency with which they are submitting data. As part

of receiving STR's reports, a participating hotel needs to first select a "competitive set (comp

---

[4] https://str.com/data-insights/resources/faq (last visited Sept. 26, 2025).

[5] https://str.com/data-insights-blog/what-is-occupancy-rate (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

set).” Confidential Witness 1 (“CW 1”)[6] stated that hotels selected their comp set based on a participation list provided by STR, *i.e.*, the hotels that agreed to share data with STR. To further produce transparency, in each report, STR also issues a “response report,” a calendar listing the names of hotels in the comparative set created by the subject hotel. The report includes details of which days/weeks/months the hotels in the current information exchange submitted data to STR.

10.     The exchange is strictly reciprocal. Hotels only gain access to STR’s pricing metrics if they provide their own rooms-available, rooms-sold, and revenue data.[7] STR’s agreements underscore that this is a closed system: the information is deemed confidential and may be shared only with internal personnel and certain advisors. The result is a system in which only horizontal competitors exchange pricing information with one another, mediated by STR.

11.     The effect of this arrangement is to eliminate competitive uncertainty. Instead of having to independently gauge the prices and performance of their rivals, hotels receive regular, standardized reports showing exactly what competitors are charging on average per room and how successfully those prices are filling rooms. Confidential Witness 5 (“CW 5”), a former revenue manager at a major hotel chain, described STR reports as “really important and critical” because they showed “where [we] fit in relative to hotels around [us] that I think perform in the same space.”

12.     As a result of Defendant and Conspirator Hotel Operators’ unlawful conduct, plaintiffs and the Class paid artificially inflated prices for renting luxury hotel rooms during the Class Period. Such prices exceeded the amount they would have paid if the price for the luxury

---

[6] CW 1 worked as a market director of revenue management at Marriott Ritz-Carlton Hotels.

[7] CoStar’s license agreement specifically states that the information exchange occurs on a give-to-get basis. A Hotel Operator has to give information to STR in order to receive benchmarking information back; the license agreement states that that “CoStar is under no obligation to provide to any Hotel Benchmarking Deliverables **if Licensee does not provide the applicable Hotel Data to CoStar** based on such data guidelines and timeframes,” and its service “is subject to and contingent on Licensee providing CoStar timely, true, accurate, correct and complete Hotel Data as required.” CoStar, *Hotel Benchmarking Product Terms and Conditions*, https://www.costar.com/CoStarTerms-and-Conditions/HotelBenchmarking (emphasis added) (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    hotel rooms had been determined by a competitive market. Thus, plaintiffs and class members

2    were injured by defendants' agreement to exchange information through STR.

3         13.    A regression analysis, drawing on discovery identifying which hotels participated

4    in STR, demonstrates that STR hotels charged materially more than they otherwise would have.

5    After controlling for zip code and star rating, the model predicts counterfactual prices based on

6    non-STR hotels, and finds that actual prices at STR hotels were roughly 12 percent higher than

7    those predicted absent participation. This elevation is not explained by geography or quality; it

8    reflects the inflationary impact of the STR information exchange, which enabled participating

9    hotels to sustain significantly higher rates than their peers.



10

11

12

13

14

15

16

17

18

19

20

21

22         14.    Defendants' agreement to exchange information is unlawful under Section 1 of the

23    Sherman Act. Plaintiffs bring this action as a class action on behalf of a class of individuals who

24    rented luxury hotel rooms from Defendant and Conspirator Hotel Operators.

25

26

27

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1

2

II.    PARTIES

A.    Plaintiffs

3        15.    Plaintiff Jeanette Portillo is a citizen and resident of the State of California. In

4  2022 and 2023, Ms. Portillo stayed at Curio Collection by Hilton and Hilton Hotel 1000 in

5  Seattle, Washington. Ms. Portillo paid higher hotel room prices to Defendants by reason of the

6  violation alleged herein. Plaintiff in the future intends to stay at hotels managed by Defendants.

7        16.    Plaintiff Alicia Coakley is a citizen and resident of the State of Oregon. In 2022,

8  Ms. Coakley stayed at the Marriott Hotel Vance in Portland, Oregon. She paid higher hotel room

9  prices to Defendants by reason of the violation alleged herein. Plaintiff in the future also intends

10  to stay at hotels managed by Defendants.

11        17.    Plaintiff Freddy Barajas is a citizen and resident of the State of Washington. In

12  2021, Mr. Barajas traveled to Portland, Oregon and stayed at Portland Marriott Downtown.

13  Mr. Barajas paid higher hotel room prices to Defendants by reason of the violation alleged herein.

14  Plaintiff in the future intends to stay at hotels managed by Defendants.

15        18.    Plaintiff Heriberto Valiente is a citizen and resident of the State of Florida.

16  Mr. Valiente often travels and has stayed at the Marriott Marquis in San Diego, California.

17  Mr. Valiente paid higher hotel room prices to Defendants by reason of the violation alleged

18  herein. Plaintiff in the future also intends to stay at hotels managed by Defendants.

19        19.    Plaintiff David Concepcion is a citizen and resident of the State of California. In

20  2023, Mr. Concepcion traveled to Los Angeles, California and stayed at the Marriott Westin

21  Bonaventure Hotel & Suites. Mr. Concepcion paid higher hotel room prices to Defendants by

22  reason of the violation alleged herein. Plaintiff in the future intends to stay at hotels managed by

23  Defendants.

24        20.    Plaintiff Daniel Kassl is a citizen and resident of the State of Illinois. In 2023,

25  Mr. Kassl stayed at The Langham in Chicago, Illinois, and the Hyatt Centric Arlington in the

26  Washington D.C. metropolitan area. Mr. Kassl paid higher hotel room prices to Defendants by

27  reason of the violation alleged herein. Plaintiff in the future intends to stay at hotels managed by

28  Defendants.

FIRST AMENDED CLASS ACTION COMPLAINT - 6
011190-11/3301271 V1


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

21.     Plaintiff Daniel Smith is a citizen and resident of the State of California. In the past few years, Mr. Smith regularly traveled to Kansas City, Missouri and San Francisco, California. He stayed at hotels managed by Defendants. For example, in 2023, Mr. Smith stayed at Marriott the Luxury Collection and Westin Hotels and Resorts in San Francisco, California. In 2021 and 2022, Mr. Smith stayed at Sheraton Suites Country Club and Courtyard by Marriott in Kansas City. Mr. Smith paid higher hotel room prices to Defendants by reason of the violation alleged herein. Plaintiff in the future intends to stay at hotels managed by Defendants.

**B.    Defendants**

22.     Defendant CoStar Group, Inc. ("STR") is a Delaware corporation headquartered in Washington, DC. Defendant STR, LLC. ("STR"), is a wholly owned subsidiary of CoStar, and is a Delaware corporation headquartered in Hendersonville, Tennessee. CoStar provides industry-leading data benchmarking and analytics services, including the STAR reports and Forward STAR reports described herein to the hospitality industry.[8]

23.     Defendant Hilton Domestic Operating Company Inc. ("Hilton") is a Delaware corporation headquartered in McLean, Virginia. Hilton rents hotel rooms throughout the United States. Hilton is one of STR's clients and subscribers to its services. Defendant Hilton's luxury brands include Waldorf Astoria, Conrad, Curio Collection, and Hilton.

24.     Defendant Hyatt Corporation ("Hyatt") is a Delaware corporation headquartered in Chicago, Illinois. Hyatt rents hotel rooms throughout the United States. Hyatt is one of STR's clients and subscribers to its services. Defendant Hyatt's luxury hotel brands include Andaz, Hyatt Regency, Park Hyatt, and Grand Hyatt.

25.     Defendant Six Continents Hotels, Inc. ("IHG") is a Delaware corporation headquartered in Atlanta, Georgia. Six Continents Hotels, Inc. is a wholly owned subsidiary of

---

[8] CoStar's 2023 10-K states that "we provide benchmarking and analytics for the hospitality industry both on a subscription basis and an ad hoc basis. We earn revenue on ad hoc transactions as reports or data are delivered to the customer." Costar's 2023 10k defines "We" as follows "'we refer[s] to CoStar Group, Inc. and its direct and indirect wholly owned subsidiaries." *See* Costar 2023 10-K, https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/1057352/000105735 223000030/csgp-20221231.htm (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1  Inter-Continental Hotels Corporation. Six Continents Hotels, Inc. and Inter-Continental Hotels

2  Corporation have an ultimate indirect parent, InterContinental Hotels Group PLC, a British

3  hospitality company headquartered in Denham, United Kingdom. IHG rents hotel rooms

4  throughout the United States. IHG is one of STR's clients and subscribers to its services.

5  Defendant IHG's luxury hotel brands include the Hotel Indigo, Intercontinental, IHG, Kimpton,

6  and Crowne Plaza.

7          26.     Defendant Loews Hotels Holding Corporation ("Loews") is a Delaware

8  corporation headquartered in New York, New York. Loews rents hotel rooms throughout the

9  United States under its Loews Hotel luxury brand, including Loews Hotel 1000, Seattle,

10 Washington.[9] Loews is one of STR's clients and subscribers to its services.

11         27.     Defendant Marriott International, Inc. ("Marriott") is a Delaware corporation

12 headquartered in Bethesda, Maryland. Marriott rents hotel rooms throughout the United States. It

13 is one of STR's clients and subscribers to its services. Defendant Marriott's luxury hotel brands

14 include JW Marriott, Ritz-Carlton, St. Regis, W Hotels, Westin, Gaylord, W Hotel, Sheraton, and

15 Renaissance.

16         28.     Defendant Accor Management US Inc. ("Accor") is a Delaware corporation

17 headquartered in National Harbor, Maryland. Accor is a wholly owned subsidiary of Accor S.A.,

18 a French hospitality company headquartered in Issy-les-Moulineaux, France. Accor rents hotel

19 rooms throughout the United States. Accor is one of STR's clients and subscribers to its services.

20 Defendant Accor's luxury hotel brands include Raffles, Orient Express, Fairmont, Sofitel,

21 Emblems, MGallery, 21c Museum Hotel, Swissôtel, SLS South Beach Miami and Novotel.

22 **C.     Co-Conspirators**

23         29.     Co-Conspirator Choice Hotels International, Inc., is a Delaware corporation

24 headquartered in Rockville, Maryland. It acquired Radisson Hospitality, Inc., ("Radisson") in

25

26     [9] Loews operated Hotel 1000 in Seattle during the relevant class period. The hotel has since
27 been sold in June 2021. *See Loews Hotels and Resorts Sells Hotel 1000 in Seattle for $55MM*
    (June 4, 2021), https://news.theregistrys.com/loews-hotels-and-resorts-sells-hotel-1000-in-
28 seattle-for-55mm/ (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

August 2022. Radisson is a Minnesota corporation headquartered in St. Louis Park, Minnesota. Radisson rents hotel rooms throughout the United States and is one of STR's clients and subscribers to its services.

30.     Co-Conspirator Great Eagle Holdings Limited is a property management company headquartered in Hong Kong, China. Great Eagle Holdings owns and manages a hotel portfolio branded The Langham ("Langham") and its affiliate brands. Langham rents hotel rooms in the United States and is one of STR's clients and subscribers to its services.

31.     Co-Conspirator Wyndham Hotels & Resorts, Inc. ("Wyndham") is a Delaware corporation headquartered in Parsippany, New Jersey. Wyndham rents hotel rooms throughout the United States. It is one of STR's clients and subscribers to its services.

32.     Co-Conspirator Omni Hotels Management Corporation ("Omni") is a Delaware corporation headquartered in Dallas, Texas. Omni rents hotel rooms throughout the United States under its Omni Hotel Luxury Brand. It is one of STR's clients and subscribers to its services.

33.     Co-conspirators John Does 1-100 are those Hotel owners who are STR's clients and subscribers to its services. Discovery will reveal the identities of these entities, which are not currently known to Plaintiffs.

34.     Defendants' officers, directors, agents, employees, franchisees, or representatives engaged in the conduct alleged in this Complaint in the usual management, direction or control of Defendants' business or affairs.

35.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

36.     When Plaintiffs refers to a corporate family or companies by a single name in this Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family. The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of their respective corporate families. As

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1  a result, those agents represented the entire corporate family with respect to such conduct, and the

2  corporate family was party to the agreements that those agents reached.

3       37.    Each of the Defendants acted as the agent of, co-conspirator with, or joint venture

4  partner of the other Defendants and co-conspirators with respect to the acts, violations, and

5  common course of conduct alleged in this Complaint. Each Defendant or co-conspirator that is a

6  subsidiary of a foreign parent acted as the United States agent when agreeing to competitively

7  sensitive exchange information for hotels they managed through STR in the United States.

8              **III.     JURISDICTION AND VENUE**

9       38.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337,

10  as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4

11  and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

12       39.    This Court has personal jurisdiction over Defendants under Section 12 of the

13  Clayton Act (15 U.S.C. § 22), Federal Rule of Civil Procedure 4(h)(1)(A), and Washington's

14  long-arm statute, the Revised Code of Washington § 4.28.185. Each defendant: (a) transacted

15  business throughout the United States, including in this District; (b) had substantial contacts with

16  the United States, including in this District; and/or (c) engaged in an antitrust conspiracy that was

17  directed at and had a direct, foreseeable, and intended effect of causing injury to the business or

18  property of persons residing in, located in, or doing business throughout the United States,

19  including in this District.

20       40.    Defendants, directly or through their divisions, subsidiaries, predecessors, agents,

21  or affiliates, engage in interstate commerce in the sale of hotel guest rooms.

22       41.    Venue is proper in this District because Defendants maintain facilities, employ

23  agents, transact business, and committed unlawful acts that had effects here.

24       42.    Defendant Hilton has the following hotels in the cities of Seattle and Bellevue,

25  Washington: Charter Hotel, Curio Collection by Hilton and Hilton.

26       43.    Defendant Hyatt has the following hotels in the cities of Seattle and Bellevue,

27  Washington: Grant Hyatt and Hyatt Regency.

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

1    44.    Defendant IHG has the following hotels in the cities of Seattle and Bellevue,

2    Washington: Kimpton Hotels, Crowne Plaza and InterContinental.

3    45.    Defendant Loews had Loews Hotel 1000 in Seattle, Washington during a portion

4    of the relevant class period.[10]

5    46.    Defendant Marriott has the following hotels in the cities of Seattle and Bellevue,

6    Washington: W Hotels, Marriott Waterfront, The Westin, Renaissance, and Sheraton.

7    47.    Defendant Accor has the following hotels in the city of Seattle, Washington: the

8    Fairmont Olympic and Hotel Andra.

## IV.    FACTUAL ALLEGATIONS

**A.    STR Operates a Centralized System for Exchanging Competitively Sensitive Pricing Information**

48.    Founded in 1985 and now owned by CoStar Group, Smith Travel Research (or "STR") is the central clearinghouse for hotel performance. STR "works with **every major hotel chain** and many independent owners and operators around the globe"[11] and that it "processes, analyzes and reports on data from 66,000 hotels representing 8.9 million rooms in 180 countries."[12] The numbers are likely far higher today: STR's homepage advertises that "there is no other provider that comes close in terms of a directly sourced global sample" including 86,000 hotels, 11 million rooms in 2,744 geographical segments and 17,587 class/scale segments of data.[13]

49.    Scott Wheeler, CFO of CoStar Group, stated at the time of CoStar's acquisition of STR that "STR's share for providing benchmarking analytics in hospitality is in the very high

---

[10] Lowe operated Hotel 1000 in Seattle during the relevant class period. The hotel has since been sold in June 2021. *See Loews Hotels and Resorts Sells Hotel 1000 in Seattle for $55MM* (June 4, 2021) https://news.theregistryps.com/loews-hotels-and-resorts-sells-hotel-1000-in-seattle-for-55mm/ (last visited Sept. 26, 2025).

[11] STR, *CoStar Group to acquire STR* (October 1, 2019), https://str.com/press-release/costar-group-acquire-str (emphasis added) (last visited Sept. 26, 2025).

[12] *Id.*

[13] STR, https://str.com/benchmarking (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

double digits of those people purchasing."[14] He continued, "**They are well saturated in the U.S., the overwhelming vast majority of hotels in the U.S. contribute their operating data to STR.**"[15] Dana Cariss, VP of revenue strategy and distribution of Coral Tree Hospitality, publicly stated that "I think STR has become a household name, a staple with hotel management companies. I'd be surprised, or let me say differently, I am surprised when I come across a hotel that does not contribute their data."[16] Confidential Witness 3 ("CW 3")[17], a former software engineer at STR, stated that "almost everybody" within the hotel industry in the U.S. was an STR client and received STR reports. Marriott, Hilton and Holiday Inn were all STR clients, just to name a few, she said. CW 3 recalled that STR "had very few competitors" and "we were kind of servicing everyone. There wasn't anyone else that did it." Similarly, Confidential Witness 4 ("CW 4")[18], a former technical writer at STR, recalled comments made internally that "STR to the hotel industry is like oxygen or water. You just have to have it."

50.    The centerpiece of STR are its STAR reports. STR launched its STAR program in 1987. Initially, according to company founder Randell Smith, the STAR program compared hotels to "a cross section of competitors that fell within a fairly broad range of groups. This primarily meant that a property would be compared to other properties in their chain scale, market track, market, region, and the total United States."

51.    STR's customers quickly pushed STR to introduce additional data reports that would allow them to track specific competitor hotel properties. According to Smith, in 1989, "a representative from Westin" contacted STR "about the prospect of identifying specific properties that each of their hotels could be compared against."[19] STR was concerned that "the opportunity

---

[14] *Hotel Data Giant STR Acquired for $450 Million,* Skift (October 1st, 2019), https://skift.com/2019/10/01/hotel-data-giant-str-acquired-for-450-million/ (last visited Sept. 26, 2025).

[15] *Id.* (emphasis added).

[16] STR, Testimonials, https://str.com/ (last visited Sept. 26, 2025).

[17] CW 3 worked for STR and later CoStar as a software engineer.

[18] CW 4 worked at STR as a technical writer.

[19] Smith, R.A. and Zheng, L. (2011). A Look at Comp Sets: A Historical Perspective That Shapes Today's Way of Thinking. Cornell Hospitality Quarterly, 52(4), 371-373.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

of abuse was so great that we initially refused to provide data at this level. After extensive

discussions we finally agreed to provide this service in spite of our initial reservations."[20]

52.     Smith further stated that the introduction of comp sets so that competitors could

directly monitor each other led to widespread adoption of STR throughout the hotel industry:

"With the broad introduction of comp sets to the industry at large, the STAR program clearly

provided management with a tool to track competitive performance" and noted that the tool has

"become so ubiquitous."[21]

53.     To generate the STAR reports, STR requires each participating hotel to submit

core transactional information drawn directly from its operations. In return, STR provides each

participating hotel with information about the pricing and supply of its nearest competitors.

**1.     Participating Defendant Hotels are required to submit actual pricing information by STR.**

54.     To participate in STR's STAR program, Defendant Hotels are required to submit

actual pricing information drawn[22] directly from their daily operations. STR's own materials

explain that the entire system depends on three core data points that it collects from hotels: (a) the

number of rooms available, (b) the number of rooms sold, and (c) net room revenue. As STR

explains on its website, "We collect rooms available, rooms sold and net room revenue on a

monthly, weekly and daily basis. We also collect data broken down by source of business

(transient, group and contract) and source of revenue (room, F&B and other)."[23]

55.     CW 4, a former STR employee, explained that hotels submitted three types of data

to STR: occupancy, rooms sold, and rooms revenue. STR then used these inputs to generate the

reports sent back to hotels.

---

[20] *Id.*

[21] *Id.*

[22] Plaintiffs provide a definition of pricing information for the purposes of this complaint in footnote 2.

[23] https://str.com/data-insights/resources/faq (last visited Sept. 26, 2025).

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

56.    Rooms available, rooms sold, and occupancy, are each types of pricing information about actual hotel room prices that hotels are required to provide to STR as part of their participation in the information exchange.

a.    **Rooms available is a form of information about actual hotel room prices**

57.    STR defines **rooms available** as the total number of rooms in a property multiplied by the number of days in the reporting period, less any rooms that were temporarily closed for renovation or seasonal reasons.[24] As set forth in more detail in the following section, STR does not report this figure back to hotels directly. Instead, it uses it as the denominator in two key metrics: Occupancy (rooms sold ÷ rooms available) and RevPAR (room revenue ÷ rooms available). Because those metrics are meaningless without the denominator, rooms available is information about actual hotel room prices. It ultimately lets competitors see (i) what share of their rivals' inventory was filled at prevailing rates (occupancy), and (ii) the effective price realized across the whole inventory (RevPAR).

58.    This information about available supply that hotels provide by reporting their rooms available is critical pricing information because it allows STR to produce pricing metrics that tell hotels whether their rivals' prices are being sustained in the market. STR itself makes the point clearly: *"How do you know if your recent occupancy or occupancy on the books is good if you don't know your competition's levels?"*[25] A publicly posted rate on Expedia only shows what a hotel is asking. It does not reveal whether customers accepted that price in enough volume to fill the building. Without the denominator of rooms available, competitors could not interpret whether a rival's actual price was effective in filling its inventory. By requiring hotels to disclose rooms available, STR ensures that occupancy—and thus the effectiveness of competitors' actual prices—can be calculated and compared across the market.

---

[24] STR, *Historical Benchmarking Data Reporting Guidelines*, https://str.com/historical-benchmarking-guidelines (defining "Rooms Available" as rooms in a property × days in period, less closed rooms) (last visited Sept. 26, 2025), attached to this complaint as Exhibit 3.

[25] https://str.com/data-insights-blog/what-is-occupancy-rate (emphasis added) (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2

          **b.**    **Rooms sold is valuable, confidential information about hotel room prices**

3

59.      STR defines **rooms sold** as the number of rooms sold and paid for during the

4

reporting period, including day-use rooms, but excluding complimentary rooms and no-shows.[26]

5

In other words, it is a count of completed transactions — not rooms merely offered or advertised,

6

but rooms for which guests actually put down their money. In turn, it is an elemental piece for

7

STR when calculating the realized price a hotel actually obtains in the market. Because this

8

metric is standardized across participating hotels, it allows STR to produce apples-to-apples

9

comparisons of actual sales activity.

10

60.      The realized price is captured in STR's standardized metric of **Average Daily**

11

**Rate (ADR)**, which STR calculated as room revenue divided by room sold.[27] The rooms sold

12

figure is thus an indispensable input that allows STR to convert posted prices into realized prices.

13

By aggregating this data across a hotel's competitive set, STR enables direct comparisons of

14

performance and pricing power in a way that individual hotels cannot replicate on their own.

15

          **c.**    **Room revenue is valuable, confidential information about hotel room prices**

16

61.      STR defines **rooms revenue** as "revenue generated from guestroom rental,"

17

expressly excluding other revenue such as rebates, refunds, discounts, commissions, service

18

charges, resort fees, and taxes.[28] STR's Historical Benchmarking Guidelines further specify that

19

rooms revenue must exclude ancillary items such as food and beverage or other operating

20

departments, ensuring that what hotels report is only the actual money paid by guests for room

21

rentals.

22

62.      This figure is the most direct form of actual price information that Defendant

23

hotels provide to STR. It is not an estimate or an index. It is the precise number of dollars that a

24

---

25

    [26] STR, *Historical Benchmarking Data Reporting Guidelines*, https://str.com/historical-benchmarking-guidelines (defining "Rooms Sold") (last visited Sept. 26, 2025).

26

    [27] https://str.com/data-insights-blog/what-average-daily-rate-adr-and-how-calculate-it (last visited Sept. 26, 2025).

27

    [28] https://str.com/historical-benchmarking-guidelines#reportingroomsrevenue (last visited Sept. 26, 2025).

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

competitor's guests actually paid for hotel rooms during the reporting period, stripped of non-room charges. This disclosure is critical because publicly available information cannot substitute for it. Only net room revenue reveals what competitors actually collected for room rentals.

**B.    STR Provides Participating Hotels with Information About Actual Hotel Room Prices**

63.    Using the inputs provided by Defendant Hotels, STR generates and returns three standardized pricing metrics about actual hotel room prices to participating hotels: Average Daily Rate (ADR), Revenue per Available Room (RevPAR), and Occupancy. These metrics are provided through the STAR reports that STR describes as the "industry standard for historical hotel performance benchmarking."[29]

64.    Each metric is derived from actual transactions and together they form the foundation of STR's STAR reports. ADR reflects the average price guests actually paid for each occupied room. RevPAR captures the effective price realized across a hotel's entire inventory, whether filled or empty. Occupancy shows whether competitors were able to sustain their prices while still filling rooms. STR itself describes these three metrics as "the three key hotel performance indicators."[30]

**1.    Average Daily Rate (ADR).**

65.    STR defines **Average Daily Rate (ADR)** as "room revenue divided by rooms sold."[31] It describes ADR as "the measure of the average paid for rooms sold in a given time period," covering only revenue-generating guestrooms.[32] In short, ADR is the realized average price that guests actually paid per occupied room.

---

[29] https://str.com/sites/default/files/Forward-STAR-Overview-Canada.pdf (pg. 4) (last visited Sept. 26, 2025).

[30] STR, *What is Average Daily Rate (ADR) and How to Calculate It*, STR Data Insights Blog (May 10, 2022), https://str.com/data-insights-blog/what-average-daily-rate-adr-and-how-calculate-it (last visited Sept. 26, 2025).

[31] STR, *FAQ*, https://str.com/data-insights/resources/faq#faq-title-93 (last visited Sept. 26, 2025).

[32] STR, *What is Average Daily Rate (ADR) and How to Calculate It*, STR Data Insights Blog (May 10, 2022), https://str.com/data-insights-blog/what-average-daily-rate-adr-and-how-calculate-it (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

66.    ADR is calculated by dividing room revenue by rooms sold—both figures supplied by participating hotels as part of the information exchange. STR publishes this formula plainly on its website:[33]

**How to calculate ADR (Formula and Examples)**

ADR is calculated by dividing room revenue by rooms sold. The metric is of course applicable for any currency.

ADR = Room Revenue/Rooms Sold*

Example 1:
Hotel A, a large property in the U.S., sold 125 rooms last night with a room revenue of US$15,000. Thus, Hotel A's ADR was US$120.

15,000/125 = 120

Example 2:
Hotel B, a small property in China with 30 rooms, sold 10 rooms last night with a room revenue of CNY6,000.
6,000/10 = 600

67.    STR emphasizes ADR's role in hotel revenue management because "the rooms department is typically the largest generator of revenue and profit for hotels. An effective approach to ADR is a key piece of the hotel revenue-management cycle with the goal of maximizing profitability."[34]

68.    ADR provides a standardized figure for the realized average price per room, allowing comparisons across competitors and time. A hotel may advertise $400 for a room, but that number has no competitive meaning unless guests actually pay it. If only a handful of rooms sell at that rate, the hotel's ADR will fall well below $400, reflecting its true realized price. But if a hotel has an actual ADR of $400, that means that it has successfully priced at that level. Thus, ADR shows what guests actually paid, not what hotels merely advertised.

---

[33] https://str.com/data-insights-blog/what-average-daily-rate-adr-and-how-calculate-it (last visited Sept. 26, 2025).

[34] https://str.com/data-insights-blog/what-average-daily-rate-adr-and-how-calculate-it (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    69.    STR itself contrasts ADR and posted rates, which STR calls the "average

2    published rate (APR)."[35] STR explains that APR reflects what hotels say they are charging, but

3    ADR reflects "the actual amount paid for rooms in past days, weeks, months, years, etc."[36]

4    70.    STR's STAR reports display ADR in several layers. At the property level, each

5    hotel sees its own ADR for the reporting period on a daily basis. Alongside that, the report shows

6    the ADR of the hotel's chosen competitive set—an aggregate of its closest rivals—and the ADR

7    of the broader market segment.[37] STR also presents an ADR index, a score that compares a

8    hotel's realized average price to its competitors and signals whether it is above or below its "fair

9    share." An index above 100 means the hotel is charging and sustaining higher actual prices than

10   its comp set, while an index below 100 means it is falling short. These indices are central to how

11   the reports are read: they reduce complex revenue and transaction data into a simple comparative

12   measure of daily average hotel room prices.

| ADR ($) | July | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| My Property | 215.37 | 208.51 | 205.70 | 208.29 | 214.27 | 212.71 | 213.05 |
| Competitive Set | 198.15 | 193.46 | 197.18 | 203.07 | 206.99 | 205.39 | 204.46 |
| Index | 108.7 | 107.8 | 104.3 | 102.6 | 103.5 | 103.6 | 104.2 |
| % Chg | | | | | | | |
| My Property | 14.7 | 10.6 | 7.7 | -3.3 | 6.4 | 6.1 | 7.1 |
| Competitive Set | 4.3 | 4.5 | 7.1 | 3.5 | 3.0 | 2.5 | 5.0 |
| Index | 10.0 | 5.8 | 0.6 | -6.5 | 3.3 | 3.5 | 2.0 |

20   71.    STR enables hotels to track and compare their ADR against competitors day by

21   day, illustrating this process with examples published on its website.

---

24   [35] https://str.com/data-insights-blog/what-average-daily-rate-adr-and-how-calculate-it (last
25   visited Sept. 26, 2025).

     [36] https://str.com/data-insights-blog/what-average-daily-rate-adr-and-how-calculate-it (last
26   visited Sept. 26, 2025).

27   [37] https://str.com/sites/default/files/2019-07/how-to-read-star-report.pdf (last visited Sept. 26,
     2025). A complete copy of How to Read a Star Report is attached to this complaint as Exhibit 1.
28   The pdf includes a complete copy of an exemplar Star Report.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX



72.     ADR is therefore more than a mathematical average. It is the industry's standardized measure of average hotel room prices—built from the dollars hotels actually collect and the rooms they actually sell, and reported back in a format that allows participating hotels to closely observe their competitors' realized rates for hotel rooms. By reducing thousands of transactions into a single comparable figure of average hotel room prices, STR gives competitors visibility into one another's realized pricing power and eliminates the uncertainty that would otherwise discipline their behavior in a competitive market. STR itself underscores the point, explaining that benchmarking ADR lets hoteliers answer practical questions: "Is my ADR truly affecting my occupancy levels? Do I need to change my rate strategy during lower demand periods? What is the optimal occupancy and ADR balance for growing RevPAR? Am I taking advantage of high demand periods the same as my competitors and market?"[38] These are pricing questions and STR provides participating hotels with the tools to answer them.

**2.     Revenue per Available Room (RevPAR).**

73.     STR defines **Revenue per Available Room (RevPAR)** as "Room Revenue [divided by] Total Rooms Available." STR describes RevPAR as the "hotel industry's gold standard for measuring top-line performance," because it incorporates both pricing and volume by

---

[38] https://str.com/data-insights-blog/what-average-daily-rate-adr-and-how-calculate-it (last visited September 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

blending Average Daily Rate (ADR) with Occupancy. Unlike ADR, which looks only at rooms sold, RevPAR captures the effective realized price across the entire inventory, sold or unsold.[39]

74.    RevPAR is calculated by dividing total room revenue by total rooms available, both figures provided by hotels as part of the information exchange. STR publishes this formula directly on its website.

**RevPAR Formula**

RevPAR shows the revenue generated per room regardless of if rooms are occupied or not. Thus, RevPAR is calculated by dividing total room revenue by total rooms available. This metric is of course applicable to any currency.

RevPAR = Room Revenue/Total Rooms Available

**RevPAR Calculation Examples**

Example 1:

Hotel A, a 150-room property in the U.S., made a room revenue of $15,000 last night. Thus, Hotel A's RevPAR was $100.

15,000/150 = 100

Example 2:

Hotel B, a 30-room property in China, made a room revenue of CNY6,000 last night.

6,000/30 = 200

75.    STR emphasizes that RevPAR provides a "comprehensive snapshot of how well hotels are both filling and pricing their rooms," calling it an "instant 'health check'" on room business.[40] RevPAR reflects the effective realized price across a hotel's full inventory. For example, a $400 ADR with half the rooms empty produces a $200 RevPAR, exposing whether high rates are sustainable at scale.

76.    STR's STAR reports present RevPAR in the same comparative format as ADR. Each hotel sees its own RevPAR, the aggregated RevPAR of its competitive set, and indices showing whether it is performing above or below its "fair share." The standardized metric of

---

[39] https://str.com/data-insights-blog/what-is-revpar (last visited Sept. 26, 2025).

[40] https://str.com/data-insights-blog/what-is-revpar (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

1    RevPAR gives participants a direct comparison of how effectively their competitors have turned

2    their posted rates into actual revenue across all rooms.[41]



9        77.    STR underscores the usefulness of RevPAR in benchmarking over time, stating

10   that "CoStar and its Benchmark feature display the RevPAR metric in all historical time series.

11   Observing this key metric provides actionable insights to assist in maximizing performance

12   potential. For hoteliers, RevPAR is a crucial metric in the revenue management process."[42] STR's

13   website displays the types of monthly indices that participants can access comparing their

14   RevPAR against their competitors.

---

[41] https://str.com/sites/default/files/2019-07/how-to-read-star-report.pdf (Tab 17 – how to read
a STAR Report) (last visited Sept. 30, 2025).

[42] https://str.com/data-insights-blog/what-is-revpar (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX



78.     RevPAR is therefore more than a statistic. By combining revenue and capacity, it provides a standardized measure of the effective prices realized across a hotel's full inventory. STR's reporting thus enables participants to compare the performance of their pricing strategy against their closest competitors. As STR itself states, "The logical next step, once you understand your RevPAR, is to compare your performance with your market or competitors. When hoteliers compare themselves to their competition, they are better placed to sell the right rooms to the right guests at the right time and price."[43]

79.     STR itself stresses that benchmarking RevPAR enables hoteliers to answer questions like "Am I effectively leveraging all the rooms in my property or portfolio? Do I need to change my revenue management strategy during periods of low demand? Am I ahead of the competition or can I make gains in occupancy and ADR? Am I taking advantage of high demand periods the same as my competitors and market? Which days of week, months or seasons provide

---

[43] https://str.com/sites/default/files/The-Ultimate-Guide-to-Hotel-Benchmarking.pdf?utm_source (last visited October 2, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1  opportunity for further growth?"[44]  These are quintessential pricing questions, and STR's

2  RevPAR metric provides participants with competitively sensitive information about their rivals

3  that can be used to answer them.

4      **3.    Occupancy.**

5      80.    STR defines **occupancy rate** as the percentage of rooms occupied in a property,

6  segment, or geographic area for a given time period. It is calculated by dividing the number of

7  rooms sold by the number of rooms available — in STR's terms, "divide demand by supply."[45]

8  STR describes occupancy as "one of the global hotel industry's foundational performance

9  metrics."[46] STR publishes the formula for occupancy on its website:

10

11  **What is the formula for occupancy rate?**

    Occupancy rate is calculated by dividing the total number of occupied rooms by the total number of rooms available. In other
12  words, divide demand by supply.

13  ● Example: Property A had 100 rooms available last night and managed to sell 80. Property A's occupancy rate was 80%.

14  ● Example: Property B had 20 rooms available last night and sold 19. Property B's occupancy rate was 95%.

15      81.    STR itself poses the central question for hotels: *"How do you know if your recent*

16  *occupancy or occupancy on the books is good if you don't know your competition's levels?"*[47]

17  Occupancy is valuable precisely because it lets hotels measure their own results against those of

18  their rivals. By requiring participants to disclose both rooms available and rooms sold, STR then

19  calculates an occupancy rate that enables participating hotels to observe whether competitors'

20  prices are successfully filling their inventory.

21      82.    STR itself acknowledges that benchmarking occupancy against competitors can

22  lead hotels, in some cases, to seek **lower** occupancy. In its discussion of occupancy rate, STR

23  advises its clients that "**a common mistake is pricing rooms too low in order to attract more**

24

25      [44] https://str.com/data-insights-blog/what-is-revpar (last visited Sept. 26, 2025).

26      [45] https://str.com/data-insights-blog/what-is-occupancy-rate (last visited Sept. 26, 2025).

        [46] https://str.com/data-insights-blog/what-is-occupancy-rate (last visited Sept. 26, 2025).
27
        [47] https://str.com/data-insights-blog/what-is-occupancy-rate (emphasis added) (last visited
28  Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

1    demand (occupancy)," and that hotels may "**re-strategize … to obtain a higher, or in some**

2    **cases, lower occupancy**."[48] In a competitive market, low occupancy should push hotels to lower

3    prices to fill more rooms. STR's framework points hotels in the opposite direction: restricting the

4    number of rooms sold in order to keep rates elevated. In this way, the exchange of occupancy

5    information expressly serves as a tool for supply constriction rather than competitive expansion.

6    83.    STR's STAR reports present occupancy in the same comparative format as ADR

7    and RevPAR. On a daily basis, each hotel sees its own occupancy rate, the aggregated occupancy

8    of its competitive set, and indices showing whether it is performing above or below its fair share.

| Occupancy (%) | Sa July 1 | Su 2 | Mo 3 | Tu 4 | We 5 | Th 6 | Fr 7 | Sa 8 | Su 9 | Mo 10 | Tu 11 | We 12 | Th 13 | Fr 14 | Sa 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| My Property | 91.3 | 83.6 | 76.9 | 77.0 | 88.3 | 91.9 | 93.1 | 93.2 | 91.7 | 96.3 | 96.3 | 95.1 | 96.3 | 95.1 | 95.5 |
| Competitive Set | 94.5 | 91.3 | 79.5 | 74.7 | 86.7 | 92.6 | 87.9 | 93.9 | 91.3 | 99.0 | 99.2 | 98.6 | 93.2 | 93.0 | 96.3 |
| Index | 96.6 | 91.5 | 96.7 | 103.1 | 101.9 | 99.2 | 105.9 | 99.3 | 100.4 | 97.2 | 97.1 | 96.4 | 103.3 | 102.6 | 99.2 |
| % Chg | | | | | | | | | | | | | | | |
| My Property | 1.1 | -4.9 | -8.9 | -13.4 | 9.9 | 6.1 | 9.2 | 3.4 | 3.5 | 5.5 | 5.4 | 3.6 | 12.8 | 27.6 | 14.6 |
| Competitive Set | 7.2 | 6.3 | 0.9 | -6.8 | 15.0 | 12.1 | 0.5 | -2.5 | 1.3 | 1.1 | 1.0 | 0.8 | 3.4 | 8.7 | 5.7 |
| Index | -5.7 | -10.5 | -9.7 | -7.0 | -4.4 | -5.4 | 8.7 | 6.1 | 2.2 | 4.3 | 4.4 | 2.8 | 9.1 | 17.5 | 8.4 |

15    84.    Occupancy completes the trio of STR's key metrics about hotel room prices.

16    Occupancy shows whether rivals' prices were sustainable, revealing how much inventory they

17    filled or withheld at their pricing levels. By reporting occupancy side-by-side with ADR and

18    RevPAR, STR delivers a complete picture of how a participant's closest competitors are

19    balancing rate and volume — information that no hotel could otherwise reliably obtain.

20    **C.    Defendant Hotels Entered into Contracts Requiring Data Submission as a Condition**
       **of Receiving STAR Reports**

21

22    85.    Discovery confirms that Defendant Hotels agreed by contract to furnish

23    competitively sensitive performance data to STR on a near-continuous basis as the price of

24    participation. These agreements make clear that participation was reciprocal: hotels could not

25    access STR's reports unless they first submitted their own operating data, including rooms

26

27    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
       [48] https://str.com/data-insights-blog/what-is-occupancy-rate (emphasis added) (last visited

28    Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

available, rooms sold, and room revenue. Defendants engaged in parallel conduct by each

simultaneously engaging in the STR information exchange during the Class Period.

86.    The following examples from discovery illustrate how major Defendant hotel

groups entered into contracts reflecting this obligation to provide pricing information.

87.



[49] STR0000089.

[50] The 2021 contract between Hyatt and STR is attached as Exhibit 4.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX



90.

---
51 STR0000099.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

91. 

92.

---

[52] The 2012 contract between Marriott and STR is attached as Exhibit 5.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    93.    

2

3                                                                        53

4

5

6

7

8

9

10   94.

11

12

13

14                                54

15

16

17

18   95.

19

20

21

22                                5

23

24

25

─────────────────

26    53 STR00000262.

27    54 STR00000261.

     55 The 2012 contract between STR and Hilton, as well as the renewals of that contract, are
28   attached as Exhibit 6.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX



96.

97.

[6]

[56] STR00000005.

FIRST AMENDED CLASS ACTION COMPLAINT - 30
011190-11/3301271 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX



98.

99.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX



1 ⁷

2 ⁵⁸

3

4

5

6

7

8 100.

9

10 ⁵⁹

11

12

13

14

15

16 101.

17

18 ⁰

19

20

21

22

23

24 _____

⁵⁷ STR00000115.

⁵⁸ A complete copy of this 2021 agreement between IHG and STR is attached as Exhibit 7.

⁵⁹ STR00000129                     ). STR has not produced in discovery the 2012 contract between STR and Loews.

⁶⁰ STR00000133.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

102.

[61]

103.

[62] As referenced throughout the complaint, STR's publicly available terms and conditions state that it operates on a give-to-get basis, and STR's own public materials make clear that it collects from participating hotels rooms available, rooms sold, and room revenue information.[63]

---

[61] STR00000135.

[62] STR00000269; STR00000271.

[63] STR's publicly available terms and conditions for its benchmarking product are attached to this Complaint as Exhibit 2.

1    104.    These contractual obligations formed the reciprocal foundation of STR's

2  exchange. As set forth in the following section, STR then organized the data in a manner that

3  allowed each Defendant hotel to compare its performance directly against a group of selected

4  rivals.

5        1.    **The STAR reports are designed around providing Participants with Competitively Sensitive Information about the actual prices of their closest competitors**

6

7    105.    STR organizes its output around "comp sets"—clusters of hotels that identify one

8  another as direct rivals. By selecting a comp set, each hotel ensures that its reports compare its

9  own performance against the same competitors it faces in practice. The system transforms STR's

10  raw data into a tool of mutual monitoring, in which hotels can observe the actual prices and

11  occupancy levels of the very properties they compete with day to day. Indeed, STR specifically

12  guides participants that it should select properties for its comp set that are the "group of hotels

13  that compete with your property for business."[64]

14    106.    STR emphasizes that to make the benchmarking process work, the key is to have

15  hotel management teams select an appropriate comp set. "Without a comp set," STR states, "you

16  are left to compare your business against yourself and market. While those comparisons are

17  important, comp sets provide the **most granular intel** available in learning where you can

18  improve the performance of your property or portfolio."[65]

19    107.    To ensure accurate benchmark, STR instructs hotels to choose a comp set that is in

20  "direct competition" in the relevant geographical area.[66] For example, it recommends hotels do

21  not "simply select those hotels 'across the street' from your subject property."[67] Instead, hotels

22  should consider "the characteristics of the hotels in your area, such as their class, room count,

23

24    [64] https://str.com/data-insights/resources/faq (last visited Sept. 26, 2025).

25    [65] STR, *What is Hotel Benchmarking?* (July 30, 2019), https://str.com/data-insights-blog/what-is-benchmarking (emphasis added) (last visited Sept. 26, 2025).

26    [66] CoStar, *Careful Comp Set Selection Key to Performance* (February 14, 2012) https://www.costar.com/article/1917132465/careful-comp-set-selection-key-to-performance (last visited Sept. 26, 2025).

27

28    [67] *What is Hotel Benchmarking? Supra* note 65.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1   meeting space, etc. This is because selecting hotels that perform at different levels than your own

2   property can produce misleading results."[68] STR advises participating hotels to maintain an

3   ongoing review of their competitive sets to ensure those sets accurately capture their closest

4   rivals.

5        108.    STR has gone further by offering analytics that grade a hotel's comp set based on

6   how closely it matches those of its competitors—effectively ensuring that hotels are mutually

7   monitoring one another. A 2011 STR article described this "report card" system, which assigns

8   letter grades to comp sets and highlights whether a hotel's identified rivals also name it in

9   return.[69] STR explained that in a "perfectly competitive environment" the name-back percentage

10  should be 100 percent, meaning all rivals are identifying and monitoring each other as direct

11  competitors.[70] STR's grading model encourages hotels to adjust their comp sets until they are

12  mutually monitoring each other.

13       109.    Another important feature of the comp set process is that it makes participation

14  transparent. Because each hotel must select the rival properties it wishes to benchmark against, a

15  participant, by definition, then knows exactly which of its competitors are participating in the

16  STR information exchange.

---

18  [68] *Id*.

19  [69] *Comp Sets Revisited*, Lodging Magazine (October 26, 2011), available at https://web
20  .archive.org/web/20240315152142/https://lodgingmagazine.com/comp-sets-revisited/ (last visited
    Sept. 26, 2025) (In the article, an STR employee writes "STR Analytics has utilized this extensive
21  database to build a model, essentially assigning report card-like letter 'grades' to every single
    primary set, using several weighted metrics. The grade depicts how the comp set fits relative to
22  other analogous properties' comp sets. Using the comp-set grading model, averages have been
    established on class and market levels…. In a perfectly competitive environment, the name-back
23  percentage (the percentage of hotels you name as a primary competitor who name you as a
    primary competitor) should be 100 percent; meaning that competitive hotels find each other
24  equally competitive…. For those hotels not able to achieve an A+ primary comp set, it is
    imperative to understand the set's challenges and use that knowledge to strategize for the future.
25  Knowing the weak areas within a comp set can be just as effective as having a highly competitive
    comp set in helping to interpret indexes and change what could have been seen as a negative, as a
26  positive (or vice versa). Understanding these challenges will also aid in tweaking the comp set to
    make it more tightly competitive.").
27

28  [70] *Id*.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

110.    Therefore, STR does not deliver its reports in the abstract. Because of STR's requirement that hotels benchmark themselves against a handpicked group of competitors, the information exchange ensures that each participant gains precise visibility into the pricing of the properties it faces in the marketplace. Thus, the STR reports are not broad industry summaries but customized reports of how a hotel's closest competitors are pricing and performing.

2.    **The STAR Report feature several key hallmarks of the type of information exchange that are recognized as likely to produce anticompetitive effects.**

111.    In recent filings, the Department of Justice has underscored that *"an agreement to exchange information among competitors"* can itself be unlawful under Section 1 of the Sherman Act. The Department of Justice has highlighted three features that make information exchanges particularly likely to raise anticompetitive concerns; (1) it is limited to participants in a closed, reciprocal system and (2) the information is sufficiently current to influence present conduct; and (3) the exchange involves competitively sensitive data. Each of these apply.

**D.    STR's information exchange occurs in a closed system on a give-to-get basis**

112.    First, the information exchange occurs in a closed, reciprocal system. The DOJ has explained that courts carefully consider "whether the information shared is publicly available or disseminated only among the parties to the information exchange."[71] And, "[w]hen competitors agree to exchange competitively sensitive information only among each other, it suggests that the information sharing will benefit only the competitors at the expense of consumers, workers, or other market participants."[72]

113.    Here, STAR reports aren't a newsletter you can buy at a kiosk. They're a "give-to-get" exchange. If a hotel doesn't contribute its data, it doesn't get the reports. CoStar put it plainly in its own 10-K: "STAR Reports are only available to industry participants who provide us with data."[73]

---

[71] https://www.justice.gov/atr/media/1371806/dl at pg. 16 (last visited Sept. 26, 2025).

[72] https://www.justice.gov/atr/media/1371806/dl at pg. 16 (last visited Sept. 26, 2025).

[73] CoStar, December 31, 2022, Form 10-K: https://www.sec.gov/ix?doc=/Archives/edgar/data/1057352/000105735223000030/csgp-20221231.htm (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

114.    STR enforces this "give data-to-get data" policy in its license agreement. Its "Hotel Benchmarking Product Terms and Conditions" provides that:

> Licensee **shall** provide the Hotel Data types as indicated in the License Agreement for Licensee's hotels as indicated in the License Agreement and in accordance with the data guidelines and timeframes set forth here: https://str.com/data-reporting-guidelines. **CoStar is under no obligation to provide to any Hotel Benchmarking Deliverables if Licensee does not provide the applicable Hotel Data to CoStar based on such data guidelines and timeframes.**
>
> …
>
> CoStar's provision of the Hotel Benchmarking Deliverables **is subject to and contingent on Licensee providing CoStar timely, true, accurate, correct and complete Hotel Data as required**.[74]

115.    As part of the bargain administered by STR, the frequency with which a hotel provides data sets the rhythm at which it receives data. This is spelled out in STR's terms and conditions:

> (ii) To the extent the Hotel Benchmarking Deliverables are delivered through the STR Application, Hotel Benchmarking Deliverables will generally be delivered to Licensee either daily, weekly and/or monthly, **depending on the frequency of data set provided by Licensee**. CoStar shall deliver or give access to Licensee the reports or services as indicated in the License Agreement.[75]

116.    CW 4, a former STR employee, echoed the publicly available terms and conditions, stating that "if you gave us daily data, you would get daily data reports in return."

117.    STR's terms and conditions in its agreements with participants also ensure that the data is kept within a closed system. For example, a sample hotel survey agreement from STR strictly limits users' ability to share the reports with third parties: "Client may copy, distribute or reproduce STR's Confidential Information and the data contained therein only to its employees, agents, representatives, owners and/or franchisees who have a need to know the information contained in the Reports for the purpose of Client's internal business operations, as well as Client's legal, tax or other professional advisors (hereinafter all 'Permitted Users'). Software

---

[74] CoStar, *Hotel Benchmarking Product Terms and Conditions*, https://www.costar.com/ CoStarTerms-and-Conditions/HotelBenchmarking (emphasis added) (last visited Sept. 26, 2025).

[75] *Id.* (emphasis added).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    providers, on-line travel agencies, revenue management consultants and other similar third parties

2    shall not be considered 'Permitted Users.' Unless Client has obtained STR's express written

3    consent, which shall be set forth in a separate agreement, Client shall NOT share STR

4    Confidential Information with any outside data vendor, outside consultant or other third party

5    which is not a Permitted User, nor shall any such party be added to any STR Distribution List

6    (defined below) or given log-in access to the STR website."[76]

7        **1.    The information exchanged through STR is current and prospective.**

8        118.    Second, the DOJ has emphasized the importance of the timeliness of the data that

9    is exchanged. As the DOJ has explained, "The temporal nature of the data—i.e., whether it

10    reflects past, present, or planned future conditions—carries significant weight in courts' analysis

11    of information exchanges as well. As courts have recognized, exchanges of recent or future

12    information carry far greater potential for anticompetitive effects than historical data….

13    Information sharing is more likely to enable this sort of anticompetitive behavior where the

14    parties are sharing current data (price, output, or other information) or planned future changes."[77]

15        119.    As discussed above, STR both collects and reports data on a daily basis. This

16    almost immediate collection and promulgation of current pricing information heightens the

17    competitive risks associated with the reports. As discussed throughout this complaint, factual

18    evidence shows that the Defendant Hotels both provided data to and received reports back from

19    STR on a near continuous basis, with STR regularly providing each of the Defendant Hotels with

20    weekly and monthly reports about their competitors' prices.

21        120.    And besides the STAR report itself, which provides information to users broken

22    out on a daily basis, STR offers additional types of current and prospective reporting. For

23    example, STR provides users with a "Bandwidth Report" which displays the daily high and low

24    performance of each hotel in a comp set, alongside the subject hotel's position. The report

25

26

27        [76] https://str.com/hs-terms-conditions (emphasis added) (last visited Sept. 30, 2025).

28        [77] https://www.justice.gov/atr/media/1371806/dl at pg. 17 (last visited Sept. 26, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT - 38
011190-11/3301271 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1   includes a "Daily Ranking" feature that shows where the property ranks against rivals in

2   occupancy, ADR, and RevPAR on a day-by-day basis.[78]



121.    STR even calculates the revenue a hotel could have gained or lost had it been the

daily RevPAR leader or laggard.



122.    In recent years, STR has heightened the competitive risks of its reports by

introducing new reports that are specifically forward looking. In 2019, Costar's CEO, Andy

Florance, stated at the time of acquisition that "there is clear demand in my mind for the

forecasting component of the business where you are gathering forward information and

forecasting future demand in the market and future pricing."

123.    Since then, STR has introduced Forward STAR reports in certain U.S. markets.

These reports allow participants to exchange information about future occupancy. As STR

explains, "through the Forward STAR element of benchmarking, hoteliers can get ahead of the

---

[78] https://str.com/sites/default/files/2019-06/bandwidth-report-sample.pdf (last visited October 2, 2025).



**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1  game by measuring rooms booked for the days, weeks and months ahead for both the local market

2  and the competition."[79]

3       124.    Specifically, for the purposes of the Forward STAR reports, STR collects two

4  types of forward-looking data from participating hotels: adjusted rooms available and rooms

5  booked. "Adjusted rooms available" is the "total number of rooms a property has available in its

6  inventory to be booked." "Rooms booked" means "any room which has been subtracted/deducted

7  from the Adjusted Rooms Available due to a booking."[80]

8       125.    STR translates the data into two forward-looking indicators: occupancy on the

9  books and pickup. The former reveals the number of rooms already reserved for future periods—

10  90 days forward in weekly reports and 12 months in monthly reports—while the latter measures

11  the incremental increase in bookings over time. These metrics enable hotels to benchmark their

12  own expected occupancy against that of their rivals, providing a forward-looking assessment of

13  relative market share that would otherwise remain uncertain in a competitive market.

14       **2.    The information exchanged involves competitively sensitive data.**

15       126.    Third, the STR information exchange involves competitively sensitive

16  information. The DOJ has explained that "Exchanges of price, output, or cost information can

17  'stabilize prices' by encouraging or enabling competitors to match prices or to use each other as a

18  benchmark in pricing. Courts have therefore been especially suspicious when competitors

19  exchange recent, current, or future price or output."[81] And, the DOJ has further noted that "not

20  every case requires a direct exchange of price or cost. Courts have condemned information

21  sharing even where no prices or quantity are exchanged at all— recognizing that the plaintiffs'

22  burden is to show that the facts, taken as a whole, indicate a tendency for anticompetitive harm."[82]

23

24

25  [79] https://str.com/data-insights-blog/understanding-your-str-reports-forward-looking-data-

26  2022 (last visited Sept. 26, 2025).

    [80] https://str.com/forward-star-data-reporting-guidelines (last visited Sept. 26, 2025).

27  [81] https://www.justice.gov/atr/media/1371806/dl at pg. 13 (last visited Sept. 26, 2025).

28  [82] https://www.justice.gov/atr/media/1371806/dl at pg. 14 (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

127.    The STAR report itself provides participants with extensive, current information about a competitor's prices and occupancy levels. A typical monthly STAR report generally includes the following information:[83]

(1) Regarding the subject hotel's performance vs. its competitive set:

- *Monthly performance at a glance*: a summary of a subject hotel's performance against its competitive set for the current month, year-to-date, running 3-month and running 12-month periods. [84]

- *STAR summary*: a summary of a subject hotel's occupancy, ADR and RevPar versus its comp set and pre-defined STR industry segments, for the current month, year-to-date, running 3-month and running 12-month periods.

- *Competitive set report*: a comparison of a subject hotel versus comp set for the most recent 18-month period, as well as for year-to-date, running 3 month and running 12-month periods.

- *Segmentation Summary*: a summary of the subject hotel versus its comp set segmentation data for the current month and year-to-date. Segmentation data includes Occupancy, ADR and RevPar by source of business (transient, group and contract).

- *Daily data for the month*: Occupancy, ADR and RevPAR shown by day of week for the current month.

- *Day of week and weekday/weekend*: details occupancy, ADR and RevPAR for each day of the week and weekday/weekend for the current month, year-to-date, and the same day of the week for running 3-month and 12-month periods.

(2) Regarding the subject hotel's performance vs. its competitive set vs. its relevant market scale:[85]

- *Segmentation analysis*: a summary of monthly occupancy, ADR, RevPAR, index and ranking analysis of transient, group, contract and total business for the past 18 months.

- *Segmentation day of week*: Occupancy, ADR and RevPAR for transient, group, contract and total business shown by day of week for the current month.

---

[83] STR, *How to use the STAR report*, https://str.com/sites/default/files/2019-07/how-to-read-star-report.pdf (last visited Sept. 26, 2025).

[84] A running 3-month number "is the average of the values for the current month and the previous two months; a running 12-month number is the average of the values for the current month and the previous 11 months." *How and why is running data calculated*, https://str.com/data-insights/resources/faq (last visited Sept. 26, 2025).

[85] STR classifies each hotel into seven chain scale groups: Luxury, Upper Upscale, Upscale, Midscale with F&B, Midscale w/out F&B, Economy and Independent. https://str.com/sites/default/files/2019-07/how-to-read-star-report.pdf (last visited Sept. 26, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT - 41
011190-11/3301271 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- *Additional revenue analysis*: this is the monthly revenue analysis for room, F&B, other and total for the past 18 months. Revenue shown is divided by number of rooms sold.

(3) Response report:

- *Response Report*: details of properties in the subject hotel's comp set that have reported data to STR over the past 24 months.

- *Segmentation response report*: Details properties in the competitive set that have reported data to STR over the past 24 months.

128.    STR itself repeatedly underscores the competitive value of the information that is provided through the STAR report. STR calls RevPAR the "gold standard for measuring top-line performance,"[86] ADR a "key piece of the hotel revenue-management cycle,"[87] and occupancy "one of the global hotel industry's foundational performance metrics."[88] By STR's own description, each metric is designed to allow participants to track how their rivals are filling and pricing their rooms and to use that knowledge to adjust their own strategies.

129.    STR repeatedly tells its subscribers that the purpose of its reporting system is to enable them to make more profitable competitive decisions by monitoring rivals. STR advertises that benchmarking ADR will help answer whether your "ADR is truly affecting [your] occupancy levels,"[89] and that RevPAR reporting allows hotels to answer the question "Am I ahead of the competition or can I make gains in occupancy and ADR?"[90] STR further stresses that benchmarking occupancy against competitors is necessary, asking directly: "How do you know if your recent occupancy or occupancy on the books is good if you don't know your competition's levels?"[91]

---

[86] https://str.com/data-insights-blog/what-is-revpar (last visited Sept. 26, 2025).

[87] https://str.com/data-insights-blog/what-average-daily-rate-adr-and-how-calculate-it (last visited Sept. 26, 2025).

[88] https://str.com/data-insights-blog/what-is-occupancy-rate (last visited Sept. 26, 2025).

[89] https://str.com/data-insights-blog/what-average-daily-rate-adr-and-how-calculate-it (last visited Sept. 26, 2025).

[90] https://str.com/data-insights-blog/what-is-revpar (last visited Sept. 26, 2025).

[91] https://str.com/data-insights-blog/what-is-occupancy-rate (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

130.    These are not abstract statements about industry health; they are explicit acknowledgments that STR's product gives hotels competitively useful intelligence about actual prices and output levels of their closest rivals. Indeed, STR specifically markets that "one of the great benefits of benchmarking comes in identifying gaps in your market and opportunities for improvement. Once you understand the data and landscape of your hotel and competition, you can begin shaping your…pricing…strategies to ensure they are optimized for success."[92]





Hotel A vs. B – the power of context

At first glance, you would probably be tempted to say Hotel A is outperforming Hotel B. If both operate in the same market and have similar pricing, property type and amenities, then you're right. Hotel A's 7% increase trumps Hotel B's 3% decline.

But what if these properties are operating in two different markets?

As you can see in the second image, context is everything. If Hotel A's competitors recorded more impressive growth of 15%, and Hotel B's competitors posted a more severe decline of 10%, Hotel B's performance is contextually better.

Hotel A's benchmarking, unfortunately, shows that it wasn't able to captialize on the market's growth as effectively as the competition. Hotel B, conversely, was better able to deal with a wider market decline.

The payoff = better understanding, planning and strategy

One of the great benefits of benchmarking comes in identifying gaps in your market and opportunities for improvement. Once you understand the data and landscape of your hotel and competition, you can begin shaping your marketing, pricing and operational strategies to ensure they are optimized for success.

Which hotel is performing better?

Analyzing the competition puts performance into perspective

---

[92] https://str.com/sites/default/files/The-Ultimate-Guide-to-Hotel-Benchmarking.pdf?utm_source (last accessed October 2, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

131.    STR explicitly recommends that revenue managers follow a four-part cycle—"analyze, identify, develop, monitor"—through which insights from STR reports are translated into strategy.[93] In the analyze stage, managers are instructed "to use the STAR report to examine the big picture and compare their property's long term historical performance to the competition in the local market." In the "identify" stage, managers are told they "should identify strengths and weaknesses in relation to occupancy and rate," including by narrowing "in on a particular month's performance compared to the same month last year." In the "develop" stage, STR advises managers to enlist their teams to set tactics that "may include pricing."





132.    And STR works closely with participants collectively to maximize their ability to profitably utilize the competitively sensitive information contained in STR reports. Most notably, since 2009, STR has hosted the annual **Hotel Data Conference (HDC)**, a sold-out event that it markets as "a gathering of industry executives with a specific interest in crunching data to

---

[93] https://str.com/sites/default/files/The-Ultimate-Guide-to-Hotel-Benchmarking.pdf?utm_source (last accessed October 2, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

1   improve the performance of their hotels and/or hotel companies." STR itself promotes HDC as

2   the only forum where revenue management leaders across the industry come together to exchange

3   ideas on how best to deploy STR's data in their pricing and inventory strategies.

4        133.    The conference content underscores that hotels not only receive STR's reports, but

5   actively rely on them in day-to-day operations. STR executives use the platform to encourage

6   particular approaches to data, including strategies that link profitability to reduced occupancy

7   rather than lower room rates. For example, at the 2023 HDC, STR's assistant director of financial

8   performance advised that hotels are "most profitable" at occupancy levels between 83% and

9   91%—messaging that framed occupancy data as a tool for calibrating supply.[94] Similarly, at a

10  2020 HDC event, an STR executive gave a presentation about "pricing psychology," explaining

11  that "when it comes to revenue management, you are only as smart as the least smart property in

12  your comp set," and delved into the usage of "ADR trends" to "assess how many 'rogue' hoteliers

13  have begun slashing rates – and whether they are pulling the rest of the comp set down with

14  them."

---

[94] 5 Lessons Learned at The 2023 Hotel Data Conference (August 16, 2023),
https://resources.otelier.io/blog/5-lessons-learned-about-hotel-analytics-at-the-2023-hotel-data-conference/ (last visited Sept. 26, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

| 11:25 AM - 11:45 AM | Networking Break | Networking |
|---|---|---|
| 11:45 AM - 12:15 PM | **Navigating This Cycle (and What Recovery May Look Like)** [-]<br><br>The global pandemic may be unprecedented, but we still can look for guideposts to help us navigate. In this session, Jan Freitag (STR's VP of Lodging Insights) and Isaac Collazo (InterContinental Hotels Group's VP of Competitive Intelligence) put this downturn into perspective by drawing comparison and lessons learned from past cycles. Additional context will be drawn by comparing U.S. hotel performance against other world regions to determine who is on the path to recovery—and who is struggling to survive. To close, the duo will dive into the recovery narrative and explain what needs to happen (and how demand will return) for STR's forecast to hold true. | General |
| Presenters: | Isaac Collazo, Vice President, Competitive Intelligence, InterContinental Hotels & Resorts<br>Jan Freitag, Senior Vice President, Lodging Insights, STR | |
| 12:15 PM - 12:30 PM | **Pricing Psychology in This Downturn** [-]<br><br>When it comes to revenue management, you are only as smart as the least smart property in your comp set—or so the saying goes. Carter Wilson (STR's SVP of Consulting and Analytics) uses data to determine whether that adage holds true with an update on this popular examination of pricing psychology during downturns. He'll pull insights from past recessions to set the scene and then dive into more recent ADR trends to assess how many "rogue" hoteliers have begun slashing rates—and whether they are pulling the rest of the comp set down with them. | General |
| Presenter: | Carter Wilson, Senior Vice President, Consulting & Analytics, STR | |
| 12:30 PM - 1:15 PM | **Revenue Management Best Practices to Get You Through the Downturn** [-]<br><br>A panel of revenue managers shares what they have learned thus far in the pandemic and what they are doing to survive (and thrive?) in the next 12 months. The discussion will prioritize best practices and tangible advice, covering such topics as: how to balance short- and long-term revenue strategy; effective pricing practices that target different demand segments; which KPIs really are driving decision-making; and ways to operate more efficiently amid reductions in staffing. | General |
| Moderator: | Carter Wilson, Senior Vice President, Consulting & Analytics, STR | |
| Panelists: | Andrew Rubinacci, EVP & Chief Commercial Officer, Omni Hotels & Resorts<br>Carolee Moore, Vice President of Revenue Management & eCommerce, Crestline Hotels & Resorts<br>Karen McWilliams, Vice President of Revenue Strategy, Concord Hospitality<br>Nicole Young, Senior Corporate Director of Global Revenue Management, Rosewood Hotel Group | |
| 1:15 PM - 1:30 PM | Networking Break | Networking |

134.    As part of HDC, Employees from hotel chains and revenue management companies frequently serve as speakers and panelists of the conference to share their views on hotel pricing. For example, at the 2023 HDC, there was a panel titled "Courageous Revenue Management," where panelist revenue strategists discussed "how they are evolving revenue management to protect rate integrity, maximizing revenue channels, and making other bold and creative moves." And at the 2022 HDC, on a panel titled "Exchanging occupancy for ADR? Understanding cost and profitability" Jihad Lotfi, McKibbon Hospitality Vice President of

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    Revenue Management, presented that hoteliers should not be "afraid to take risk" on charging

2    high hotel rates.[95]

3         135.    The conference thus operates as more than a neutral forum. By bringing together

4    competing revenue managers and instructing them in how to apply STR's reports, the event

5    magnifies the competitive concerns raised by the information exchange because participants are

6    taught, collectively, how to use the information exchange to protect rate integrity and restrict

7    output.

8         136.    The features of the STR system—reciprocity, timeliness, and competitively

9    sensitive subject matter—are precisely those that the Department of Justice has identified as

10   raising heightened antitrust risk. STR's own promotional statements, and the use of its Hotel Data

11   Conference as a platform for guiding participants' use of the reports, confirm that the pricing

12   information provided by STR is intended to be competitively actionable.

13        **3.    Participating Hotels rely on STR reports as part of their business operations.**

14        137.    Defendants did not merely receive STR's reports—they used them. Managers and

15   revenue strategists regularly reviewed the information, incorporated it into performance

16   evaluations, and discussed it in connection with pricing and occupancy decisions. In this way, the

17   reports functioned as a standard reference point in participants' internal decision-making.

18        138.    The following section sets forth examples of this reliance. Confidential witnesses

19   consistently describe hotel employees' extensive usage of STR data. Confidential witnesses also

20   state that hotels are able to deanonymize the STR data to identify competitors. Hotels have also

21   publicly acknowledged the central role STR plays in their operations, emphasizing that STR

22   benchmarking is a critical component of managing occupancy, rates, and market share. Job

23   postings for revenue management positions further confirm this reliance, as they routinely

24   identify proficiency with STR as a required qualification and highlight STR experience as a core

25   skill for applicants. Together, these sources demonstrate that hotels do not treat STR as optional

26   or peripheral, but as a necessary and ingrained part of their business practices.

27   _____

28        [95] Revenue Experts: 'Don't Be Afraid To Take Risk' on Hotel Rates (August 25, 2022),
     https://www.hospitalitynet.org/external/4112139.html (last visited Sept. 26, 2025).

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

139.    CW 2 worked in various revenue management functions at multiple Defendants, including IHG and Hyatt. CW 2 stated that each of the hotels they worked at received and used STR reports. CW 2 stated that each hotel received the reports on at least a weekly basis. CW 2 stated that STR reports were used "mostly for strategy meetings" each week to gauge performance compared to competitors. CW 2 noted that these strategy meetings were attended by a hotel's leadership team, and sometimes included attendance from the corporate office. CW 2 stated that hotels used the reports to help answer the question "Where do I fit relative to hotels around me that I think perform in the same space?" CW 2 explained that "It was a really important and critical tool for us" in determining how the hotel was "competing relative to the comp set." CW 2 further explained that STR reports directly inform future pricing strategies: "I distinctly remember when you're trying to price out for the future that you would of course reference the STR report to that time of year."

140.    CW 1 worked at multiple Defendant hotels, including the Ritz Carlton and the Waldorf Astoria. CW 1 stated that participating hotels received weekly and monthly reports from STR that contained occupancy, ADR, and RevPAR data. CW 1 explained that if a hotel was "losing share" to its "comp set" a hotel "could make decisions based on that." CW 1 also noted that STR offered additional reports, such as a bandwidth report, that would specifically identify "gaps" between a participating hotel and its competitors.

141.    Confidential Witness 5 ("CW 5") worked as a revenue manager in the hotel industry, including at Hyatt. CW 5 stated that STR reports served as a "report card" for hotels, based on their performance compared to their comp set. CW 5 noted the importance of the fact that STR reports included a "chart that tells you by day, this was your occupancy, this was comp set occupancy." CW 5 explained that STR data was able to inform a hotel's "next year's strategy," including decisions related to "specific weeks."

142.    Confidential Witness 6 ("CW 6") worked in revenue management functions at a number of Defendant hotel companies, including work at Starwood and Hilton. CW 6 stated that hotels can deanonymize STR reports and do so "quite frequently." CW 6 explained a process by which two hotels may partner together to deanonymize the STR data. If a hotel has seven hotels

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1   in its competitive set and wants to deanonymize data for one of the hotels, "I would partner with

2   another hotel close to me that would pick six of the seven I had…And what you do is subtract six

3   out of the seven to single out the hotel that you wanted to measure." CW 6 said that "usually the

4   best tactic" is to work with a "partner" hotel that is "just on the fringe" of the hotel's area.

5        143.    CW 3, a former STR employee, stated that they understood that hotels "relied a

6   lot" on STR reports in performing "performance reviews" of their own employees. CW 3

7   understood that hotels used STR when determining whether to give merit increases to hotel

8   employee personnel.

9        144.    STR's service is widely used in the hotel industry. As of late 2019, Andrew

10  Florance, CoStar's CEO, stated that the "second largest competitor is probably one-fortieth the

11  size, maybe 2 to 3% the size."

12       145.    Hotels have openly acknowledged that STR is indispensable to how they operate

13  in testimonials on STR's website. Dana Cariss, Vice President of Revenue Strategy and

14  Distribution at Caral Tree Hospitality, described STR as "the single source of truth at the

15  moment" for the industry. [96] Similarly, Sourav Ghosh, Chief Financial Officer of Host Hotels &

16  Resorts, affirmed that "STR data is frankly the industry's standard in the lodging space,"

17  emphasizing the trust hotels place not only in STR's raw data but also in its "analysis and

18  research work."[97]

19       146.    Executives have also been candid about how STR supports their daily pricing

20  strategies. Andrew Rubinacci, Executive Vice President of Revenue Strategy at Aimbridge

21  Hospitality, explained:

22              We use STR every day, and it is extremely valuable, and I think it is
               a competitive advantage for the people and the expertise we have.
23             **Data's data: it's what you do with it and how you incorporate it
               into your everyday tactics and strategies**. [STR] allows us to do
24             that, they present the information in a really digestible format, and it
               allows us to go ahead and do the things we need to with it.[98]
25

26  ────────────

27  [96] STR, *Testimonials*, https://str.com/ (last visited Sept. 26, 2025).

28  [97] *Id.*

    [98] STR, *Testimonials*, https://str.com/ (emphasis added) (last visited Sept. 26, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT - 49
011190-11/3301271 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    147.    Other executives echo the same theme of reliance on STR data for maximizing

2    revenue. Alex Cisneros, Senior Vice President of Revenue Generation at Red Roof, highlighted

3    how the company has centralized competitive and market data so franchisees "can make decisions

4    faster." He emphasized that "Red Roof's franchisees for the most part are making more money

5    with less occupancy," crediting the role of "providing more data to franchisees to educate and **get**

6    **them comfortable commanding higher rates**."[99] His remarks demonstrate how STR-powered

7    insights directly affect pricing outcomes across an entire franchise network.

8    148.    Public job postings from major hotel companies further confirm that STR is an

9    integral part of hotel revenue management. These companies not only contract with STR, but also

10    explicitly require knowledge of STR reports as a skill for their employees, embedding the use of

11    STR into the core functions of revenue managers, general managers, and other hotel staff.

12    Employees at Defendant hotels themselves repeatedly advertise their own proficiency with STR

13    reports as a central qualification, underscoring that use of STR is viewed across the industry as an

14    essential professional competency.

15    149.    **Hilton**. Hilton's job advertisements for revenue managers at its Revenue

16    Management Consolidated Center list as a minimum qualification "in-depth knowledge of

17    industry analytical reports such as STR…reports."[100] Hilton employees, including revenue

18    managers, publicly tout their experience with using STAR reports as part of their work experience

19    at Hilton.[101]

20

21    _____

[99] Revenue Experts: 'Don't Be Afraid To Take Risk' on Hotel Rates, CoStar, August 24,

22    2022, https://www.costar.com/article/631164910/revenue-experts-dont-be-afraid-to-take-risk-on-hotel-rates (emphasis added) (last visited Sept. 26, 2025).

23    [100] https://www.linkedin.com/jobs/view/revenue-manager-full-service-rmcc-americas-at-

24    hilton-3804835593/ (last visited Sept. 26, 2025).

25    [101] https://www.linkedin.com/in/minalpatel1/ (last visited Sept. 26, 2025) ("Analyzing and

reviewing monthly and weekly STAR Report results, understanding gains or losses of RevPAR

26    Index and apply this knowledge to impact and forecast future results");

https://www.linkedin.com/in/lisa-silverstein-a141b433/ (last visited Sept. 26, 2025) ("Training to

27    become a Revenue Manager including pricing strategies, displacement analysis, short term and

monthly forecasting, strategy meetings, STAR report analysis, critiques, and future strategy

28    recommendations.).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

150.    **Hyatt.** Hyatt job postings for revenue management positions likewise include responsibilities directly tied to STR. For example, Hyatt's advertised position for Senior Manager, Revenue Management, Franchise states that the role will "manage the STR access administration for Americas Franchise Operators."

151.    **Marriott**. Marriott incorporates STR into the duties of its general managers. Marriott's job postings for general manager positions require candidates to review STR reports and respond to property shareholder critiques based on those reports as part of their "core work activities."[102] Marriott employees working in revenue management regularly tout their experience with using STR reports as part of their work experience at Marriott.[103]

152.    **IHG**. IHG job postings for revenue management roles require direct use of STR. IHG is publicly listed by STR as one of its clients. For example, IHG's advertised position for a director of revenue management position states that the role will "monitor RevPAR index on STR report and provide critical analysis of performance on weekly and monthly basis."[104]

153.    **Loews**. Loews likewise incorporates STR into its job duties. A Loews posting for a group rooms coordinator lists among its responsibilities the task of "[a]nalyz[ing] weekly STR reports to examine hotel occupancy, ADR and RevPAR performance."[105] Employees at Loews also publicly highlight their use of STR reports in their professional experience.[106]

---

[102] Marriott Careers, https://jobs.marriott.com/marriott/jobs/24022693?lang=en-us (last visited Feb. 20, 2024).

[103] https://www.linkedin.com/in/betsy-bolton-3ba22635/ (last visited Sept. 26, 2025) (the manager of centralized revenue management services is responsible for conducting "[a]nalysis of performance reports, STR Reports (weekly and monthly); Lead a weekly Strategy Meeting where the appropriate booking horizon is evaluated for proper pricing and inventory controls"); https://www.linkedin.com/in/meghan-davino/ (last visited Sept. 26, 2025) (the revenue manager of Marriott would "review and analyze STR data on a weekly and monthly basis, identify and implement strategies for future demand scenarios, and compile weekly reports to analyze key drivers of market share performance and understand overall effectiveness of strategies").

[104] IHG job posting, https://g.co/kgs/N5FrpWL (last visited Feb. 20, 2024).

[105] Loews job posting, https://www.linkedin.com/jobs/view/137378309/ (last visited Feb. 20, 2024).

[106] https://www.linkedin.com/in/stuart-schwartz-523b558/ (last visited Sept. 26, 2025) (working as a managing director at Loews, a key metric listed on the LinkedIn profile is that the hotel property is "consistently ranted #1 or #2 within competitive set" in the STR reports).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

154.    **Accor**. Accor advertised jobs in revenue management include duties related to STR reports. For example, the ability to utilize STR reports is highlighted as a crucial skill for the Director of Revenue Management position advertised by Accor Fairmont.[107]



155.    In another Accor job posting, it states that the revenue analyst will be responsible for "[a]ssisting ADRM to upload STR information through STR and internal report."[108] And Employees working at Accor tout their experience with using STR reports as part of their work experience.[109]

156.    **Omni Hotels**. Omni Hotels requires managers to use STR as part of their responsibilities. A job posting for general manager specifies the candidate must "[r]eview[] the STR report, competitive shopping reports and using other resources to maintain an awareness of

---

[107] *See* https://www.linkedin.com/posts/the-fairmont-winnipeg_experience-luxury-opportunity-activity-6896546265513959424-wRvO/ (last visited Feb. 20, 2024).

[108] Accor Fairmount Hotels job posting, https://www.linkedin.com/jobs/view/revenue-analyst-at-fairmont-hotels-resorts-153576177/ (last visited Feb. 20, 2024).

[109] https://www.linkedin.com/in/ben-shih-8273331/ (last visited Sept. 26, 2025) (reviewing "the STR report, competitive shop reports and other industry metrics to optimize the hotel's market position" is part of the job duties of the director of sales and marketing at Accor).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

the property's market position."[110] Employees working at Omni Hotels tout their experience with

using STR reports to deliver excellent financial results for the hotel.[111]

157.    The importance Omni attaches to STR was also recognized in a 2007 federal court

decision. In that decision, the Court stated that: "With regard to sales, Omni compares a hotel's

performance to the performance of a small number of competitors in its geographic market,

referred to as the "competitive set." Omni analyzes individual hotel performance against the

competitive set based on three factors: (a) average room rate, (b) occupancy, and (c) revenue per

available room ("RevPar"). RevPar represents the revenue per available room the hotel is

receiving, computed by multiplying the average room rate by the percentage of occupancy. To

analyze how a hotel is performing in these areas compared to the competitive set, Omni purchases

the STAR report from Smith Travel Research. The STAR report is a monthly analysis which

provides comparative data."[112] In that decision, the Court specifically found that Omni had fired

general managers of its hotels based, in part, on poor performance in the STAR report.[113] This

judicial finding underscores that Omni does not merely consult STR data, but makes critical

employment decisions based on it.

---

[110] Omni Hotels job posting, https://www.linkedin.com/jobs/view/general-manager-at-omni-hotels-resorts-3779904785/.

[111] https://www.linkedin.com/in/josh-gibson-3328219/ (last visited Sept. 26, 2025) (an employee specifically noted that he won an award "for excellent financial and STR results at Omni Charlotte and Omni Hilton Head Oceanfront Resort for 2015 results").

[112] *Equal Emp't Opportunity Com. v. Omni Hotels Mgt.,* 516 F. Supp. 2d 678 (N.D. Tex. 2007).

[113] *Equal Emp't Opportunity Com. v. Omni Hotels Mgt.*, 516 F. Supp. 2d 678 (N.D. Tex. 2007). ("In the twelve months before and after Elmougy's separation, Omni terminated non-Muslim, non-Egyptian GMs without prior written warning: (a) Mike Knapp, GM of the Omni Los Angeles, April 9, 2001, for poor sales (RevPar index change in the bottom five (5) hotels of the Omni chain at the time of separation); (b) Paul Martin, GM of the Omni Severin in Indianapolis, April 30, 2002, for low morale and lagging sales (RevPar index change above the bottom five hotels of the Omni chain at the time of separation").

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    158.    **Choice/Radisson**. Choice Hotels' employees working in revenue management

2    regularly highlight their experience of analyzing STAR reports as part of their work

3    experience.[114]

4    159.    **Langham**. Langham employees working in revenue management tout their

5    experience with using STR reports as part of their work experience.[115]

6    160.    **Wyndham**. Wyndham's job postings also include STR as part of required

7    responsibilities. For instance, a Wyndham advertisement for coordinator, revenue management

8    services operations lists "coordination of STR reporting and initiating competitive pricing

9    reports" as a primary responsibility of the role.[116]

10    161.    Taken together, these confidential witness accounts, public statements, and job

11    postings establish that STR is embedded in the work of key hotel employees responsible for

12    pricing, for whom proficiency with STR is a baseline qualification. This consistent evidence

13    shows that hotels treat STR as indispensable to their core pricing and revenue management

14    practices.

15

16

17

18

19

---

20    [114] https://www.linkedin.com/in/jordanreus/ (last visited Sept. 26, 2025) (the revenue manager
of Choice Hotels is responsible for "[o]ptimize[ing] RevPAR by analyzing demand and creating
21    effective selling strategies, oversell and optimal market mix; Prepar[ing] and analyz[ing] weekly,
monthly and period end data including Daily Report, Segmentation Report, ChoiceMAX reports,
22    pricing positions, market shops, STR, reservation activity, etc").

23    [115] https://www.linkedin.com/in/chapmann-wong-crme-685857b0/?originalSubdomain=hk
(last visited Sept. 26, 2025) (employee who used to work at Langham corporate office as a
24    revenue executive noted that reviewing STR reports as part of his job duties);
https://www.linkedin.com/in/kenneth-ayson-crme-chia-827a7751/ (last visited Sept. 26, 2025)
25    (The director of revenue management at Langham is required to "[m]onitor RevPAR index on
STR report and provide critical analysis of performance on weekly and monthly basis.").
26

27    [116] Wyndham job posting, https://www.linkedin.com/jobs/view/coordinator-revenue-
management-services-operations-at-wyndham-hotels-resorts-3815108056/ (last visited Sept. 26,
28    2025).

---

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

**E.    Defendant and Conspirator Hotel Operators Subscribe to the STR Reporting Services**

162.    Numerous independent sources confirm that each Defendant and Co-Conspirator subscribed to STR's services during the Class Period. STR's website prominently identifies Hotel Operators Hilton, Marriott, Accor, IHG, Hyatt and Wyndham as its clients.[117]



163.    **Hilton.** Hilton is publicly listed by STR as one of its clients. ████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████ As of the middle of 2024, numerous Hilton hotels were actively participating in the information exchange in the Luxury Hotel Markets. Examples of those hotels are identified below.

164.    **Hyatt.** Hyatt is publicly listed by STR as one of its clients. ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████

[117] STR, Our clients, https://str.com/who-we-serve/hotel-operators (last visited Sept. 26, 2025).

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    [REDACTED] Through at least 2024, numerous Hyatt-affiliated hotels in the Luxury Hotel Markets

2    participated in STR. Examples of those hotels are identified below.

3        165.    **Marriott**. Marriott is publicly listed by STR as one of its clients. [REDACTED]

4    [REDACTED]

5    [REDACTED]

6    [REDACTED]

7    [REDACTED] Through at least 2024, numerous Marriott-

8    affiliated hotels in the Luxury Hotel Markets participated in STR. Examples of those hotels are

9    identified below.

10        166.    **IHG**. IHG is publicly listed by STR as one of its clients. [REDACTED]

11    [REDACTED]

12    [REDACTED]

13    [REDACTED]

14    [REDACTED] Through at least 2024, numerous IHG-affiliated hotels in the Luxury Hotel Markets

15    participated in STR. Examples of those hotels are identified below.

16        167.    **Loews**. [REDACTED]

17    [REDACTED]

18    [REDACTED]

19    [REDACTED] Through at least 2024, numerous Loews-affiliated hotels in the

20    Luxury Hotel Markets participated in STR. Examples of those hotels are identified below.

21        168.    **Accor**. Accor is publicly listed by STR as one of its clients. [REDACTED]

22    [REDACTED]

23    [REDACTED] Through at least 2024, numerous Accor-affiliated hotels in

24    the Luxury Hotel Markets participated in STR. Examples of those hotels are identified below.

25        169.    **Omni Hotels**. Through at least 2024, numerous Omni-affiliated hotels in the

26    Luxury Hotel Markets participated in STR. Examples of those hotels are identified below.

27

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    170.    **Choice/Radisson**. Radisson is publicly listed by STR as one of its clients.[118]

2    Choice Hotels' employees working in revenue management regularly highlight their experience

3    of analyzing STAR reports as part of their work experience.[119] Through at least 2024, numerous

4    Choice-affiliated hotels in the Luxury Hotel Markets participated in STR. Examples of those

5    hotels are identified below.

6    171.    **Langham**. Langham employees working in revenue management tout their

7    experience with using STR reports as part of their work experience.[120] Through at least 2024,

8    numerous Langham-affiliated hotels in the Luxury Hotel Markets participated in STR. Examples

9    of those hotels are identified below.

10    172.    **Wyndham**. Wyndham is publicly listed by STR as one of its clients. Through at

11    least 2024, numerous Wyndham-affiliated hotels in the Luxury Hotel Markets participated in

12    STR. Examples of those hotels are identified below.

13    **F.    The information exchanges orchestrated by STR produce anticompetitive effects.**

14    173.    Competition is likely to be harmed when competitors who possess dominant

15    market shares in a concentrated market, such as the market at issue, exchange competitively

16    sensitive information about their current and forward-looking prices and supply/demand. When

17    defendants that are competing for the same customers exchange information that is crucial to

18    competition, comfort replaces uncertainty and incentives to lower price are reduced.

19

20    [118] Caroline Thissen, Senior Area Director of Sales and Revenue Optimization at Radisson
21    praised STR's services by providing her testimonials featured on the STR website: https://str.com/
    (last visited Sept. 29, 2025).

22    [119] https://www.linkedin.com/in/jordanreus/ (last visited Sept. 29, 2025) (the revenue manager
23    of Choice Hotels is responsible for "[o]ptimize[ing] RevPAR by analyzing demand and creating
    effective selling strategies, oversell and optimal market mix; Prepar[ing] and analyz[ing] weekly,
24    monthly and period end data including Daily Report, Segmentation Report, ChoiceMAX reports,
    pricing positions, market shops, STR, reservation activity, etc").

25    [120] https://www.linkedin.com/in/chapmann-wong-crme-685857b0/?originalSubdomain=hk
26    (last visited Sept. 29, 2025) (employee who used to work at Langham corporate office as a
    revenue executive noted that reviewing STR reports as part of his job duties);
27    https://www.linkedin.com/in/kenneth-ayson-crme-chia-827a7751/ (last visited Sept. 29, 2025)
    (The director of revenue management at Langham is required to "[m]onitor RevPAR index on
28    STR report and provide critical analysis of performance on weekly and monthly basis").

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1.    **The structure of the relevant Luxury Hotel market is one where information exchange is likely to lead to anticompetitive effects.**

174.    The Luxury Hotel market exhibits numerous attributes indicating that the type of information exchanges facilitated by STR are particularly likely to cause anticompetitive effects. In particular, the market features high barriers to entry, market concentration, a relatively fungible product, and inelastic demand.

175.    **Barriers to entry**. The existence of high barriers to entry is one factor which makes a market susceptible to collusion. Although under the basic economic principles, collusive parties' ability to raise luxury hotel room prices above competitive level would attract new entrants who seek to benefit from the supracompetitive pricing, because there are significant barriers to entry in the market, such new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a collusion.

176.    During the Class Period and continuing today, substantial barriers impede entry into the luxury hotel rental market. New entrant into the market would face costly and lengthy start-up costs, including the high cost of renovating and customizing a hotel property, upfront investment in hotel amenities, recruiting and training highly skilled staff, establishing a property management infrastructure, implementing marketing and advertising campaigns, and ongoing costs of property maintenance. For example, one 2019 survey found that the median cost to develop a luxury hotel was $675,000 per room. In other words, the median cost to open a 100-room hotel would be $67.5 million.[121] On average, the number of rooms in a luxury hotel is over 300.[122] This means that the average cost to open a luxury hotel in the United States is approximately $200 million dollars.

---

[121] *U.S. Hotel Development Cost Survey 2020*, HVS (October 14, 2020) https://www.hvs.com/article/8910-US-Hotel-Development-Cost-Survey-2020 (last visited Sept. 29, 2025).

[122] *Average number of rooms per hotel in the United States from 2017 to 2020, by chain type*, Statista (April 21, 2023), https://www.statista.com/statistics/823786/average-number-of-rooms-per-hotel-by-chain-type/ (last visited Sept. 29, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

177.    **Market concentration.** The U.S. hotel market has been subject to steadily increasing consolidation over the past years[123] and arguably has become "the world's most consolidated hotel market, with only about one-third of hotels have remained independent."[124] As a result of the consolidation, the Luxury Hotel market is dominated by a few key players.[125] Collectively, Defendants and their co-conspirators controlled at least 70% of the relevant market during the Class Period. The presence of few companies supports the inference that a conspiracy to exchange information had the intended effect of restraining competition.

178.    **Relative fungibility of hotel rooms**. With an accounting of a few high-level characteristics of properties—such as the size, amenities, location, or the age of the building—hotel guest rooms within classes of properties are relatively fungible, such that competition among defendant hotels is primarily driven by pricing.

179.    **Inelastic demand**. The demand for luxury hotel rooms is relatively inelastic, as consumers make reservations for immediate, short-run needs.[126] Because hotel defendants dominated the relevant market during the Class Period, consumers generally have limited reasonable substitutes to discipline cartel pricing.

---

[123] The article published by CoStar, titled "Merged and Acquired: A Review of US Hotel Industry Consolidation in 2023," describes that "consolidation was still the name of the game" for the U.S. hotel industry. *See* https://www.costar.com/article/2083388443/merged-and-acquired-a-review-of-us-hotel-industry-consolidation-in-2023 (last visited Sept. 29, 2025).

[124] *Independent Hotels in the U.S. Pressured by the Big Brands*, Skift (March 1, 2023) https://skift.com/2023/03/01/independent-hotels-in-the-u-s-pressured-by-the-big-brands/ (last visited Sept. 29, 2025).

[125] According to the analysis conducted by James Halse, portfolio manager of Platinum Assent Management in 2020, "[l]arge hotel groups, such as Marriott and Hilton, dominate the market for these travelers. In the US today, around 70% of hotels are part of branded chains." *See* Oligopoly Forming: Consolidation in the Hotel Industry (January 22, 2020), https://www.linkedin.com/pulse/oligopoly-forming-consolidation-hotel-industry-james-halse-cfa (last visited Sept. 29, 2025).

[126] The Supreme Court has emphasized that inelastic demand occurs in markets where "buyers place orders only for immediate, short-run needs." *United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2        **2.    The nature of the information exchanged renders it likely to produce
             anticompetitive effects.**

3        180.    The STR information exchange is likely to have anticompetitive effects because it

4   involves (1) current and forward-looking price information, (2) shared only among participating

5   hotels, (3) focused exclusively on prices and supply; (4) in a loosely deanonymized format, and

6   (5) facilitated by common third-party.

7        181.    As discussed in detail above, STR reports contain current and forward-looking

8   price information.

9        182.    Moreover, STR is available to only one side of the market—the hotel owners and

10  operators who submitted data to STR. Consumer purchasers are unable to access the information

11  because STR functions on a "give to get" basis. In addition, the publication of the "response

12  report" allows report subscribers to monitor participation by their competitors in the agreements.

13  This information asymmetry contributes to the anticompetitive effects of the information

14  exchange.

15       183.    Although STR has claimed that the data it distributes is aggregated, the expansive

16  amount of competitively sensitive information provided in the reports is at best loosely

17  "anonymized." A comp set only needs to include as few as three competitors that are not affiliated

18  with the subject hotel.[127] To provide further transparency, STR excludes the subject hotel from

19  comp set data on daily and weekly reports. Moreover, each report provides the subject hotel with

20  details of whether properties in the subject hotel's comp set have reported data to STR. In any

21  event, although the report provides aggregated data sets, the subject hotel knows which

22  competitors it is looking at because it handpicks them for the competitive set. Furthermore, ttry

23  vehe STR STAR reports do not provide abstract industry averages; they provide participants with

24  contemporaneous averages of ADR, occupancy, and RevPAR for the precise set of competitors a

25  hotel selects as its "comp set." These metrics reflect actual revenue realized per room and thus

26  provide direct, current insights into rival pricing and demand conditions.

27      _____

28       [127] STR, *Competitive Set Guidelines:* https://str.com/competitive-set-trend-report-guidelines
    (last visited Sept. 29, 2025).



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

184.    Lastly, as part of the information exchange scheme, participating hotels all agree to pay STR to manage the exchange of competitively sensitive information among competitors. STR profits by managing the scheme and encourages participating hotels' use of the reports it provided for anticompetitive purposes. Such use of a common intermediary to exchange information help competitors foster trust for collusion because participating hotels do not need to trust each other directly, as long as they trust the intermediary. This is what STR has achieved over the years.

185.    To foster trust, STR issues detailed data submission guidelines to outline protocols and standardize performance data consistency for reporting purposes.[128] It also engages in extensive data verification. As CW 4 explained, STR implemented "a lot of internal applications that were run against" data submitted by each hotel to STR to verify accuracy. There was an accuracy percentage or threshold for various metrics which, if not met, triggered "more scrutiny," CW 4 said.

### 1. Economic analysis confirms that the STR information-sharing scheme produces anticompetitive effects in the form of higher prices for participating hotels during the conspiracy period.

186.    Economic analysis confirms that collective information exchange through STR leads to higher prices. Preliminary economic analysis was conducted on a publicly available dataset of future listing prices for over 6,000 hotels across 15 major cities in the United States between January and June of 2024. The data, comprising of over 360,000 price points, allows an assessment of how hotel operators set their room rates on the basis of information available at the time. In the amended complaint, Plaintiffs have revised that analysis based on information STR produced in discovery – in particular, a list identifying all hotels using STR in the Luxury Hotel Markets in certain luxury categories.

187.    An initial analysis comparing STR and non-STR hotels shows that participation in STR is associated with higher prices. Looking at monthly average prices across the luxury hotel

---

[128] *See Forward STAR Data Reporting Guidelines*, https://str.com/forward-star-data-reporting-guidelines (last visited Sept. 29, 2025); *Historical Benchmarking Data Reporting Guidelines*, *supra* note 24.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

markets,[129] STR hotels charged more than their non-STR counterparts on average. This pricing gap, evident across markets, underscores that STR hotels systematically sustained higher rates than non-participants—an effect that points to the inflationary impact of the STR information exchange:



188.    Plaintiffs then conducted a regression analysis to predict the counterfactual prices that STR hotels would have charged had they not participated in STR. The regression relied on information produced in discovery identifying which hotels participated in STR. It controlled for **zip code**, ensuring comparisons were made between hotels operating in the same geographic areas. It also controlled for **star rating**, ensuring that differences in hotel quality did not drive the results.

189.    The model then estimated counterfactual prices for STR hotels based on the observed pricing of comparable non-STR hotels. The results are striking: actual prices at STR

---

[129] The average price is calculated after controlling for a hotel's star rating, the day of the week, and the hotel's location.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    hotels were, on average, **12 percent higher** than the counterfactual prices they would have

2    charged absent STR participation. This elevation cannot be explained by geography or quality

3    differences. It reflects the inflationary effect of the STR information exchange, which enabled

4    participating hotels to maintain significantly higher prices than their peers.



19    190.    This empirical result aligns with the economic dynamics of STR's information

20    exchange. Hotels compete in markets where pricing is highly responsive to expectations about

21    rival behavior. STR's near-contemporaneous reports provide participants with visibility into

22    whether competitors are discounting during soft periods or maintaining and increasing rates when

23    demand is strong. With that information, hotels can condition their pricing strategies on rivals'

24    conduct rather than relying solely on independent assessments of market demand.

25    191.    Evidence from preliminary analysis of listed prices displays parallel pricing

26    movements and trends amongst competitors, suggesting a common pricing strategy and/or a

27    shared input in determining room fares. The graph below shows price parallelism in four pairs of

28    competing premium hotel chains across 15 major U.S. cities. The similarities in their pricing

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

patterns are unlikely to be explained by adjustments due to shifting demands, given that these are

observed (and averaged) across 15 different markets.



### 3. Competitively sensitive information sharing among competitors is likely to result in anticompetitive effects.

192.    Extensive economic research documents and empirical observation suggest that

industry-wide information exchange leads to anticompetitive effects, including elevated prices. In

a 2006 paper, "Information Agreements, The Pros and Cons of Information Sharing," competition

law professor Richard Whish writes that:

> Against this the dangers of information agreements have to be borne
> in mind. The essence of competition is that each producer should act
> independently on the market and not coordinate its behaviour with
> that of its rivals. If competitors agree to divulge to one another
> detailed information about their pricing policies, investment plans or
> research and development projects, it becomes easier for them to act
> in concert. **Indeed in some circumstances it may be that the mere
> exchange of information will in itself be sufficient to eliminate**

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    **normal competitive rivalry**. The overriding principle is that certain forms of contact between competitors should be avoided.[130]

2    193.    Similarly, Professors Jeffrey R. Church and Roger Ware explain that information

3    exchange is one type of "facilitating practices" that could increase the likelihood of collusion

4    among participants, as facilitating practices typically promote collusion by (i) increasing the

5    probability of detection, increasing the severity of punishment, or decreasing the response time

6    for punishment or (ii) decreasing the difficulties associated with reaching an agreement.

7    Facilitating practices typically operate by promoting information exchange, or managing

8    incentives, or both.[131]

9    194.    Use of an intermediary to facilitate an information exchange does not relieve any

10   existing anticompetitive concerns. Indeed, Principal Deputy Assistant Attorney General Doha

11   Mekki of the Department of Justice has stated that "exchanges facilitated by intermediaries can

12   have the same anticompetitive effect as direct exchanges among competitors. In some instances,

13   **data intermediaries can enhance – rather than reduce – anticompetitive effects**."[132]

14   195.    Moreover, an empirical study shows that when firms share their price information

15   with one another, but not with buyers, the information is more likely to raise competitive

---

[130] Richard Whish, "Information Agreements," in *The Pros and Cons of Information Sharing*, Swedish Competition Authority's Pros and Cons Series 5 (2006), p. 20, https://www.konkurrensverket.se/globalassets/dokument/informationsmaterial/rapporter-och-broschyrer/pros-and-cons/rapport_pros-and-cons_2006_information_sharing.pdf (emphasis added) (last visited Sept. 29, 2025). *See also* Francisco Gomez-Martinez, Sander Onderstal, and Joep Sonnemans, "Firm-Specific Information and Explicit Collusion in Experimental Oligopolies," *European Economic Review* 82 (2016): 132-141 (working paper for experimental evidence that communication of firm-specific information reduces the level of competitiveness in the market), available at https://www.sciencedirect.com/science/article/abs/pii/S0014292115001610 (last visited Sept. 29, 2025).

[131] Jeffrey R. Church and Roger Ware, *Industrial Organization: A Strategic Approach*, Irwin McGraw-Hill (2000), pp. 348-349.

[132] Principal Deputy Assistant Attorney General Doha Mekki of the Antitrust Division Delivers Remarks at GCR Live: Law Leaders Global 2023 (February 2, 2023), https://www.justice.gov/opa/speech/principal-deputy-assistant-attorney-general-doha-mekki-antitrust-division-delivers-0 (emphasis added) (last visited Sept. 29, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    concerns. This is because if buyers have knowledge of the various sellers' prices, then they can

2    more easily force them to compete with each other.[133]

3        196.    Regarding the nature of the data exchanged, economic research has identified that

4    "private communication among the participating firms about future plans as well as the exchange

5    of individual data on prices and quantities carries high risks of collusion; exchange of individual

6    data on demand and cost carries medium risks; while the exchange of aggregate data carries low

7    risks."[134]

8        197.    The Federal Trade Commission and Department of Justice's "Antitrust Guidelines

9    for Collaborations Among Competitors" emphasize that "[o]ther things being equal, the sharing

10   of information relating to price, output, costs, or strategic planning is more likely to raise

11   competitive concern than the sharing of information relating to less competitively sensitive

12   variables. Similarly, other things being equal, the sharing of information on current operating and

13   future business plans is more likely to raise concerns than the sharing of historical

14   information."[135]

15       198.    The Department of Justice has recently emphasized the significant potential

16   anticompetitive effects from information exchange. Doha Mekki, Principal Deputy Assistant

17   Attorney General of the Department of Justice, stated in February 2023 that "the suggestion that

18   data that is at least three-months old is unlikely to be competitively-sensitive or valuable is

19   undermined by the rise of data aggregation, machine learning, and pricing algorithms that can

20   increase the competitive value of historical data for some products or services."[136] Mekhi

21       [133] Douglas D. Davis and Charles A. Holt, "Consumer Search Costs and Market

22   Performance," *Economic Inquiry* 34, no. 1 (1996): 133-151.

23       [134] Mats Bergman, "Introduction," in *The Pros and Cons of Information Sharing*, Swedish
     Competition Authority's Pros and Cons Series 5 (2006), p. 15, https://www.konkurrensverket.se/

24   globalassets/dokument/informationsmaterial/rapporter-och-broschyrer/pros-and-
     cons/rapport_pros-and-cons_2006_information_sharing.pdf (last visited Sept. 29, 2025).

25       [135] Federal Trade Commission & U.S. Department of Justice, Antitrust Guidelines for

26   Collaborations Among Competitors 15–16 (April 2000), https://www.ftc.gov/sites/default/files/
     documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-

27   competitors/ftcdojguidelines-2.pdf (last visited Sept. 29, 2025).

         [136] *Principal Deputy Assistant Attorney General Doha Mekki of the Antitrust Division
28   Delivers Remarks at GCR Live: Law Leaders Global 2023* (February 2, 2023),

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    continued that "aggregated, older data may have been less useful than disaggregated current or

2    prospective information…. The modern economy may have solved for these speed bumps. The

3    realities of some markets – and the products and services that are core to them – challenge

4    embedded assumptions about the susceptibility of those markets to concerted action among

5    market participants of varying sizes and geographies. In some industries, high-speed, complex

6    algorithms can ingest massive quantities of 'stale,' 'aggregated' data from buyers and sellers to

7    glean insights about the strategies of a competitor. Where that happens the distinctions between

8    past and current or aggregated versus disaggregated data may be eroded."[137]

9         199.    Based on these concerns, the Department of Justice retracted guidelines it had

10    previously provided on the types of information exchange that it had classified as falling into

11    "safe harbor" zones, explaining that technological advancement and modern economics had

12    rendered the policy statements regarding information exchange outdated. The now-retracted safe

13    harbor guidelines were that (1) the collection was managed by a third party; (2) all data was more

14    than three months old; and (3) there were at least five providers for each statistic, with no

15    individual provider representing more than 25% of the data on a weighted basis for that statistic.

16         200.    Notably, the information exchange through STR does not even satisfy these now-

17    retracted guidelines. STR permits competitive sets with fewer participants than the guidelines

18    contemplated: it requires only that (1) four other hotels be included; (2) no single property

19    account for more than 50 percent of the room supply; and (3) no single company account for more

20    than 70 percent of the room supply.[138] And, as discussed above, STR provides current data back

21    to participants, including weekly reports on competitors. This data is not more than three months

22    old. In short, both STR's rules on aggregation and the frequency with which it disseminates data

23    clearly violate the now-retracted guidelines from the Department of Justice on when information

24    exchange will have a safe harbor.

25    _____

26    https://www.justice.gov/opa/speech/principal-deputy-assistant-attorney-general-doha-mekki-antitrust-division-delivers-0 (last visited Sept. 29, 2025).

    [137] *Id.*

27

28        [138] A complete copy of STR's competitive set trend report guidelines is attached to this complaint as Exhibit 8 (available at https://str.com/competitive-set-trend-report-guidelines).

FIRST AMENDED CLASS ACTION COMPLAINT - 67
011190-11/3301271 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

201.    As the DOJ has recognized, information exchanges can be particularly problematic when paired with pricing algorithms and revenue management systems. The hotel industry exemplifies this dynamic, with both technologies in widespread use.

202.    Defendant hotels operate centralized revenue management systems. For example, Hilton requires franchisees to use its "OnQ" system, which includes revenue and rate management, inventory controls, and forecasting. Marriott likewise provides a revenue management system for franchise hotels for the Westin brand. IHG requires its properties to use its "Concerto" platform, which integrates revenue management algorithms and price optimization tools.

203.    Defendant hotel executives have touted the importance of these systems. For example, Hilton's CFO, Kevin Jacobs, has stated regarding Hilton's revenue management work that "We have a vendor that we work with. We co-created the algorithm with them…[today's] algorithms are being tweaked constantly to add incremental data fields that used to be in revenue management in our world. The world is awash in data that are contributing to the decision-making in these algorithms and just make it smarter." A Hyatt executive, on a May 2, 2019 investor call, emphasized that "we have been and will continue to work closely with our franchise operators to leverage the most effective revenue management strategies to optimize performance as we work through these industry dynamics."

204.    Defendants have specifically attributed their ability to achieve higher prices and show greater discipline to their leveraging of data and employment of revenue management systems. For instance, at a September 20, 2022 investor event, there was the following exchange between an investment analyst and Keith Barr, then CEO of IHG: "Q: So, compared with five years ago, IHG is much better at pricing discipline and extracting optimal rate from the market, and that is a long-term tailwind. Is that right? A: Yeah, absolutely. It's leveraging technology and data and analytics."

205.    Defendant executives have specifically noted the importance of revenue management systems being deployed throughout the industry. At an October 21, 2022, investor event, an IHG executive stated that "it's been encouraging how the revenue management

FIRST AMENDED CLASS ACTION COMPLAINT - 68
011190-11/3301271 V1

1  discipline in IHG and across the industry has worked, so that when there is demand, people have

2  gone for the maximum rates available. I think that's been a very effective strategy." Similarly,

3  Kathleen Oberg, CFO of Marriott, similarly stated on a May 2, 2023 investor call that "there's

4  also been some great learnings on the part of the industry about revenue management."

5      206.    STR supplies a key source of data that helps fuel these revenue management

6  systems. CW 5 stated that she believed that STR data was "one of the historical data set points"

7  that was fed into revenue management software. In particular, CW 5 identified that STR data was

8  "definitely" used for hotels using IDeaS' revenue management software. Correspondingly, IDeaS,

9  a leading revenue management software provider for multiple Defendants, publicly notes that it

10  uses STR as a data source for "market demand intelligence."[139]

11      207.    And industry executives have acknowledged that the effectiveness of these

12  revenue management systems depends on the breadth of market-level data they receive. Hilton's

13  CFO has explained that the company "co-created the algorithm" with its vendor and that these

14  algorithms are "tweaked constantly to add incremental data fields" from the market. IHG

15  executives have likewise attributed improved pricing discipline to "leveraging technology and

16  data and analytics." STR's information exchange thus helps power and validate Defendant hotels'

17  revenue management systems.

18  **G.    Defendant and Conspirator Hotel Operators Possess Market Power in the Relevant**
19  **Luxury Hotel Metropolitan Markets**

20      **1.    Luxury Hotels constitutes the relevant product market.**

21      208.    One tool that courts use to assess the competitive effects of concerted action is

22  defining a relevant market, which is the zone of competition among the agreeing rivals in which

23  the agreement may affect competition. A relevant market contains both a product dimension (the

24  "product market") and a geographic dimension (the "geographic market"). The relevant antitrust

25  market in this case is the Luxury Hotel Metropolitan Markets.[140]

26  _____

27      [139] https://go.rev.ideas.com/journey-to-success (last visited Sept. 29, 2025).

28      [140] Luxury hotels here were identified based on hotels identified as having four or five star
     ratings on Kayak in the fifteen metropolitan markets identified below.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    209.    Budget or mid-range economy hotels are not reasonable substitutes for luxury

2    hotels from the perspective of consumers. For example, consumers who stay at luxury hotels

3    generally expect the hotels have highly skilled staff who provide high-quality service, top-notch

4    amenities and facilities, such as upscale spas, fine dining restaurants, fitness centers, swimming

5    pools, luxurious bedding, and stylish furnishings, none of which is provided by the budget or

6    economy hotels.

7    210.    Further, luxury hotels are typically situated in prime locations, such as city centers,

8    beachfronts, or scenic countryside settings. These desirable locations offer guests convenient

9    access to attractions, shopping, dining, and entertainment options, enhancing their overall

10   experience.

11   211.    Hotel industry has long recognized the luxury hotels—traditionally has been

12   associated with four and five-star hotel brands—as a distinct market.[141] Luxury hotels often have

13   prestigious brand reputations built over years of delivering exceptional service and experiences.

14   Guests choose luxury hotels for the prestige associated with the brand, knowing that they can

15   expect a certain level of excellence and sophistication.

16   212.    The hotel industry has specifically catered to the desire of consumers to identify

17   luxury hotels with a star rating that classifies hotels in segments from one star to five stars. Four-

18   and five-star hotels are widely recognized as providing distinctive levels of luxury and comfort to

19   guests as compared to hotels with lower star ratings. Various independent organizations provide

20   star ratings in response to consumer demand for identifying particular subsets of hotels that are

21   responsive to the specific needs of those consumers.

22   213.    Recognizing the uniqueness of the Luxury Hotels market and its distinct consumer

23   base, Defendant Hotel Operators have developed separate brands tailored to this high-end

24   segment. For instance, among the 24 brands created within Hyatt's portfolio, "Andaz" hotels are

25   luxury hotels, "Destination by Hyatt" are luxury and upper-upscale hotels, and "Hyatt House" are

26

27   [141] *Five Star Hotel Market: Elevating Luxury Hospitality*,
https://markwideresearch.com/press-release/five-star-hotel-market-elevating-luxury-hospitality/

28   (last visited Sept. 29, 2025).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  upscale hotels.[142] Other Defendant Hotel Operators take similar approach to effectively cater to

2  diverse consumer needs and provide targeted webpages and searches available on their websites

3  specifically focused on their luxury hotel brands.[143]

4         **2.**      **Metropolitan Areas constitute the relevant geographic markets.**

5        214.    Defendant STR operates a nationwide business with hotel clients spread

6  throughout the country. The foundational STAR report is structured in the same way across the

7  country. Consumers throughout the country are impacted by the information exchange agreement

8  organize by STR.

9        215.    Consumers of hotel rooms are generally looking for lodging in a specific location,

10  usually tied to a trip that the consumer is taking to that region that necessitates accommodation.

11  Therefore, there are specific metropolitan markets for luxury hotels. Consumers in a particular

12  metropolitan market do not consider hotels in other metropolitan markets as adequate substitutes

13  for the hotel in the geographic market they are seeking. In short, a consumer visiting Miami will

14  not consider a luxury hotel room in New York to be an adequate substitute.

15        216.    Plaintiffs allege that Defendants' agreement harmed competition in at least the

16  following metropolitan areas, each of which compromises a separate and distinct relevant

17  geographic market under any potential Rule of Reason Analysis. The fifteen metropolitan areas

18  each constitute a relevant geographic market.

19        217.    The metropolitan area around **Austin, Texas** constitutes a relevant geographic

20  market. Multiple Hotel Operators have branded luxury hotels in that metropolitan market that

21  participate in the STR information exchange.[144] In total, STR identified in discovery

22  approximately ▮ hotels in the Austin Metropolitan Hotel Market participating in STR as of July

---

[142] Hyatt, *Our Brands*, https://www.hyatt.com/development/ourbrands (last visited Sept. 29, 2025).

[143] See e.g., Hilton, https://www.hilton.com/en/locations/luxury/; Marriott, https://www.marriott.com/travel-experience/luxury-hotels/; IHG, https://www.ihg.com/explore/luxury-hotels (last visited Sept. 29, 2025).

[144] Each of the hotels listed in the following section were participating in the STR information exchange as of July 2024, the date for which STR produced a list of hotels participating in STR in the Metropolitan Markets.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1  2024.[145] Examples of Defendant Hotels in the Austin Metropolitan Hotel market participating in

2  STR include the following:

3      A.      Marriott hotels participating in STR in the Austin market include

4

5      B.      Hyatt hotels participating in STR in the Austin market include

6

7      C.      IHG hotels participating in STR in the Austin market includ

8

9      D.      Omni hotels participating in STR in the Austin market include

10

11     E.      Accor hotels participating in STR in the Austin market include

12

13     218.    The metropolitan area around **Boston, Massachusetts** constitutes a relevant

14  geographic market. Multiple Hotel Operators have branded luxury hotels in that metropolitan

15  market that participate in the STR information exchange. In total, STR identified in discovery

16  approximately ▮ hotels in the Boston Metropolitan Market participating in STR as of July 2024.

17  Examples of Defendant Hotels in the Boston Metropolitan market participating in STR include

18  the following:

19     A.      Marriott hotels participating in STR in the Boston market include

20

21     B.      IHG hotels participating in STR in the Boston market include

22

23     C.      Accor hotels participating in STR in the Boston market include

24

25

26

---

27  [145] STR produced information identifying all hotels in the upper midscale, upscale, upper
    upscale, and luxury class tiers participating in STR between January 2024 and July 2024 in the

28  Luxury Hotel Markets.



**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

      D.       Langham hotels participating in STR in the Boston market include ██

219.    The metropolitan area around **Chicago, Illinois** constitutes a relevant geographic market. Multiple Hotel Operators have branded luxury hotels in that metropolitan market that participate in the STR information exchange. In total, STR identified in discovery approximately ██ hotels in the Chicago Metropolitan Market participating in STR as of July 2024. Examples of Defendant Hotels in the Chicago Metropolitan market participating in STR include the following:

      A.       Marriott hotels participating in STR in the Chicago market include ██

      B.       Hyatt hotels participating in STR in the Chicago market include ██

      C.       IHG hotels participating in STR in the Chicago market include ██.

      D.       Accor hotels participating in STR in the Chicago market include ██

      E.       Loews hotels participating in STR in the Chicago market include ██

      F.       Langham hotels participating in STR in the Chicago market include ██

220.    The metropolitan area around **Denver, Colorado** constitutes a relevant geographic market. Multiple Hotel Operators have branded luxury hotels in that metropolitan market that participate in the STR information exchange. In total, STR identified in discovery approximately ██ hotels in the Denver Metropolitan Market participating in STR as of July 2024. Examples of Defendant Hotels in the Denver Metropolitan market participating in STR include the following:

      A.       Marriott hotels participating in STR in the Denver market include ██

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

1          B.          Hyatt hotels participating in STR in the Denver market include ███

2    ███████

3          221.    The metropolitan area around **Kansas City, Missouri** constitutes a relevant

4    geographic market. Multiple Hotel Operators, including Marriott, Hilton, Hyatt, IHG, Accor, and

5    Loews have branded luxury hotels in that metropolitan market. In total, STR identified in

6    discovery approximately ███ hotels in the Kansas City Metropolitan Market participating in STR

7    as of July 2024. Examples of Defendant Hotels in the Kansas City Metropolitan market

8    participating in STR include the following:

9          A.          IHG hotels participating in STR in the Kansas City market include

10   ██████████████

11         B.          Loews hotels participating in STR in the Kansas City market include

12   █████████.

13         222.    The metropolitan area around **Los Angeles, California** constitutes a relevant

14   geographic market. Multiple Hotel Operators have branded luxury hotels in that metropolitan

15   market that participate in the STR information exchange. In total, STR identified in discovery

16   approximately ███ hotels in the Los Angeles Metropolitan Market participating in STR as of July

17   2024. Examples of Defendant Hotels in the Los Angeles Metropolitan market participating in

18   STR include the following:

19         A.          Marriott hotels participating in STR in the Los Angeles market include ███

20   ████████████████████████████████

21   ████████████████████████████████

22   ██████

23         B.          Hyatt hotels participating in STR in the Los Angeles market include ███

24   ████████

25         C.          IHG hotels participating in STR in the Los Angeles market include

26   ███████████

27

28

FIRST AMENDED CLASS ACTION COMPLAINT - 74
011190-11/3301271 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

D.    Accor hotels participating in STR in the Los Angeles market include

E.    Loews hotels participating in STR in the Los Angeles market include

F.    Langham hotels participating in STR in the Los Angeles market include

223.    The metropolitan area around **Miami, Florida** constitutes a relevant geographic market. Multiple Hotel Operators have branded luxury hotels in that metropolitan market that participate in the STR information exchange. In total, STR identified in discovery approximately ▮ hotels in the Miami Luxury Hotel Market participating in STR as of July 2024. Examples of Defendant Hotels in the Miami Luxury Hotel market participating in STR include the following:

A.    Marriott hotels participating in STR in the Miami market include

B.    IHG hotels participating in STR in the Miami market include

C.    Loews hotels participating in STR in the Miami market include

224.    The metropolitan area around **Nashville, Tennessee** constitutes a relevant geographic market. Multiple Hotel Operators have branded luxury hotels in that metropolitan market that participate in the STR information exchange. In total, STR identified in discovery approximately ▮ hotels in the Nashville Luxury Hotel Market participating in STR as of July 2024. Examples of Defendant Hotels in the Nashville Luxury Hotel market participating in STR include the following:

A.    Marriott hotels participating in STR in the Nashville market include

FIRST AMENDED CLASS ACTION COMPLAINT - 75
011190-11/3301271 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

B.    Hyatt hotels participating in STR in the Nashville market include ███

███████

C.    Loews hotels participating in STR in the Nashville market include ███

███████

225.    The metropolitan area around **New York, New York** constitutes a relevant geographic market. Multiple Hotel Operators have branded luxury hotels in that metropolitan market that participate in the STR information exchange. In total, STR identified in discovery approximately ███ otels in the New York Luxury Hotel Market participating in STR as of July 2024. Examples of Defendant Hotels in the New York Luxury Hotel market participating in STR include the following:

A.    Marriott hotels participating in STR in the New York market include ███

████████████████████

████████████████████████████

███████

B.    Hyatt hotels participating in STR in the New York market include ███

███████████

C.    IHG hotels participating in STR in the New York market include

████████████████████████

██

D.    Accor hotels participating in STR in the New York market include ███

██████████████

E.    Langham hotels participating in STR in the New York market include ███

██████████

F.    Loews hotels participating in STR in the New York market include ███

███████

226.    The metropolitan area around **Phoenix, Arizona** constitutes a relevant geographic market. Multiple Hotel Operators have branded luxury hotels in that metropolitan market that participate in the STR information exchange. In total, STR identified in discovery approximately

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    ▮ hotels in the Phoenix Metropolitan Market participating in STR as of July 2024. Examples of

2    Defendant Hotels in the Phoenix Metropolitan market participating in STR include the following:

3          A.    Marriott hotels participating in STR in the Phoenix market include ▮

4    ▮

5    ▮

6          B.    Hyatt hotels participating in STR in the Phoenix market include ▮

7    ▮.

8          C.    Accor hotels participating in STR in the Phoenix market include ▮

9    ▮

10    227.    The metropolitan area around **Portland, Oregon** constitutes a relevant geographic

11    market. Multiple Hotel Operators have branded luxury hotels in that metropolitan market that

12    participate in the STR information exchange. In total, STR identified in discovery approximately

13    ▮ hotels in the Portland Metropolitan Market participating in STR as of July 2024. Examples of

14    Defendant Hotels in the Portland Metropolitan market participating in STR include the following:

15          A.    Marriott hotels participating in STR in the Portland market include ▮

16    ▮

17          B.    Hyatt hotels participating in STR in the Portland market include ▮

18    ▮

19          C.    Hilton hotels participating in STR in the Portland market include ▮

20    ▮

21          D.    IHG hotels participating in STR in the Portland market include ▮

22    ▮

23    228.    The metropolitan area around **San Diego, California** constitutes a relevant

24    geographic market. Multiple Hotel Operators have branded luxury hotels in that metropolitan

25    market that participate in the STR information exchange. In total, STR identified in discovery

26    approximately ▮ hotels in the San Diego Metropolitan Market participating in STR as of July

27    2024. Examples of Defendant Hotels in the San Diego Metropolitan market participating in STR

28    include the following:

FIRST AMENDED CLASS ACTION COMPLAINT - 77
011190-11/3301271 V1

1  A.  Hyatt hotels participating in STR in the San Diego market include
2  ██████████████████████████████████
3  █████████.

4  B.  IHG hotels participating in STR in the San Diego market include
5  ███████████████

6  C.  Loews hotels participating in STR in the San Diego market include
7  █████████████

8  D.  Accor hotels participating in STR in the San Diego market include
9  ██████████████

10  229.  The metropolitan area around **San Francisco, California** constitutes a relevant
11  geographic market. Multiple Hotel Operators have branded luxury hotels in that metropolitan
12  market that participate in the STR information exchange. In total, STR identified in discovery
13  approximately ███ hotels in the San Francisco Metropolitan Market participating in STR as of
14  July 2024. Examples of Defendant Hotels in the San Francisco Metropolitan market participating
15  in STR include the following:

16  A.  Marriott hotels participating in STR in the San Francisco market include
17  ███████████████████████████████████
18  ██████████████████████████████
19  █████████

20  B.  Hyatt hotels participating in STR in the San Francisco market include
21  ████████████████████.

22  C.  IHG hotels participating in STR in the San Francisco market include
23  ████████████████████████████
24  ███████.

25  D.  Accor hotels participating in STR in the San Francisco market include
26  ████████████████████████████████.

27  230.  The metropolitan area around **Seattle, Washington** constitutes a relevant
28  geographic market. Multiple Hotel Operators have branded luxury hotels in that metropolitan

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

1  market that participate in the STR information exchange. In total, STR identified in discovery

2  approximately ▉ hotels in the Seattle Metropolitan Market participating in STR as of July 2024.

3  Examples of Defendant Hotels in the Seattle Metropolitan market participating in STR include the

4  following:

5          A.     Marriott hotels participating in STR in the Seattle market include ▉

6  ▉

7          B.     Hyatt hotels participating in STR in the Seattle market include ▉

8  ▉

9          C.     Accor hotels participating in STR in the Seattle market include ▉

10  ▉.

11          D.     IHG hotels participating in STR in the Seattle market include ▉

12  ▉

13          231.    The metropolitan area around **Washington, D.C.** constitutes a relevant geographic

14  market. Multiple Hotel Operators have branded luxury hotels in that metropolitan market that

15  participate in the STR information exchange. In total, STR identified in discovery approximately

16  ▉ hotels in the Washington D.C. Metropolitan Market participating in STR as of July 2024.

17  Examples of Defendant Hotels in the Washington D.C. Metropolitan Market participating in STR

18  include the following:

19          A.     Marriott hotels participating in STR in the Washington market include ▉

20  ▉

21  ▉

22  ▉

23          B.     Hyatt hotels participating in STR in the Washington market include ▉

24  ▉.

25          C.     IHG hotels participating in STR in the Washington market include

26  ▉

27  ▉

28



**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

D.    Accor hotels participating in STR in the Washington market include

███████████████████████████████████████████████

████████ .

**3.    The Luxury Hotel Metropolitan Markets constitute the relevant antitrust markets.**

232.    The Luxury Hotel Metropolitan Markets satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

233.    Here, the SSNIP test is satisfied. Using publicly available data on hotel room rates in the Luxury Hotel Metropolitan Markets, the price gap between luxury hotels compared to midscale and economy ranges from as high as 47% in San Diego to 9% (at its lowest) in Portland.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX



234.    Indeed, as shown in the graph below, the pricing differences between luxury hotels and economy hotels is, on average, over 40% across the nation. This stark difference in the average prices demonstrates that hotel operators in the luxury hotels rental market can increase prices by a SSIP without losing sufficient sales to render the increase unprofitable. The luxury hotels rental market is thus properly defined.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX



4.    **Defendant and Conspirator Hotel Operators collectively possess market power in the Luxury Hotel Metropolitan Markets**

235.    Defendant Hotel Operators and their conspirators are able to collectively exercise market power in the Luxury Hotel Metropolitan Markets. As set forth in Appendix A, Hotel Operators collectively possess market power in the Luxury Hotel Metropolitan Markets. They possess an average market share of 70% across all 15 metropolitan areas. In every single one of these markets, Hotel Operators' market share is no less than 50%.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1
2
3
4
5
6
7
8
9
10
11
12
13



14    236.    Plaintiffs also analyzed market share in the relevant luxury hotel markets using

15  discovery materials identifying STR participants.[146] That analysis shows that hotels participating

16  in STR accounted for 79 percent of the total market share. This dominant share shows that STR

17  functioned not as an ancillary service, but as the backbone of information exchange, channeling

18  competitively sensitive data across nearly the entire market.

19
20
21
22
23
24
25
26

---

27    [146] STR produced a file showing all hotels participating in STR in the metropolitan markets in
certain status tiers. This included hotels participating in STR that have not been named, to date, as
28  Defendants.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2

3

4

5

6

7

8

9

10

11

12

13



14    **V.    CLASS ACTION ALLEGATIONS**

15    237.    Plaintiffs bring this action on behalf of themselves, and as a class action under the

16    Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking compensatory damages

17    and injunctive relief pursuant to federal law on behalf of the members of the following class:

18    All persons that have been direct purchasers of hotel guest room
rentals from Defendants or co-conspirators in the Luxury Hotel
19    Metropolitan Markets during the Class Period of February 20, 2020,
through the Present. Specifically excluded from this Class are the
20    Defendants and co-conspirators; the officers, directors or employees
of any Defendant or co-conspirator; any entity in which any
21    Defendant or co-conspirator has a controlling interest; and any
affiliate, legal representative, heir or assign of any Defendant or co-
22    conspirator. Also excluded from this Class are any federal, state or
local governmental entities, any judicial officer presiding over this
23    action and the members of his/her immediate family and judicial
staff, any juror assigned to this action, and any co-conspirator
24    identified in this action.

25    238.    The Class is so numerous that joinder of all members in this action is

26    impracticable. There are tens of thousands if not hundreds of thousands of members in the

27    proposed Class.

28    239.    Plaintiffs' claims are typical of those of the Class.


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    240.    Plaintiffs and all members of the Class were all injured by the same unlawful

2    conduct, which resulted in all of them paying more for hotel rooms than they otherwise would

3    have in a competitive market.

4    241.    Plaintiffs will fairly and adequately protect and represent the interests of the Class.

5    The interests of the Plaintiffs are not antagonistic to the Class.

6    242.    Questions of law and fact common to the members of the Class will predominate

7    over questions, if any, that may be individual to individual class members since the Defendants

8    have acted and refused to act on grounds generally applicable to the Class.

9    243.    Questions of law and fact common to the Class include, but are not limited to:

10    A.    Whether Defendants and their co-conspirators engaged in an information

11         exchange agreement that reduced or suppressed competition in the Luxury

12         Hotel Metropolitan Markets;

13    B.    The identity of the participants of the alleged agreement;

14    C.    The duration of the agreement alleged herein and the acts performed by

15         Defendants and their co-conspirators in furtherance of the agreement;

16    D.    Whether the conduct of Defendants and their co-conspirators, as alleged in

17         this Complaint, caused injury to the property of the plaintiffs and the other

18         members of the Class;

19    E.    The effect of Defendants' alleged conspiracy on the prices of hotel guest

20         rooms sold in the Luxury Hotel Metropolitan Markets during the Class

21         Period; and

22    F.    The appropriate class-wide measure of damages.

23    244.    Plaintiffs are represented by counsel who are experienced and competent in the

24    prosecution of complex antitrust and unfair competition class actions.

25    245.    Class action treatment is the superior method for the fair and efficient adjudication

26    of the controversy in that, among other things, such treatment will permit many similarly situated

27    people to prosecute their common claims in a single forum simultaneously, efficiently, and

28    without the unnecessary duplication of effort and expense that numerous individual actions would

FIRST AMENDED CLASS ACTION COMPLAINT - 85
011190-11/3301271 V1

1    engender. The benefits of proceeding through the class mechanism, including providing injured

2    persons with a method of obtaining redress for claims that might not be practicable for them to

3    pursue individually, substantially outweigh any difficulties that may arise in the management of

4    this class action.

5    246.    Defendants have acted on grounds generally applicable to the Class, thereby

6    making final injunctive relief appropriate with respect to the Class as a whole.

## VI.    ANTITRUST INJURY

8    247.    Defendants' anticompetitive conduct had the following effects, among others:

9    A.    Price competition has been restrained or eliminated with respect to hotel

10    guest room rentals;

11    B.    The prices of hotel guest rooms have been fixed, raised, stabilized, or

12    maintained at artificially inflated levels as a result of the information

13    exchange;

14    C.    Direct purchasers of hotel guest room have been deprived of free and open

15    competition; and

16    D.    Direct purchasers of hotel guest room, including plaintiffs, paid artificially

17    inflated prices.

18    248.    Commonly used and well-accepted economic models can be used to measure both

19    the extent and the amount of the supra-competitive charge paid by the direct purchasers. Thus, the

20    economic harm to plaintiffs and the class members can be quantified.

21    249.    The purpose of the conspiratorial conduct of defendants and their co-conspirators

22    was to raise, fix, or maintain the price of hotel guest rooms and, as a direct and foreseeable result,

23    plaintiffs and the Class paid supra-competitive prices for hotel guest rooms during the Class

24    Period.

25    250.    By reason of the alleged violations of the antitrust laws, plaintiffs and the Class

26    have sustained injury to their property, having paid higher prices for hotel guest rooms than they

27    would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as

28    a result have suffered damages.

FIRST AMENDED CLASS ACTION COMPLAINT - 86
011190-11/3301271 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

251.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.    CAUSES OF ACTION

**FIRST CLAIM FOR RELIEF:**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT FOR**
**CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION**
**15 U.S.C. § 1**
**(On Behalf of Nationwide Class for Injunctive and**
**Equitable Relief and Damages)**

252.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

253.    Since at least February 2020, defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

254.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

255.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for hotel room prices in the Luxury Hotel Metropolitan Markets.

256.    The relevant product market is the Luxury Hotel Markets, and the relevant geographic markets are the metropolitan areas as defined above.

257.    Defendant Hotel Operators possess market power in the Relevant Markets. Defendant Hotel Operators and their co-conspirators controlled at least 70% percent of the Luxury Hotel Metropolitan Markets. Defendant Hotel Operators' collective market power includes the power to artificially inflate the prices for hotel rooms in the Relevant Market above competitive levels.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

258.    Defendants could impose an increase in the price of hotel rooms collectively without causing many consumers to switch their purchases to other hotels. The Luxury Hotel Market constitutes a unique product market.

259.    The information regularly exchanged by Defendants pursuant to the agreement has consisted of competitively sensitive and non-public information about current and forward-looking supply and pricing data.

260.    Defendants' regular information exchanges through STR reflected concerted action between horizontal competitors in the market for hotel rooms.

261.    Each Defendant Hotel Operator furnished competitively sensitive information to other Defendant Hotel Operators with the understanding that it would be reciprocated. STR enforced this understanding by requiring defendants to share data in order to receive comparable data.

262.    The agreement to regularly exchange detailed and non-public information about current supply and pricing suppressed competition between the Defendants. The information exchanges allowed Defendant Hotel Operators to compare their prices and occupancy with their competitors and to raise prices when they were lower than competitors.

263.    When Defendant Hotel Operators that are competing for the same consumers exchange competitive information like they do it here, it reduces the incentives to compete on price. Accordingly, Defendant Hotel Operators used the data obtained through STR to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the Luxury Hotel Metropolitan Markets. This strategic information was a material factor in Defendant Hotel Operators' decisions to inflate the prices that plaintiffs paid for hotel rooms during the Class Period.

264.    There are no procompetitive justifications for the Defendants' unlawful agreements to exchange timely, nonpublic data focused solely on price and supply, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.



1    265.    The information-exchange agreement has had the effect of inflating the prices of

2    hotel rooms during the Class Period.

3    266.    As a result of Defendants' unlawful conduct, plaintiffs and the members of the

4    Class have been harmed by being forced to pay inflated, supracompetitive prices for hotel rooms.

5    267.    Defendants' combination violates section 1 of the Sherman Act under either a

6    Quick Look or full Rule of Reason analysis.

7                                    **REQUEST FOR RELIEF**

8        WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly

9    situated, respectfully request judgment against Defendants as follows:

10       A.    The Court determine that this action may be maintained as a class action under

11   Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class

12   Representatives and their counsel of record as Class Counsel, and direct that notice of this action,

13   as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once

14   certified;

15       B.    The unlawful conduct, conspiracy, or combination alleged herein be adjudged and

16   decreed in violation of Section 1 of the Sherman Act;

17       C.    Plaintiffs and the Class recover damages, to the maximum extent allowed under

18   the applicable laws, and that joint and several judgments in favor of Plaintiffs and the members of

19   the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

20       D.    Defendants, their affiliates, successors, transferees, assignees and other officers,

21   directors, partners, agents, and employees thereof, and all other persons acting or claiming to act

22   on their behalf or in concert with them, be permanently enjoined and restrained from in any

23   manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged

24   herein, or from entering into any other conspiracy or combination having a similar purpose or

25   effect, and from adopting or following any practice, plan, program, or device having a similar

26   purpose or effect;

27

28

FIRST AMENDED CLASS ACTION COMPLAINT - 89
011190-11/3301271 V1

1    E.    Plaintiffs and the members of the Class be awarded pre- and post- judgment

2    interest as provided by law, and that such interest be awarded at the highest legal rate from and

3    after the date of service of this Complaint;

4    F.    Plaintiffs and the members of the Class recover their costs of suit, including

5    reasonable attorneys' fees, as provided by law; and

6    G.    Plaintiffs and the members of the Class have such other and further relief as the

7    case may require and the Court may deem just and proper.

8                            **JURY TRIAL DEMANDED**

9    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

10   Procedure, of all issues so triable.

11   DATED this 3rd day of October, 2025.       Respectfully submitted,

12                                              HAGENS BERMAN SOBOL SHAPIRO LLP

13
                                                */s/ Steve W. Berman*
14                                              Steve W. Berman (WSBA No. 12536)
                                                */s/ Theodore Wojcik*
15                                              Theodore Wojcik (WSBA No. 55553)
                                                */s/ Xiaoyi Fan*
16                                              Xiaoyi Fan (WSBA No. 56703)
17                                              1301 Second Avenue, Suite 2000
                                                Seattle, WA 98101
18                                              Telephone: (206) 623-7292
                                                Facsimile:  (206) 623-0594
19                                              Email: steve@hbsslaw.com
20                                              Email: tedw@hbsslaw.com
                                                Email: kellyf@hbsslaw.com
21
                                                Rio S. Pierce (*pro hac vice*)
22                                              HAGENS BERMAN SOBOL SHAPIRO LLP
                                                715 Hearst Avenue, Suite 300
23                                              Berkeley, CA 94710
                                                Telephone: (510) 725-3000
24                                              Facsimile:  (510) 725-3001
25                                              Email: riop@hbsslaw.com

26                                              *Attorneys for Plaintiffs*

27

28

FIRST AMENDED CLASS ACTION COMPLAINT - 90
011190-11/3301271 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on October 3, 2025, I caused the foregoing document to be served

3    upon counsel of record via ECF.

4

DATED: October 3, 2025

5                                                    /s/ *Steve W. Berman*
                                                     Steve W. Berman
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT - 91
011190-11/3301271 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

# Appendix A

# Defendants Market Share

## Aggregate for all 15 Cities



# Defendants Market Share



# Defendants Market Share



# Defendants Market Share



# Defendants Market Share



# Defendants Market Share



# Defendants Market Share



## Los Angeles

28%

72%

■ Defendant
■ Non-Defendant Luxury

# Defendants Market Share

## Miami



# Defendants Market Share

## Nashville



# Defendants Market Share

## New York



# Defendants Market Share



# Defendants Market Share



# Defendants Market Share

## San Diego



# Defendants Market Share

## San Francisco



- Defendant
- Non-Defendant Luxury

# Defendants Market Share

## Seattle



# Defendants Market Share

## Washington D.C.

